## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

_____

| | | |
|---|---|---|
| **Miranda Doxzon,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **Civil Action No:** |
| | : | |
| **Department of Human Services of the** | : | |
| **Commonwealth of Pennsylvania,** | : | |
| **Teresa D. Miller, in her official** | : | |
| **capacity as Secretary of the** | : | |
| **Department of Human Services and** | : | |
| **in her individual capacity, and Kevin** | : | |
| **Hancock, in his individual capacity,** | : | |
| | : | |
| **Defendants.** | : | |

_____

## COMPLAINT

Plaintiff Miranda Doxzon brings this action against Defendants
Department of Human Services of the Commonwealth of Pennsylvania
("DHS"), Teresa D. Miller, in her official capacity as Secretary of DHS and
in her individual capacity, and Kevin Hancock, DHS's Deputy Secretary for
the Office of Long-Term Living, in his individual capacity:

## INTRODUCTION

1.     Plaintiff Miranda Doxzon is a 21-year-old young woman from
Philadelphia County, Pennsylvania with physical disabilities requiring the

use of a wheelchair and mental health disabilities who is entitled to appropriate services provided by Defendants in the community.

2.     Although Ms. Doxzon was living in an apartment in the community with services funded by the Philadelphia Department of Human Services ("Philadelphia DHS") due to her status as a dependent youth, after she turned 21 years old in October 2019, she was no longer eligible for that funding from Philadelphia County.  Due to Defendants' failure to provide an appropriate transition between its child welfare system and its adult disability services system and to make community-based services available, Plaintiff was removed from her home in the community and sent to live in a large nursing facility, where she has little, if any, access to community and social activities, including shopping, visiting with friends, and other community activities.  Ms. Doxzon is also now unable to seek treatment from her own doctors.  She receives no job training or other services aimed at teaching her life skills needed for community living.

3.     In the nursing facility, Ms. Doxzon feels as if she is in jail, does not feel safe, and has no privacy.

4.     Defendants' have and continue to deprive Ms. Doxzon of the ability to live in the community and to participate in community life.

2

5.      Defendants' actions and/or inactions violate Title XIX of the Social Security Act ("Title XIX"), Title II of the Americans with Disabilities Act ("ADA"), and Section 504 of the Rehabilitation Act ("RA").

6.      Due to Defendants' unlawful actions and/or inactions, Ms. Doxzon remains unnecessarily institutionalized, which has subjected her and continues to subject her to segregation, isolation, and discrimination, and has caused her to suffer and to continue to suffer from, *inter alia*, anxiety, depression, fear, emotional distress, mental anguish, embarrassment, and humiliation.

7.      Ms. Doxzon brings this action to compel Defendants' to provide her with appropriate residential services in the community as required by law and to redress the harm she has suffered.

8.      Ms. Doxzon seeks declaratory and injunctive relief, as well as compensatory damages.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331, 1343(a)(3), and 1343(a)(4).

10.      Venue is proper in the Middle District of Pennsylvania pursuant to 28 U.S.C. § 1391(b) because Defendants reside in this district.

## PARTIES

11.    Plaintiff Miranda Doxzon, is a 21-year-old young woman from Philadelphia, Pennsylvania who has multiple disabilities, including cerebral palsy, epilepsy, and depression.

12.    Defendant Department of Human Services of the Commonwealth of Pennsylvania ("DHS") is the single state agency responsible for implementing Pennsylvania's Medical Assistance Program,including the home and community-based waiver services provided to individuals with disabilities.  42 U.S.C. § 1396a(a)(5); 55 Pa. Code § 101.1(e).  DHS is also responsible to provide oversight and funding to the county child welfare agencies and ensure transition planning for youth with disabilities aging out of the child welfare system. 42 U.S.C. § 671(a)(2) and 675(5)(H); 55 PA Code § 3130.12(b); and Pa. R. Juv. Ct. Proc. 1631(E).

13.    Defendant Miller is the Secretary of DHS.  Defendant Miller is responsible to ensure that Pennsylvania's Medical Assistance program is operated in compliance with federal law and that the county child welfare systems comply with state and federal laws.  Defendant Miller is sued in her official capacity and in her individual capacity for actions and omissions under color of state law.

14.     Defendant Kevin Hancock is the Deputy Secretary for the Office of Long-Term Living within DHS, which is responsible for the administration of institutional and community-based health services to adults with physical disabilities. He is sued in his individual capacity for actions and omissions under color of state law.

## FACTUAL BACKGROUND

**A.     After years of unnecessary institutionalization, Ms. Doxzon thrives in a community home before being unlawfully and unnecessarily re-institutionalized by Defendants.**

15.     Due to her cerebral palsy, Ms. Doxzon uses a wheelchair for mobility and needs assistance with activities of daily living, such as transferring to the toilet and shower and to her bed, meal preparation, dressing, cleaning, transportation, and doing laundry.  In addition, Ms. Doxzon requires durable medical equipment, such as a Hoyer lift and shower chair.

16.     Due to her epilepsy, Ms. Doxzon occasionally has seizures requiring an aide to call 9-1-1 and to place her on her side until medical assistance arrives.

17.     Ms. Doxzon needs 24-hour aide services daily for assistance and safety, as well as habilitative services, which are health care services

and devices that help a person keep, learn, or improve skills and functioning for daily living, and behavioral/mental health services.

18.   Ms. Doxzon does not have intensive medical needs and does not need shift nursing care.

19.   Ms. Doxzon needs a community home that is wheelchair accessible.

20.   In November 2011, when she was just 13 years old, Ms. Doxzon was adjudicated to be a dependent child and was placed in the custody of Philadelphia DHS.

21.   Despite being appropriate for placement in the community with appropriate services, from 2011 to 2018, Ms. Doxzon was instead shuffled between various institutional settings, including behavioral health facilities, hospitals, and large group homes.

22.   For approximately five years, Ms. Doxzon was forced to live at Woods Services, which is a large, segregated, institutional setting in Bucks County, Pennsylvania that houses individuals with severe developmental and intellectual disabilities, many of whom are non-verbal.

23.   Ms. Doxzon does not have a severe developmental or intellectual disability.  Ms. Doxzon is not non-verbal.

24.    As a teenager, Ms. Doxzon was not permitted to visit with friends outside of the institutions, to have or attend birthday parties or other celebratory occasions with her friends and other social gatherings, to develop hobbies in the community or otherwise participate regularly in community life.

25.    On April 5, 2018, after years of unlawful institutionalization, Ms. Doxzon filed a lawsuit against Philadelphia DHS in the United States District Court for the Eastern District of Pennsylvania, docketed at Civ. A. No. 18-1440, alleging that Philadelphia DHS's failure to provide her with appropriate residential and non-residential supports and services in the community violated federal law.

26.    Shortly after filing the lawsuit, Philadelphia DHS agreed to provide Ms. Doxzon with an apartment in the community and necessary services, including 24-hour staff care with two staff at all times.  In addition, Defendants' MA program provided her with home and community-based mental health services and necessary equipment, including a wheelchair, a shower chair, and an electric Hoyer lift.

27.    Ms. Doxzon began living in her apartment on June 7, 2018, and for the first time in years, she was comfortable with her living situation and her caretakers.

28.    While living in her apartment, Ms. Doxzon was able to go shopping, visit with friends, go to her own doctors, go to school, go to church, and participate in other community activities.

29.    Philadelphia DHS was responsible for continuing to pay for Ms. Doxzon's apartment until she turned 21 on October 29, 2019.

30.    Ms. Doxzon consistently told Philadelphia DHS staff and anyone who asked that she wanted to continue to live in the community after her discharge from Philadelphia DHS custody.

31.    Defendants' failed to provide appropriate transition services to Ms. Doxzon to ensure that she could continue to receive services in her apartment or to identify another location in the community where she could be provided all the services she needs to live in the community.

32.    Defendants' failed to make available any community-based options in which Ms. Doxzon could receive services.

33.    On October 29, 2019, Disability Rights Pennsylvania emailed a letter to DHS requesting "immediate assistance in ensuring [Ms. Doxzon's] continued placement in the community when Philadelphia DHS loses custody of her" and alerting Defendants that Ms. Doxzon's legal right to community placement was in imminent jeopardy.  Defendants failed to ensure her continued placement in the community.

8

34.    Instead, on December 18, 2019, just a few days before the Christmas holiday, Ms. Doxzon was abruptly removed from her apartment and taken to Inglis House, which is a specialized skilled nursing, long-term care facility housing more than 252 residents, all of whom use wheelchairs, who range in age from 20 to 90, with an average age of 47.

35.    At Inglis House, Ms. Doxzon is unlawfully isolated and segregated as she can interact only with other people with mobility disabilities.

36.    After arriving at Inglis House, Ms. Doxzon became depressed and she even reported thoughts of suicidal ideation.  She is distraught over being in an institution again.

37.    Ms. Doxzon is unable to leave the nursing facility without permission and staff have placed an alarm device on her wheelchair that goes off if she gets near an entrance or exit.

38.    Ms. Doxzon's typical day consists of waking up, going to the dining hall for lunch and dinner, sitting in the lobby of the nursing facility for hours, and then bathing and going to sleep.

39.    Ms. Doxzon has no privacy.  At the nursing facility, Ms. Doxzon is required to keep her bedroom door open at all times.  She does not feel

9

safe as other residents come in and out of her room without permission and she has been threatened by at least one other resident.

40.   Ms. Doxzon does not have access to community transportation. She cannot attend church or visit with friends or family.  In January 2020, Ms. Doxzon was unable to attend her cousin's ninth birthday party because she had no transportation and no aide to accompany her.

41.   Ms. Doxzon was accepted into an employment training program at Children's Hospital of Philadelphia but has been unable to attend due to a lack of transportation and an aide to accompany her.

42.   Ms. Doxzon is not receiving services that expose her to unstructured community experiences.

43.   Ms. Doxzon has been told that she must use Inglis House's doctors and she can no longer treat with her current primary care doctors and specialists.

44.   Ms. Doxzon is essentially trapped.

45.   Ms. Doxzon is not eating well, and she was hospitalized for dehydration on January 10, 2020.

46.   On February 8, 2020, Ms. Doxzon was transported to the hospital emergency room after expressing suicidal ideation due to her continued nursing facility confinement.  Ms. Doxzon was returned to the

10

nursing facility the following day despite tearful pleading to be placed in the community.

47.    Ms. Doxzon does not belong in a nursing facility as she can live in the community with appropriate community supports and services. Indeed, she lived in an apartment in the community with supports and services from June 2018 until December 18, 2019.

**B.    Defendants are legally obligated to provide Ms. Doxzon with appropriate services in the community through their <u>Community HealthChoices Waiver program.</u>**

48.    Title XIX of the Social Security Act ("Title XIX"), 42 U.S.C. § 1396, *et seq.*, establishes the federal MA program.

49.    MA is a cost-sharing arrangement under which the federal government reimburses more than 50% of the expenditures incurred by states that elect to furnish MA to individuals whose income and resources are insufficient to cover the costs of their medical care.

50.    The purpose of the MA program is to provide medical services to eligible individuals, including services to help such individuals "attain or retain capability for independence or self-care ...."  42 U.S.C. § 1396-1.

51.    States are not required to participate in the MA program, but, if they choose to do so, they must comply with federal MA laws and regulations.

52.    Pennsylvania has chosen to participate in the MA program.

53.    Ms. Doxzon is qualified for MA services and is enrolled in Defendants' MA program.

54.    Title XIX delineates the types of medical services that either must or can, at the option of the state, be funded under a state's MA plan. *See* 42 U.S.C. § 1396d(a).  Services covered under the state plan must be provided to all eligible recipients who need them. 42 U.S.C. § 1396a(a)(10).

55.    In order to enable states to provide community-based services only to a select group of people who would otherwise require institutional placement without providing these services to others who may also need them, Title XIX permits a state to obtain home and community-based services ("HCBS") waivers from the federal Centers for Medicare and Medicaid Services ("CMS").  42 U.S.C. § 1396n(c)(1), (c)(4)(B), and (c)(5); 42 C.F.R. § 440.180.  HCBS waivers allow states to "waive" certain Title XIX requirements including the requirement that the state ensure that all eligible individuals have access to services in the same amount, duration, and scope, which is known as the "comparability" requirement. 42 U.S.C. § 1396n(c)(1) and (c)(3).  HCBS Waiver services approved by CMS constitute MA services under the state plan.  42 U.S.C. § 1396n(c)(1).

56.    Thus, an HCBS waiver gives the state the right to receive federal reimbursement when it provides services that otherwise could not be reimbursed under Title XIX or that the state would otherwise have to make available to every MA recipient in the state and, in return, the state agrees to provide those specified services in accordance with the terms of the HCBS waiver.

57.    Unless the federally approved waiver application has a cap on some or all covered services, an enrolled participant is entitled to receive all the covered services that he or she needs to live in the community.

58.    In sum, the purpose of Title XIX's home and community-based waivers is to encourage states to provide services to assist individuals with disabilities avoid institutionalization.  42 U.S.C. § 441.300.

59.    Defendant DHS has been granted several waivers from CMS to operate HCBS waiver programs, including a HCBS program it calls Community HealthChoices ("CHC").

60.    The CHC waiver is available to individuals who are at least 21 years old and have been determined to need the level of care offered in a nursing facility, but who wish to remain in the community.  Under the CHC waiver, enrollees are eligible for certain services that are not otherwise covered under the state plan.

61.     The CHC waiver program became operative in southeast

Pennsylvania in January 2019, combining and replacing several previously

existing HCBS waivers.

62.     After her 21st birthday, but before she was transferred to the

nursing facility, Ms. Doxzon was enrolled in Defendants' CHC waiver.

63.     Under the CHC waiver program, there is no cap on any of the

services needed by Ms. Doxzon.  Therefore, she is entitled to all

appropriate services.

**C.     Plaintiff is entitled to residential habilitation services, 24-
         hour-per-day aides, and home accessibility adaptations
         through Defendants' CHC waiver program, but Defendants
         <u>have failed to make them available.</u>**

64.     According to its federally approved HCBS waiver application,

the CHC waiver program provides, among other services, residential

habilitation in the form of up to 24 hours per day of assistance in a small

(one to eight-person) provider-operated residence in the community. *See*

CHC Approved Waiver Application (last amended January 1, 2020)

<http://www.healthchoices.pa.gov/cs/groups/webcontent/documents/docum

ent/c_293207.pdf> at pp. 67-68.

65.     Residential habilitation services are individually tailored

services designed to assist an individual in acquiring the basic skills

necessary to maximize independence in activities of daily living and to fully

14

participate in community life. Residential habilitation includes community

integration, personal assistance services, and night-time assistance. This

includes any necessary assistance in performing activities of daily living

(i.e., bathing, dressing, eating, mobility, and toileting) and instrumental

activities of daily living (i.e., cooking, housework, and shopping).

Transportation is provided as a component of the residential habilitation

service.  Staffing is permitted at the staff-to-individual ratio needed by the

individual, including 2:1.  CHC Approved Waiver Application (last amended

January 1, 2020)

<http://www.healthchoices.pa.gov/cs/groups/webcontent/documents/docum

ent/c_293207.pdf> at p. 92.

66.    Defendants' have failed to provide Ms. Doxzon with the

residential habilitation services to which she is entitled.

67.    Defendants' have developed, implemented, and enforced

policies and/or practices that create a lack of access to residential

habilitation services in the CHC waiver for people, like Ms. Doxzon, who

have physical disabilities, by, inter alia:

        a.    Deciding not to recruit and/or contract with a sufficient

number of residential habilitation providers to serve individuals with

physical disabilities either from among the hundreds of residential

habilitation providers enrolled in one of its other HCBS waivers or otherwise;

b.    Deciding not to offer providers of residential habilitation for CHC waiver enrollees an extra state-funded payment to cover the room and board costs (which are not federally reimbursable under Title XIX) even though DHS does just that for providers of residential habilitation services in another HCBS waiver; and

c.    Deciding to fund only a very limited number of residential habilitation programs in the CHC waiver serving primarily individuals with traumatic brain injuries, as opposed to individuals with physical disabilities such as cerebral palsy.

68.    Defendant Miller, Secretary of DHS, and Defendant Hancock, DHS's Deputy Secretary for the Office of Long-Term Living, were and are responsible for the administration of the CHC waiver.  Defendant Miller's and Hancock's policies and practices regarding the administration of the CHC waiver have resulted in the inability of Ms. Doxzon to access residential habilitation services and her unnecessary and unlawful institutionalization.

69.    Defendants' DHS, Miller, and Hancock knowingly, willingly, and with deliberate indifference to the consequences, administered and

continued DHS programs and policies that prevent Plaintiff and others with physical disabilities who need around-the-clock support from accessing residential habilitation services.

70.    Defendants knew that their policies would likely result in violations of MA recipients' legal rights to be served in integrated settings and to receive all covered waiver services, and to receive them with reasonable promptness.

**D.    Plaintiff is entitled to "specialized services," including community integration and habilitation, but Defendants <u>have failed to provide them.</u>**

71.    Under Title XIX, states are required to ensure that nursing facility residents with certain disabilities, including cerebral palsy, are assessed to determine their need for "specialized services" beyond what the nursing facility is required to provide.  42 U.S.C. § 1396r(e)(7).

72.    "Specialized services" are services that combined with the services provided by the nursing facility result in "active treatment" as defined in 42 C.F.R. § 483.440(a)(1).  42 C.F.R. 483.120(a)(2).

73.    "Active treatment," which is a form of habilitation, is "aggressive, consistent implementation of specialized and generic training, treatment, health services, and related services … directed toward -- (i) the acquisition of the behaviors necessary for the client to function with as

17

much self-determination and independence as possible; and (ii) the prevention or deceleration of regression or loss of current optimal functional status." 42 C.F.R. § 483.440(a)(1).

74.    For individuals with cerebral palsy, "specialized services" in Pennsylvania include, among other things, "Community Integration Activities," which "[e]xpos[e] residents to a wide variety of unstructured community experiences which they would encounter in the event that they must or choose to leave the nursing facilities or engage in activities away from the nursing facilities" and "[t]ransportation … necessary to participate in the above-specialized services." *See* PENNSYLVANIA PREADMISSION SCREENING RESIDENT REVIEW (PASRR) EVALUATION LEVEL II FORM (Revised 9/1/2018).

75.    If an individual requires specialized services while residing in the nursing facility, the state must provide or arrange for their provision. 42 C.F.R. § 483.116.

76.    If the resident does not need nursing facility services, she must be provided a safe discharge and the state must arrange for the needed specialized services in the community. 42 C.F.R. § 483.118(c)(2).

77.    Ms. Doxzon requires specialized services, including community integration activities, and can be served in the community.

18

78.    Defendant Miller has neither provided Ms. Doxzon with specialized services while residing at the nursing facility nor arranged for specialized services to be provided in the community.

**E.    Defendants are Required to Provide Ms. Doxzon with the Appropriate Services in the most integrated setting <u>appropriate to her needs, which is in the community.</u>**

79.    Defendants are required, under the ADA and the RA, to provide Ms. Doxzon services 'in the most integrated setting appropriate to [her] needs" (28 C.F.R. 35.130(d) and 28 C.F.R. §§ 41.51(d)), which is in the community.

80.    The "most integrated setting" is one that "enables individuals with disabilities to interact with nondisabled persons to the fullest extent possible. . ." 28 C.F.R. § Pt. 35, App. A (2010); *see* Statement of the Department of Justice on Enforcement of the Integration Mandate of Title II of the Americans with Disabilities Act and *Olmstead v. L.C.*, available at http://www.ada.gov/olmstead/q&a_olmstead.htm ("Integration Mandate").

81.    In upholding the Integration Mandate, the Supreme Court has held that unjustified isolation of people with disabilities is discrimination based on disability under Title II of the ADA. *Olmstead v. L.C.*, 527 U.S. 581, 597 (1999).  The Court emphasized that the unjustified isolation of individuals with disabilities "perpetuates unwarranted assumptions that

persons so isolated are incapable or unworthy of participating in community life" and that it "severely diminishes the everyday life activities of individuals including family relations, social contacts, work options, economic independence, educational advancement, and cultural enrichment." *Id.* at 600-01.

82.     In violation of this mandate, Defendants have unnecessarily institutionalized Plaintiff and have failed to provide her with appropriate services in the most integrated setting appropriate to her needs.

83.     Plaintiff wants to live in the community.

84.     With appropriate services and supports, Plaintiff has lived and could continue to live in the community.

85.     The community is the most integrated setting for the provision of services appropriate to Plaintiff's needs.

86.     Instead, due to Defendants' institutionalization of Plaintiff, she is being subject to the precise unjustified segregation and isolation that the Supreme Court held to be illegal under the ADA as she only has interaction with other people with mobility disabilities, she is unable to engage in community and social activities, including shopping, visiting with friends and family, and going to church, she is unable to treat with her own doctors and is being otherwise excluded from community life.

87.    Defendants' unnecessary and unlawful institutionalization of Plaintiff has caused her to suffer and to continue to suffer from, *inter alia*, anxiety, depression, fear, emotional distress, mental anguish, embarrassment, and humiliation.

**F.    Defendants have failed to provide a system for transition planning and continuity of care, resulting in the unnecessary and unlawful institutionalization of adults with disabilities aging out of the child welfare system.**

88.    Defendants are responsible for developing policies to ensure that adults with disabilities are being provided with the services to which they are entitled.

89.    In addition to Defendants' responsibility for the administration of adult disability services, Defendants DHS and Miller are also responsible for oversight and monitoring of the county child welfare system including the requirement for appropriate discharge planning. *See* 55 PA Code § 3130.12(b); 42 U.S.C. § 671(a)(2) and 675(5)(H); and PA Rule of Juvenile Court Procedure 1631E.

90.    On information and belief, Defendant DHS has failed to develop or implement an appropriate policy relating to the transition of dependent youth to the adult disability system.

91.     In 2013, however, Defendant DHS held stakeholders meetings related to, among other things, the transition of youth with disabilities from the child welfare system to the adult disability system.

92.     In 2014, recommendations were sent to Defendant DHS to address the problems encountered by dependent youth with disabilities transitioning from the child welfare to the adult disability services system.

93.     The recommendations included, among other things, identifying dependent youth who could be eligible for HCBS waivers at least two years ahead of their transition date, allowing overlap between waiver enrollment and child welfare custody and ensuring payment for services during the overlap period.

94.     Despite being fully aware of the problems created by the absence of policies to provide for the transition of dependent youth with disabilities who are aging out of the child welfare system, Defendant DHS chose not to implement the recommendations or to develop and implement any other policies to address transition-related issues impacting youth with disabilities like Ms. Doxzon and resulting in their unnecessary and unlawful institutionalization.

95.     Defendant DHS knew that there would be youth aging out of the child welfare system who would need a transition without gaps in

service to avoid institutionalization and that their deliberate failure to act would result in unnecessary and unlawful institutionalization.

96.     By choosing to limit the CHC waiver to participants over the age of 21, and by not assessing needs, authorizing, and assuring the availability of necessary community-based services *before* an MA beneficiary who has been dependent upon the child welfare system is discharged from and loses all supports from that system at age 21, Defendants are unable to provide the necessary CHC services with the reasonable promptness needed to avoid gaps in services and unnecessary institutionalization.

97.     Ms. Doxzon turned 21 on October 29, 2019.  She applied for enrollment in the CHC long before her birthday. The first time the CHC contacted Ms. Doxzon to arrange a date for an assessment of her service needs was on November 27, 2019.

98.     The only reason Ms. Doxzon was still living in the community at that time was because the juvenile court had taken the extraordinary step of extending its jurisdiction for a period of weeks beyond her 21st birthday.

99.     Ms. Doxzon was removed from her community home and placed in a nursing facility on December 18, 2019 because the CHC services necessary for her to remain in the community were not provided

23

with reasonable promptness or at all. Defendants knew that Ms. Doxzon

needed a wheelchair accessible place to live in the community with

guaranteed around-the-clock services as are provided through residential

habilitation yet failed to ensure that she had an appropriate transition plan

that could meet her needs, resulting in her unnecessary institutionalization.

100.   Defendant DHS knowingly, willingly, and with deliberate

indifference failed to develop policies to coordinate transition services

between its child welfare program and its adult disability programs,

resulting in Ms. Doxzon's unnecessary institutionalization.

## CAUSES OF ACTION

### Count I
### Violation of the Title II of the Americans With Disabilities Act ("ADA")
### Plaintiff Miranda Doxzon v. Defendant Miller, in her official capacity

101.   Paragraphs 1 through 100 are incorporated by reference as if

fully set forth herein.

102.   Plaintiff has cerebral palsy, a developmental impairment that

substantially limits one or more of her major life activities including, but not

limited to, walking and caring for herself and has been determined to be

eligible for, and in fact, has been enrolled in, Defendant's MA program

including her home and community-based services system.  As such,

24

Plaintiff is a qualified person with a disability protected by the ADA.  42 U.S.C. §§ 12102(1)(A), 12102(2)(A).

103.   Defendant DHS, administered by Defendant Miller, is a public entity subject to the requirements of Title II of the ADA.  42 U.S.C. § 12131(1)(B).

104.   Title II of the ADA requires a public entity to administer its services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities. 42 U.S.C. § 12132; 28 C.F.R. § 35.130(d).

105.   Plaintiff wants to live in the community.

106.   With appropriate services and supports, Plaintiff has lived and could continue to live in the community.

107.   The community is the most integrated setting for the provision of services appropriate to Plaintiff's needs.

108.   Plaintiff is unnecessarily institutionalized in a nursing facility due to Defendant's failure to provide her with community-based services and supports appropriate to meet her needs.

109.   By failing to plan for and provide Plaintiff with services and supports in the most integrated setting appropriate to her needs, Defendant Miller has and continues to discriminate against her in violation of the ADA

and its implementing regulations.  42 U.S.C. § 12132; 28 C.F.R. §
35.130(d).

110.  Defendant Miller has and continues to discriminate against
Plaintiff on the basis of her disability in violation of the ADA and its
implementing regulations by failing to make reasonable modifications to her
policies and practices that would afford Plaintiff access to services she
needs and is entitled to have to live in the community, including, *inter alia*,
the failure to  (a) ensure the availability of residential habilitation providers
sufficient in number and location, including paying for necessary room and
board costs as she does in another of her HCBS waivers; (b) develop a
system to ensure guaranteed home aides, and (c) develop a process for
timely approval and provision of home accessibility adaptations. 42 U.S.C.
§ 12132; 28 C.F.R. § 35.130(b)(7).

111.  Defendant Miller has and continues to discriminate against
Plaintiff on the basis of her disability in violation of the ADA and its
implementing regulations by using methods of administration that subject
Plaintiff to discrimination through unnecessary segregation, including, *inter
alia*, her failure to (a) ensure the availability of residential habilitation
providers sufficient in number and location including paying for necessary
room and board costs as she does in another of her HCBS waivers; (b)

develop a system to ensure guaranteed home aides; and (c) develop a process for timely approval and provision of home accessibility adaptations. 42 U.S.C. §§ 12132 and 28 C.F.R. §§ 35.130(b)(1), 35.130(b)(3).

**Count II**
**Violation of Section 504 of the Rehabilitation Act ("RA")**
**Plaintiff Miranda Doxzon v. Defendant DHS**

112.   Paragraphs 1 through 111 are incorporated by reference as if fully set forth herein.

113.   Plaintiff has cerebral palsy, a developmental impairment that substantially limits one or more of her major life activities including, but not limited to, walking and caring for herself, and has been determined to be eligible for, and in fact, has been enrolled in, Defendant's DHS MA program including its home and community-based services system.  As such, Plaintiff is a qualified person with a disability protected by RA.  29 U.S.C. § 705(20)(B).

114.   Defendant DHS is a recipient of federal financial assistance and, as such, is subject to the requirements of the RA.  29 U.S.C. § 794(b).

115.   Plaintiff is unnecessarily institutionalized in a nursing facility due to Defendant's DHS failure to provide her with community-based services and supports appropriate to meet her needs.

27

116.   By failing to plan for and provide Plaintiff with services and supports in the most integrated setting appropriate to her needs, Defendant DHS has and continues to discriminate against her in violation of the RA, 29 U.S.C. § 794 and its implementing regulations at 28 C.F.R. §§ 41.51(d).

117.   Defendant DHS has and continues to discriminate against Plaintiff on the basis of her disability in violation of the RA and its implementing regulations by using methods of administration that subject Plaintiff to discrimination through unnecessary segregation, including, *inter alia*, Defendants' failure to  (a) establish a process for the transition of youth from the child welfare system to the adult disability system without gaps in needed services; (b) ensure the availability of residential habilitation providers sufficient in number and location, including paying for necessary room and board costs as she does in another of her HCBS waivers; (c) develop a system to ensure guaranteed home aides to provide for Plaintiff's safety, and (d) develop a process for timely approval and provision of home accessibility adaptations. 29 U.S.C. § 794; 28 C.F.R. § 41.51(b)(3).

118.   Defendant DHS knowingly, willingly, and with deliberate indifference adopted, ratified, and/or implemented policies and practices

that caused Plaintiff to be unnecessarily institutionalized and that continue to preclude Plaintiff from promptly accessing community-based services.

119.   Defendant DHS actions and omissions violate Section 504 of the RA, 29 U.S.C. § 794, and its implementing regulations, 28 C.F.R. §§ 41.51(b)(3) and 41.51(d).

**Count III**
**Violation of Title XIX**
**Entitlement to appropriate HCBS waiver services**
**Plaintiff Miranda Doxzon v. Defendant Teresa Miller,**
**in her official capacity and in her individual capacity, and Defendant**
**Kevin Hancock, in his individual capacity**

120.   Paragraphs 1 through 119 are incorporated by reference as if fully set forth herein.

121.   Under Title XIX, states that participate in the MA program must make MA benefits available to eligible persons.  42 U.S.C. § 1396a(a)(10)(A).  This includes CHC waiver services. 42 U.S.C. § 1396n(c)(1).

122.   Plaintiff is eligible for and enrolled in the CHC HCBS waiver.

123.   The CHC-covered waiver services Plaintiff needs include, among other services, residential habilitation.

124.   Plaintiff has needed and, in fact, has been requesting such services to enable her to live in the community for years before her 21st

birthday and has continued to do so any time she has been provided with the opportunity.

125.   Since that time, by failing to provide the needed services, Defendants Miller and Hancock forced Plaintiff to live in a nursing facility where she remains.

126.   Defendants Miller and Hancock have failed to recruit residential habilitation providers, of which there are hundreds in one of DHS's other waivers, to serve individuals with physical disabilities in the CHC waiver.

127.   Defendants Miller and Hancock were and are responsible for the administration of the CHC waiver and have knowingly, willingly, and with deliberate indifference to the consequences, continued DHS policies that prevent Plaintiff from accessing residential habilitation services that would enable her to live safely in the community.

128.   Defendants Miller's and Hancock's actions and omissions under color of state law have precluded Plaintiffs from accessing covered HCBS services in violation of 42 U.S.C. §§ 1983 and 1396a(a)(10)(A).

**Count IV**
**Violation of Title XIX**
**Entitlement to Medical Assistance with Reasonable Promptness**
**Plaintiff Miranda Doxzon v. Defendant Teresa Miller,**
**in her official capacity and in her individual capacity, and Defendant**
**Hancock in his individual capacity**

129.  Paragraphs 1 through 128 are incorporated by reference as if fully set forth herein.

130.  Title XIX mandates that Medical Assistance shall be furnished with "reasonable promptness to all eligible individuals."  42 U.S.C. § 1396a(a)(8).

131.  Defendants Miller and Hancock must furnish Medical Assistance, including waiver services, promptly and without any delay caused by the agency's administrative procedures.  42 C.F.R. § 435.930(a).

132.  Plaintiff wants a home in the community with the supports that she needs and to which she is entitled under Title XIX.

133.  Defendant Miller has no continuity of care or other system in place to provide MA home and community-based services with reasonable promptness to young people aging out of the child welfare system to avoid gaps in services and unnecessary placement in nursing facilities.

134.   By choosing to limit the CHC waiver to participants over the age of 21, and by not assessing Plaintiff's needs and authorizing and assuring the availability of all necessary community-based services *before* her anticipated discharge at age 21 from the child welfare system upon which she was entirely dependent for her very survival, Defendants' failed to provide the necessary CHC services with reasonable promptness.

135.   Defendants Miller and Hancock failure to recruit and fund a sufficient number of residential habilitation providers that serve participants with physical disabilities creates unnecessary and unreasonable delays, at best, and a complete lack of access at worst.

136.   Defendants Miller and Hancock were and are responsible for the administration of the CHC waiver and Defendant Miller was and is responsible for oversight of the child welfare system, and both have knowingly, willingly, and with deliberate indifference to the consequences, continued  DHS policies that are delaying Plaintiff from accessing residential habilitation services that would enable her to live safely in the community.

137.   Defendants Miller's and Hancock's actions and omissions under color of state law that have caused delay in the ability of Plaintiff to

timely access community-based services violate 42 U.S.C. §§ 1983 and

1396a(a)(8).

**Count V
Violation of Title XIX
Right to Specialized Services
Plaintiff Miranda Doxzon v. Defendant Teresa Miller,
in her official capacity**

138.   Paragraphs 1 through 137 are incorporated by reference as if

fully set forth herein.

139.   Under Title XIX, States are required to ensure that nursing

facility residents with cerebral palsy are provided specialized services for

their disabilities beyond what the nursing facility is required to provide,

including community integration activities and transportation to such

activities.  42 U.S.C. § 1396r(e)(7), 42 C.F.R. § 483.116.

140.   Plaintiff is in need of specialized services that would enable her

to experience community activities while she is residing in the nursing

facility.

141.   Defendant Miller has failed to provide specialized services to

Plaintiff while she is residing in the nursing facility.

142.   If the nursing facility resident does not need nursing facility

services, she must be provided a safe discharge and the state must

arrange for the needed specialized services in the community. 42 C.F.R. §
483.118(c)(2).

143.  Plaintiff has and could continue live successfully in the
community with specialized services and supports.

144.  Defendant Miller has failed to provide plaintiff with a safe
discharge and specialized services in the community.

145.  Defendant Miller's actions and omissions violate 42 U.S.C. §§
1983 and 42 U.S.C. §1396r(e)(7).

**WHEREFORE**, Plaintiff Miranda Doxzon respectfully requests that
judgment be entered in her favor and against Defendants along with the
following relief:

a.     A declaration that Defendant Miller violates the Americans with
Disabilities Act, 42 U.S.C. §§ 12132; that Defendant DHS violates the
Rehabilitation Act, 29 U.S.C. § 794; and that Defendants Miller and
Hancock violate 42 U.S.C. § 1983 and Title XIX of the Social Security
Act, 42 U.S.C. § 1396a(a)(10)(A), 1396(a)(8), and 1396r(e)(7);

b.     An Order enjoining Defendants from continuing to violate 42
U.S.C. § 1983, Title XIX of the Social Security Act, 42
U.S.C. § 1396a(a)(10)(A), 1396(a)(8), and 1396r(e)(7), the Americans
with Disabilities Act, 42 U.S.C. §§ 12132, and the Rehabilitation Act, 29

U.S.C. § 794 and to compel Defendants to take all necessary steps to remedy their violations, including but not limited to, immediately providing Plaintiff with appropriate services in a wheelchair accessible and safe home in the community.

c.      An award of compensatory damages against Defendant DHS for violations of the Rehabilitation Act, 29 U.S.C. § 794;

d.      An award of compensatory damages against Defendants Miller and Hancock for violations of 42 U.S.C. § 1983 and Title XIX of the Social Security Act, 42 U.S.C. § 1396a(a)(10)(A) and 1396a(a)(8).

e.      An award of reasonable attorneys' fees, litigation expenses, and costs pursuant to 42 U.S.C. §§ 1988, 12205 and 29 U.S.C. § 794a(b);

f.      All such other, further and different relief as the Court may deem just and proper.

## **JURY DEMAND**

Miranda Doxzon demands a trial by jury for all claims at law.

Dated: February 10, 2020       By: _Rocco J. Iacullo IV_

Rocco J. Iacullo, IV (PA I.D. 86144)
Disability Rights Pennsylvania
1800 John F. Kennedy Boulevard,
Suite 900
Philadelphia, PA 19103-7421
(215) 238-8070
(215) 772-3126 (fax)
riacullo@disbilityrightspa.org

Attorney for Plaintiff

36