IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MIRANDA DOXZON, | : |
| | : |
| Plaintiff, | : |
| | : No. 1:20-CV-0236 |
| v. | : |
| | : |
| DEPARTMENT OF HUMAN SERVICES | : Jury Trial Demanded |
| OF THE COMMONWEALTH OF | : |
| PENNSYLVANIA; TERESA D. MILLER, in | : |
| her official capacity as Secretary of the | : Electronically Filed |
| Department of Human Services and in her | : Document |
| individual capacity; and KEVIN HANCOCK, | : |
| In his individual capacity, | : |
| | : |
| Defendants. | : |
| | : |

**PLAINTIFF'S REPLY IN SUPPORT OF HER**
**MOTION FOR A PRELIMINARY INJUNCTION**

Shanon S. Levin (PA ID 84040)
Brynne Madway (PA ID 316422)
Rachel Mann (PA ID 49267)
Disability Rights Pennsylvania
1800 John F. Kennedy Blvd.
Suite 900
Philadelphia, PA  19103-7421
215-238-8070
215-772-3126 (fax)
bmadway@disabilityrightspa.org

Counsel for Plaintiff

# **TABLE OF CONTENTS**

Table of Authorities.......................................................................................iii

Argument .................................................................................................. 1

    I.    Defendants' "Jurisdictional" Arguments Are
        Misguided Attacks on the Merits ................................................... 1

    II.   Plaintiff Readily Satisfies the Requirements
        for Preliminary Injunctive Relief................................................... 8

        A.   Plaintiff Is Likely to Succeed on the
            Merits of Her Federal Claims............................................... 8

            1.   Defendants' Challenges to Plaintiff's
                  ADA Claims Are Baseless............................................... 8

            2.   Defendants' Challenges to Plaintiff's
                  Medicaid Claims Are Baseless .................................... 12

                a.   The Federal Government's Did Not Waive
                      DHS's Obligation to Comply with The Entitlement
                      and Reasonable Promptness Mandates............... 12

                b.   DHS Is Not Relieved of Its Obligations
                      Under the Federal Medicaid Law
                      Because It Chose to Contract with MCOs.............. 13

                c.   The Failure to Include Residential
                      Habilitation in Plaintiff's Service Plan
                      Does Not Defeat Her Medicaid Claims .................. 17

                d.   Defendant Miller Can Be Sued in Her
                      Official Capacity for Injunctive Relief
                      Under Section 1983............................................... 30

            B.   Defendants' Arguments that Injunctive Relief Will
                Harm Plaintiff and the Public Are Specious........................ 31

Conclusion ................................................................................................ 34

## <u>TABLE OF AUTHORITIES</u>

### <u>Cases</u>

*A.H.R. v. Washington State Health Care Auth.*,
No. C15-5701JLR, 2016 WL 98513 (W.D. Wash.
Jan. 7, 2016)....................................................................................... 16

*Boulet v. Celluci*,
107 F. Supp. 2d 61 (D. Mass. 2000) ................................................ 27

*Carrasquillo v. DelBalso*,
No. 3:19-cv-0853, 2019 WL 7562729 (M.D. Pa.
Dec. 18, 2019), report and recommendation adopted,
2020 WL 201729 (M.D. Pa. Jan. 10, 2020)....................................... 31

*Cohen v. Chester County Dept' of Mental Health/Intellectual
Disabilities Services*,
No. 15-5285, 2016 WL 3031719 (E.D. Pa. May 24, 2016) ........... 2, 29

*Gonzalez v. Feinerman*,
663 F.3d 311 (7th Cir. 2011).............................................................. 31

*Grammer v. John A. Kane Regional Centers-Glen Hazel*,
570 F.3d 520 (3d Cir. 2009)................................................................. 5

*Growth Horizons, Inc. v. Delaware County*,
983 F.2d 1277 (3d Cir. 1993)............................................................... 2

*James v. Richman*,
547 F.3d 214 (3d Cir. 2008)............................................................... 33

*John B. v. Menke*,
176 F. Supp. 2d 786 (M.D. Tenn. 2001)............................................ 15

*Lee v. Pincus*,
No. 13-834-SLR, 2013 WL 6804640 (D. Del. Dec. 23, 2013)............. 7

*Murphy ex rel. Murphy v. Harpstead*,
421 F. Supp. 3d 695 (D. Minn. 2019) ................................................ 28

*Olmstead v. L.C.*,
    527 U.S. 581 (1999) ...................................................................... 8, 9

*Parkell v. Danberg*,
    833 F.3d 313 (3d Cir. 2016) ........................................................... 31

*Rodriguez v. City of New York*,
    197 F.3d 611 (2d Cir. 1999), cert. denied,
    531 U.S. 864 (2000) ........................................................................ 9

*Sabree v. Houstoun*,
    367 F.3d 180 (3d Cir. 2004) .............................................. 2, 5, 6, 7, 13

*Solter v. Health Partners of Philadelphia, Inc.*,
    215 F. Supp. 2d 533 (E.D. Pa. 2002) ................................. 3, 4, 5, 6, 7

*S.R. ex rel. Rosenbauer v. Pennsylvania Department
of Human Services*,
    309 F. Supp. 3d. 250 (M.D. Pa. 2018) ......................................... 2, 14

*Steimel v. Wernert*,
    823 F.3d 902 (7th Cir. 2016) ......................................................... 11

*Townsend v. Quasim*,
    328 F.3d 511 (9th Cir. 2003) ........................................................... 9

## Statutes and Regulations

42 U.S.C. § 1396a(a)(1) .................................................................. 13

42 U.S.C. § 1396a(a)(5) .................................................................. 13

42 U.S.C. § 1396a(a)(8) ........................................................... 5, 12, 13

42 U.S.C. § 1396a(10)(A) ........................................................ 5, 12, 13

42 U.S.C. § 1396a(10)(B) ............................................................... 13

42 U.S.C. § 1396a(a)(23) ................................................................ 13

42 U.S.C. § 1396n(b) ................................................................. 12

42 U.S.C. § 1396n(c) ................................................................. 12

42 U.S.C. § 1396n(c)(3) ............................................................. 13

42 U.S.C. § 1396r(7)(B)(ii)(II) .................................................... 10

42 U.S.C. § 1983 ............................................... 3, 5, 6, 7, 29, 32

42 C.F.R. § 438.206(a) .............................................................. 14

42 C.F.R. § 438.206(b) .............................................................. 14

42 C.F.R. § 483.102(b)(3)(ii) ..................................................... 11

42 C.F.R. § 483.112 ................................................................. 11

42 C.F.R. § 483.114 ................................................................. 11

42 C.F.R. § 483.120(b) ............................................................. 11

55 Pa. Code § 101.1(e) ............................................................. 13

## **Miscellaneous**

DHS, *Community HealthChoices Waiver*
(Jan. 1, 2020) ....................................... 4, 12, 13, 16, 19, 20, 21, 22, 28, 32

DHS, *Pennsylvania Preadmission Screening
Resident Review (PASRR) Evaluation Level II
Form* (Rev. Sept. 1, 2018) ..................................................... 11

DHS, *Proposal for Section 1915(b) Waiver MCO, PIHP,
and/or FFS Selective Contracting Programs* ...................................... 12, 13

Health Care Financing Admin., *Olmstead Update
No. 4* (Jan. 10, 2001) .......................................................... 27, 29

Plaintiff Miranda Doxzon, by and through her counsel, submits this Reply in further support of her Motion for a Preliminary Injunction.[1]  Defendants' opposition to Plaintiff's Motion is based on mischaracterization of the facts and misunderstanding of the law strung together in a smattering of scrambled and unsupported soundbites.  There simply is no sound factual or legal basis that warrants denial of Plaintiff's requested relief.

## ARGUMENT

### I.  DEFENDANTS' "JURISDICTIONAL" ARGUMENTS ARE MISGUIDED ATTACKS ON THE MERITS.

Defendants contend that this Court lacks subject matter jurisdiction to hear this case.  Defs.' Br. at 1-3.  Defendants' jurisdictional arguments are thinly-veiled attacks on the merits of Plaintiff's claims that she has been denied services to which she is entitled and discriminated against on the basis of her disability in violation of federal law.  Even if Defendants' attacks on the merits are legally valid – which they most assuredly are not – the Court cannot properly dismiss.  "'[D]ismissal for lack of jurisdiction is

---

[1] After Plaintiff filed the Motion for Preliminary Injunction in late April, she filed a Motion for a Temporary Restraining Order on July 1, 2020 (Doc. 36) after her situation deteriorated markedly placing her at risk of severe harm.  The Motion for a Temporary Restraining Order included the updated facts.  Plaintiff thus incorporates by reference her Motion for a Temporary Restraining Order and Exhibits (Docs. 36 through 36-3) into this Reply in support of her Motion for a Preliminary Injunction.

not appropriate merely because the legal theory alleged is probably false, but only because the right claimed is so insubstantial, implausible, foreclosed by prior decisions of this Court, or otherwise completely devoid of merit as not to involve a federal controversy.'" *Growth Horizons, Inc. v. Delaware County*, 983 F.2d 1277, 1280-81 (3d Cir. 1993) (citation omitted). This Court has already determined that Plaintiff is likely to succeed on the merits of her federal claims, Order Granting Temporary Restraining Order at 2 (July 1, 2020) (Doc. 37), so her claims cannot be so "devoid of merit as not to involve a federal controversy."

As an initial matter, Medicaid beneficiaries, including individuals enrolled in home and community-based services ("HCBS") waivers, routinely sue the Department of Human Services ("DHS") and its officials for failure to provide services to which they are entitled in violation of federal law. *See, e.g.*, *Sabree ex rel. Sabree v. Richman*, 367 F.3d 180, 193 (3d Cir. 2004) (permitting Plaintiffs to bring suit for failure to provide Medicaid services under 42 U.S.C. § 1983.) *S.R. ex rel. Rosenbauer v. Pennsylvania Department of Human Services*, 309 F. Supp. 3d. 250, 256 (M.D. Pa. 2018) (permitting class action against DHS for failure to provide Medicaid services under Section); *Cohen v. Chester Cty. Dep't of Mental Health/Intellectual Disabilities Servs.*, No. CV 15-5285, 2016 WL 3031719,

2

at *1 (E.D. Pa. May 25, 2016) (denying motion to dismiss where plaintiff brought claims for denial of waiver services); *Leonard v. Mackereth*, No. 1-7418, 2014 WL 512456, at *8 (E.D. Pa. Feb. 10, 2014) (granting summary judgment on claims against DHS "for failing to provide or ensure provision of [Medicaid] services to the plaintiffs").

Defendants cite *Solter v. Health Partners of Philadelphia, Inc.*, 215 F. Supp. 2d 533 (E.D. Pa. 2002), for the proposition that the Court lacks jurisdiction over Plaintiff's claims under Title XIX of the Social Security Act, the federal Medicaid statute.  Defs.' Br. at 2.  Defendants inaccurately construe *Solter* to mean that the only recourse for a Medicaid participant who is enrolled in a Medicaid managed care organization ("MCO") and is unable to access Medicaid services to which she is entitled is to file a lawsuit against the MCO in state court.  Thus, Defendants assert, Plaintiff cannot bring a federal lawsuit against the Secretary of DHS to enforce the federal Medicaid statute through 42 U.S.C. § 1983 ("Section 1983") to challenge her ongoing inability to obtain services to which she is entitled through DHS's Medicaid HCBS Waiver, Community HealthChoices.[2] Defendants' reliance on *Solter* is misplaced for multiple reasons.

---

[2] According to the approved Community HealthChoices waiver application submitted by DHS, the "CHC waiver is administered by the

3

First, the procedural posture of *Solter* differs significantly from this case.  In *Solter*, the plaintiffs brought entirely different claims against an entirely different defendant.  Unlike Plaintiff in this case, the *Solter* plaintiffs opted to sue a Medicaid MCO in state court bringing only state law claims. *Solter*, 215 F. Supp. 2d at 533-34.  The MCO removed the case to federal court, arguing that the standards for treatment are set by the federal Medicaid statute which can be enforced against the MCO via an implied private right of action over the removed state law claims.  Granting the plaintiffs' motion to remand to state court, the court held that there was no implied private right of action to enforce the Medicaid statute and, thus, no federal jurisdiction.  *Id.* at 537-540.  Where, as here, a plaintiff files a claim in federal court asserting a violation of the federal statute, then federal question jurisdiction exists.  Defendants cannot simply recast Plaintiff's claims.  "Subject-matter jurisdiction is determined by 'an examination of the face of the complaint.'"  *Marrero v. Brin*, 536 F. App'x 270, 272 (3d Cir. 2013) (quoting *Westmoreland Hosp. Ass'n v. Blue Cross of W. Pa.,* 605 F.2d 119, 123 (3d Cir.1979)).

---

Pennsylvania Department of Human Services (DHS), Office of Long-Term Living (OLTL), an office within the Single State Medicaid Agency." *Community HealthChoices Waiver* at 5 (Jan. 1, 2020), http://www.healthchoices.pa.gov/cs/groups/webcontent/documents/document/c_293207.pdf (Exh. A).

Second, *Solter* simply did not address the question of whether it would have had jurisdiction over a case filed by the plaintiffs in federal court to enforce the federal Medicaid statute, as Plaintiff has done here.  So, it cannot stand for the proposition that the court could not exercise subject matter jurisdiction over such a case.[3]

Finally, and perhaps most significantly, Defendants' reliance on *Solter* runs aground on the Third Circuit's subsequent decision in *Sabree*.  In that case, the Court unequivocally held that a Medicaid participant can enforce the entitlement provision, 42 U.S.C. § 1396a(a)(10), and the reasonable promptness provision, 42 U.S.C. § 1396a(a)(8), of the federal Medicaid statute through Section 1983.  *Sabree,* 367 F.3d at 189-94.[4]  This is

---

[3] Defendants' implicit argument that DHS cannot be liable to Plaintiff because it has been relieved of all responsibilities under the federal Medicaid Act – including ensuring that beneficiaries, like Plaintiff, timely receive services to which they are entitled – because it chose to enter into contracts with MCOs to arrange for such services has no legal basis.  *See* discussion, *infra*, at 13-17.

[4] The federal Medicaid statute has no provision for express enforcement. Absent such an express provision, it can be enforced in a lawsuit against a private actor (such as the MCO in *Solter*) only if there is an implied private right of action, but it can be enforced against a state actor (such as Defendant Miller in this case) if it enforceable pursuant to Section 1983.  "[T]he distinction between implied private rights of action and § 1983 private rights of action rests not in the articulation of rights, but in the availability of a remedy."  *Sabree,* 367 F.3d at 188 n.17; *accord Grammer v. John A. Kane Regional Centers-Glen Hazel*, 570 F.3d 520, 525 n.2 (3d Cir. 2009).

5

precisely what Plaintiff has done here.  In ruling that these provisions can be enforced through Section 1983, the Third Circuit expressly held – contrary to *Solter* – that the "text and structure" of the Medicaid statute evinced an unambiguous congressional intent to allow private enforcement of the statute's entitlement and reasonable promptness provisions through Section 1983.  *Id.* at 189-92.  In addition, the court rejected the argument that the Medicaid statute included any type of comprehensive remedial scheme that would evidence congressional intent to preclude enforcement. *Id.* at 193.  The court specifically concluded that the availability of state administrative fair hearings does not preclude enforcement of the Medicaid statute through Section 1983.  *Id.* at 193 & n.29.

The Third Circuit in *Sabree* held that the plaintiffs were entitled to enforce their Medicaid claims in federal court through Section 1983 and were not relegated to state administrative fair hearings.  There is no reason why the conclusion should be any different for Plaintiff in this case where she proceeds on precisely the same theory as the *Sabree* plaintiffs. Defendants cannot rely on *Solter*, which predates *Sabree* and used a slightly different standard, to conclude that the only remedy for Plaintiff is to

sue her MCO in state court.[5]  Defendants' argument in their Reply (as well as in their Trial Brief (Doc. 60 at pp. 3-4)) that Plaintiff has an "available state law remedy" ignores Third Circuit precedent that holds that any such remedies do not bar Plaintiff from private enforcement of the federal Medicaid claims she asserts.

Not content with attacking the Court's jurisdiction over Plaintiff's claims under the federal Medicaid statute, Defendants also contend that the Court lacks jurisdiction even over her claims under the Americans with Disabilities Act ("ADA") and Rehabilitation Act ("RA").  Defendants contend Plaintiff's claims do not arise under the ADA and RA because she "does not get to frame [her] own claims."  Defs.' Br. at 1, 2.  But, a plaintiff does have the right to state the claims she wishes to state.  *Cf. Lee v. Pincus,* No. 13-834-SLR, 2013 WL 6804640, at *2 (D. Del. Dec. 23, 2013) ("a defendant may not recast plaintiff's complaint as a securities fraud class action so as to have it preempted").  Whether those claims succeed or fail is a separate question, but a defendant cannot redline a plaintiff's complaint

---

[5] If *Sabree* held that the state fair hearing process for Medicaid violations was insufficient to preclude enforcement of the federal Medicaid statute through Section 1983, then the MCOs' private grievance processes, cited by *Solter*, which offer fewer protections than the state administrative fair hearing process, certainly cannot negate the plaintiffs' right to enforce the Medicaid statute through Section 1983.

to eliminate federal counts and then assert that there is no federal

jurisdiction.  Indeed, Defendants cite no relevant authority for their

extraordinary contention that they control Plaintiff's claims.[6]

## II.  PLAINTIFF READILY SATISFIES THE REQUIREMENTS FOR PRELIMINARY INJUNCTIVE RELIEF.

### A.  Plaintiff Is Likely to Succeed on the Merits of Her Federal Claims.

#### 1.  Defendants' Challenges to Plaintiff's ADA and RA Claims Are Baseless.

Defendants contend that Plaintiff is not likely to succeed on the merits

of her ADA and RA claims under the integration mandate.  Citing a footnote

in *Olmstead v. L.C.*, 527 U.S. 581, 603 n.14 (1999), Defendants assert that

the ADA does not "impose[] on States a standard of care for whatever

medical services they render, or … require[] States to provide a certain

level of benefits to individuals with disabilities."  Defs.' Br. at 4, 11-12.

Plaintiff's ADA and RA claims are based not on any particular standard of

care or level of services.  Rather they are based on the basic premise of

---

[6] Defendants' reliance on *Disability Rights New Jersey, Inc. v. Velez*, 796 F.3d 293 (3d Cir. 2015), Defs.' Br. at 1, 3, is unavailing. The court in that case upheld the entry of summary judgment against the plaintiff on its ADA and RA challenges to the forced administration of psychiatric medications in state hospitals. While the court found the merits of plaintiff's claims lacking, it nowhere suggested that the lack of merit equated with a lack of jurisdiction.

*Olmstead* that, under appropriate circumstances, a state must provide community placements as an alternative to institutional placements. *Id.* At 607.

While states are not required to fundamentally alter their service systems, that does not mean they cannot be required to make reasonable accommodations in order to provide community placements. As the Ninth Circuit opined:

> "[P]olicy choices that isolate the disabled cannot be upheld solely because offering integrated services would change the segregated way in which existing services are provided. *Olmstead* makes that clear, for precisely that alteration was at issue in *Olmstead,* and *Olmstead* did not regard the transfer of services to a community setting, without more, as a *fundamental* alteration. Indeed, such a broad reading of fundamental alteration regulation would render the protection against isolation of the disabled substanceless."

*Townsend v. Quasim***,** 328 F.3d 511, 518-519 (9th Cir. 2003).

Even the case cited by Defendants, *Rodriguez v. City of New York*, 197 F.3d 611 (2d Cir. 1999), *cert. denied*, 531 U.S. 864 (2000), Defs.' Br. at 12, interpreted *Olmstead*'s standard of care/level of benefits footnote much more narrowly than do Defendants. In that case, the plaintiffs wanted the state to provide a new Medicaid service – personal care services for safety monitoring. The court concluded that the plaintiffs were asking the state to provide a "certain level of benefits" to individuals with disabilities, which is

9

not required by the ADA, because the state is not required to provide "a new benefit." *Id.* at 619.[7]  Of course, residential habilitation is not a "new benefit."

Defendants further contend that to prove unlawful "discrimination" under the integration mandate, the Plaintiff must show that she is forced to choose between living in a nursing facility and living in the community in order to receive the service, *i.e.*, that she can only get the services she seeks if she enters a nursing home.  Defs.' Br. at 11-12.  In fact, this is exactly the situation here.  Due to Defendants' denial of community-based services, Plaintiff must enter a nursing facility to get the 24-hour services in a residential setting that she needs.  DHS's Medicaid program would pay for a nursing home would provide a roof over her head and personal assistance care the Medicaid statute would require DHS to assure that Plaintiff received with habilitation services in a nursing home, for instance,

---

[7] Defendants also cite *Disability Rights New Jersey, Inc.*, 796 F.3d at 306 n.5, to support their argument that Plaintiff cannot succeed on her integration mandate claim.  Defs.' Br. at 12.  *Disability Rights New Jersey, Inc.* involved a claim that the ADA requires states to seek judicial review before psychiatric patients are subject to forced medication – it was not an integration mandate claim, *Disability Rights New Jersey, Inc.*, 796 F.3d at 305 n.4, and thus has no relevance to this case.

to learn independent living skills.[8]  The integration mandate bars states

from forcing Plaintiff to enter a nursing home to receive those services,

especially when DHS's Medicaid program can provide Plaintiff with those

same services in a community-based setting through DHS's Community

HealthChoices Waiver.

Moreover, integration mandate cases can succeed even where the

issue is not whether the plaintiff can only receive services in an institutional

setting.  For instance, in *Steimel v. Wernert*, 823 F.3d 902, 908, 916 (7th

Cir. 2016), the court held that the plaintiffs were entitled to seek services

that would allow them to participate in (and thus be more integrated in) the

community, which certainly would not be services available in institutions.

---

[8] The Medicaid statute requires states to provide "specialized services" – including training to enable the individual to develop independent living skills and to prevent loss of skills – to nursing home residents who have intellectual disabilities (called "mental retardation" in the statute), which is defined to include "related conditions" such as cerebral palsy even if there is no co-occurring intellectual disability diagnosis.  *See* 42 U.S.C. § 1396r(e)(7)(B)(ii)(II); 42 C.F.R. §§ 483.102(b)(3)(ii) (incorporating definition of related conditions in 42 C.F.R. § 435.1010), 483.112, 483.114, 483.120(a)(2), 483.120(b); *see also* DHS, *Pennsylvania Preadmission Screening Resident Review (PASRR) Evaluation Level II Form* at 5-6, 8 (Rev. Sept. 1, 2018) (specialized services for persons with related conditions include community integration and life skills training), https://www.dhs.pa.gov/providers/Providers/Documents/PASRR/Level%20II%20PASRR%20Evaluation%20Form.pdf (Exh. B).

### 2.  Defendants' Challenges to Plaintiff's
### Medicaid Claims Are Baseless.

### a.  The Federal Government's Did Not Waive
### DHS's Obligation to Comply with The Entitlement
### and Reasonable Promptness Mandates.

In their Trial Brief (Doc. 60 at 1-3), Defendants assert that the federal

government, in approving DHS's request for a waiver under 42 U.S.C. §

1396n(b) for Community HealthChoices, authorized the waiver of the

entitlement mandate, 42 U.SC. § 1396a(a)(10)(A), and reasonable prompt-

ness mandate, 42 U.S.C. § 1396(a)(8).  This argument has no merit.

First, the services at issue in this case, including residential

habilitation, are covered by 42 U.S.C. § 1396n(c), which is an HCBS

waiver, not 42 U.S.C. § 1396n(b), which is a managed care waiver.[9]  DHS

neither requested nor received a federal waiver of the entitlement and

reasonable promptness mandate in its HCBS Waiver under Section

1396n(c).  *Community HealthChoices Waiver* at 6 (Exh. A).  Indeed, the

federal Medicaid statute does not authorize the federal government to

---

[9] Community HealthChoices consists of both a managed care and
HCBS Waivers, *See Community HealthChoices Waiver* at 4 (Exh. A), but
they are governed by different documents and subject to different
standards.  *Compare Community HealthChoices Waiver* (Exh. A) (HCBS
Waiver), *with Proposal for Section 1915(b) Waiver MCO, PIHP, and/or FFS
Selective Contracting Programs* (Managed Care Waiver) (Doc. 60-1).

waive those provisions.  *See* 42 U.S.C. § 1396n(c)(3) (listing provisions that can be waived in HCBS Waivers).

Second, DHS did not request, and the federal government thus did not approve, waivers of the entitlement and reasonable promptness mandates in its managed care waiver for Community HealthChoices.  The waiver proposal shows that DHS sought and received waivers only for the following provisions of the federal Medicaid statute – 42 U.S.C. §§ 1396a(a)(1) (statewideness), 1396a(a)(10)(B) (comparability), and 1396a(a)(23) (freedom of choice).  *Proposal for Section 1915(b) Waiver MCO, PIHP, and/or FFS Selective Contracting Programs* at 8 (Doc. 60-1). There is nothing in that waiver that relieves Defendants of their obligations to comply with the entitlement mandate, 42 U.S.C. § 1396a(a)(10)(A). and the reasonable promptness mandate, 42 U.S.C. § 1396a(a)(8).

### b.  DHS Is Not Relieved of Its Responsibilities Under the Federal Medicaid Law Because It Chose to Contract with MCOs.

DHS is the single state agency responsible to administer the federal Medicaid program.  42 U.S.C. § 1396a(a)(5); 55 Pa. Code § 101.1(e); *Community HealthChoices* Waiver at 23 (Exh. A).  When a state chooses to participate in the federal Medicaid program, it is responsible to ensure compliance with federal laws and regulations.  *See Sabree*, 367 F.3d at 182.  This would include compliance with the Medicaid statute's "entitle-

13

ment mandate" and "reasonable promptness" mandate," which apply to the Community HealthChoices Waiver and are at issue in this case. *See id.* at 180, 194; *S.R. ex rel. Rosenbauer*, 309 F. Supp. 3d. at 256; *see also* Pls.' Br. at 12-14 (discussing Plaintiff's Medicaid claims) (Doc. 18).

Yet, Defendants assert that DHS is magically relieved of these federal obligations to Community HealthChoices participants, like Plaintiff, simply because it has chosen to contract with MCOs to arrange for services. DHS cannot evade liability simply by delegating to MCOs some of the day-to-day tasks necessary to implement the Medicaid statute.[10]

Federal regulations explicitly affirm that states which provide Medicaid services through MCOs "must ensure that all services covered under the State plan are available and accessible to enrollees of MCOs …." 42 C.F.R. § 438.206(a). States also have the obligation to ensure that each MCO "maintains and monitors a network of appropriate providers" that "is sufficient to provide adequate access to all services covered under the contract for all enrollees …." 42 C.F.R. § 438.206(b). Thus, while a state may use MCOs to handle the day-to-day obligations, ultimate

---

[10] Defendants' suggestion that only the MCOs can be held accountable for the denial of Medicaid Waiver services to Plaintiff is contradicted by their assertion that "[f]ederal law designated the states as 'the dominant authority responsible for providing services to individuals with disabilities.'" Defs.' Br. at 3 (citation omitted).

responsibility to make sure that participants receive covered services remains with the state.  Defendants cannot excuse their failure to assure that Plaintiff had timely access to residential habilitation and other services by blaming the MCOs and cannot avoid liability under the federal Medicaid statute's entitlement and reasonable promptness mandates.

The courts also have soundly rejected the precise argument asserted by Defendants.  In holding that Tennessee could not avoid liability for failing to comply with the Medicaid statute's requirements to provide Early, Periodic, Screening, Diagnosis and Treatment ("EPSDT") services because services are provided through MCOs (called the "TennCare" system), the court in *John B. v. Menke*, 176 F. Supp. 2d 786 (M.D. Tenn. 2001), wrote:

> EPSDT cannot simply be relinquished to the MCOs as the State remains ultimately bound by the EPSDT regulations. ….
>
> Defendants disclaim responsibility for the ultimate provision of EPSDT-compliant services by a once-removed provider.  However, as stated by another court in the Medicaid context, "[t]he public policy implications of Defendants' position, if accepted, would be devastating.  It is patently unreasonable to presume that Congress would permit a state to disclaim federal responsibility by contracting away its obligations to a private entity.  *J.K. By and Through R.K. v. Dillenberg*, 836 F. Supp. 694, 699 (D. Ariz. 1999).  *Clearly, the failure of State contractors to follow the federal requirements does not relieve the State Defendants of their responsibilities.*

*Id.* at 800-01 (emphasis added; footnotes omitted).

15

Likewise, in *A.H.R. v. Washington State Health Care Auth.*, No. C15-5701JLR, 2016 WL 98513 (W.D. Wash. Jan. 7, 2016), plaintiffs sued the Washington Medicaid agency for failing to provide medically fragile children with round-the-clock skilled nursing care.  The state alleged that the MCOs with which it contracted to implement its Medicaid program were indispensable parties.  The court disagreed, writing:

> "Even if a state delegates the responsibility to provide treatment to other entities, such as local agencies or managed care organizations, the ultimate responsibility remains with the state."  …  It is [the state agency], not the MCOs, that bears the responsibility to ensure that the State Plan complies with federal law and that Plaintiffs received the required treatment.

*Id.*, at *7 (quoting *Katie A. ex rel. Ludin v. Los Angeles County*, 481 F.3d 1150, 1159 (9th Cir. 2007)).

Defendants' arguments that it has no responsibility for the actions and inactions of the MCOs with which it contracts to implement its Community HealthChoices Waiver is belied by its representations to the federal government that the Waiver is "administered by DHS, the Single State Medicaid Agency, and its Office of Long-Term Living."  *See Community HealthChoices Waiver* at 21-22, 23, 317 (Exh. A).

Thus, when Defendants assert that Plaintiff "is not receiving CHC services from PA DHS," Defs.' Br. at 2, 7, they are incorrect.  DHS

16

contracts with the MCOs which contract with providers to provide services under the Community HealthChoices Waiver, but it is DHS ultimately as the single state agency that has responsibility to comply with its federal responsibilities under the federal Medicaid statute.  If it chooses to delegate some of its activities, it can do so but it does not and cannot relinquish its federal responsibilities.

### c.  The Failure to Include Residential Habilitation in Plaintiff's Service Plan Does Not Defeat Her Medicaid Claims.

Defendants contend that because residential habilitation is not listed in Plaintiff's Person-Centered Services Plan ("PCSP") dated March 2, 2020 Plaintiff is not "eligible" for that service and, thus, cannot prevail on her claims that DHS violated the entitlement and reasonable promptness mandates of the federal Medicaid statute by failing to timely provide her with that service.  Defs.' Br. at 4, 13-14.  Since residential habilitation is not in Plaintiff's PCSP, Defendant exclaims that "[t]his ends the issue."  Defs.' Br. at 14.  It does not.  Defendants' argument is premised on a misunder-standing of Plaintiff's claims, mischaracterization of the facts, and an

alarming lack of familiarity both with how this system is supposed to work

and how it works in reality.[11]

 Initially, it must be stressed that, contrary to Defendants' assertion,

Plaintiff's preliminary injunction request is not limited to residential

habilitation services.  Plaintiff seeks all services available under the

Community HealthChoices Waiver which she needs and to which she is

entitled.  *See* Pls.' Br. at 8-9, 14-15 (Doc. 18).[12]

---

[11] Defendants seem to suggest that Ms. Doxzon, who is a young woman who spent her life in the child welfare system and has no family or support system to help her navigate the complex Medicaid system, must use precise magic words to make service requests and ensure that Defendants' MCO includes her requests in a specific document.  *See* Doxzon Decl. dated July 11, 2020 ¶¶ 4-5 (reflecting her understanding of the process) (Exh. H).  Defendant cites to no authority for such requirements.

[12] Defendants also contend that Plaintiffs cannot seek "housing" – outside of residential habilitation – through her Medicaid claims because "housing" is not a service under the Community HealthChoices Waiver. Defs.' Br. at 4, 14-15.  Plaintiff does not contend that the federal Medicaid Act requires Defendants to provide her with "housing" – only residential habilitation and other services available in the Waiver.  It should be recognized, however, that DHS has explained that "[h]ousing is one component of the Person-Centered Service Plan" and "Community HealthChoices MCOs are to have a 'housing coordinator" who is part of the Person-Centered Planning Team."  DHS, *Community HealthChoices Question and Answer Document: Service Coordination*, Question 23 (Rev. Dec. 2, 2019), http://www.healthchoices.pa.gov/cs/groups/webcontent/documents/docume nt/c_274784.pdf (Exh. C).  The service coordinators, too, have extensive duties to assist individuals, including those in nursing facilities as Plaintiff

In addition, the exclusion of residential habilitation from Plaintiff's PCSP reflects only that Defendants' system does not work as intended.  To understand this, here is a very brief summary of how the system should work to assure that a participant has access to the services he or she needs:

- Once enrolled in an MCO, a service coordinator conducts a "comprehensive needs assessment."  DHS, *Community Health-Choices Question and Answer Document: CHC Assessment Process*, Question 6 (Rev. Dec. 2, 2019), http://www.healthchoices.pa.gov/cs/groups/webcontent/docume nts/document/c_274784.pdf (Exh. D).

- The comprehensive needs assessment does not review the participant's need for any specific services available under the Community HealthChoices Waiver.  *See Community HealthChoices Waiver* at 247 (Exh. A).

_____

was, to find and secure housing and develop a housing support plan. *Community HealthChoices Waiver* at 19-20 (Exh. A).  Plaintiff has not been provided with the services of a housing coordinator nor has her service coordinator identified any community living options or referred her to anyone who could help her find housing.  *See* Doxzon Decl. dated July 11, 2020 ¶¶ 7-8 (Exh. H).

19

- Service coordinators usually are not health care professionals. *See Community HealthChoices Waiver* at 20 (Exh. A) (service coordinators can be registered nurses, people with bachelor's degrees in social work, psychology, or related experience or people who have three years of experience in a social service or health care setting).

- Based on the comprehensive needs assessment, there is a person-centered planning meeting with the service coordinator and the participant to develop the PCSP.  *Community HealthChoices Waiver* at 245 (Exh. A).

- The PSCP is a written description of participant-specific healthcare, long-term supports and services, and wellness goals to be achieved and identifies the type, scope, amount, duration, and frequency of the covered services to be provided to the participant.  The PSCP should consider the participant's unique medical and psychosocial needs and history and her functional level and support systems.  The PCSP process should address "the full array of medical and non-medical services needed by the [p]articipant provided by the CHC-MCO and available in the community to ensure the maximum degree

20

of integration and the best possible outcomes and participant

satisfaction." *Community HealthChoices Waiver* at 245, 248

(Exh. A).

- Before the PSCP meeting, the service coordinator is supposed

  to provide information to the participant so that she can make

  informed choices about services in order to develop an effective

  plan. This includes information about "the types of services

  available through the Waiver and other resources." *Community*

  *HealthChoices Waiver* at 245, 248 (Exh. A).

- The Person-Centered Planning Team should provide the

  participant with necessary supports to ensure that they are able

  to make informed choices and decisions. *Community*

  *HealthChoices Waiver* at 245 (Exh. A).

- The service coordinator is supposed to monitor the health,

  welfare, and safety of the participant and service plan imple-

  mentation through regular contacts with the participant and

  caregivers. *Community HealthChoices Waiver* at 19 (Exh. A).

- The service coordinator is supposed to arrange for

  modifications in services and service delivery if necessary to

address the needs of the participants. *Community*

*HealthChoices Waiver* at 19 (Exh. A).

▪ In addition to mandatory annual reviews of both the compre-

hensive assessments and the PCSPs, when there are "trigger

events" those documents must be reviewed and updated as

expeditiously as possible and, in no event, later than 14 days

after those events. Trigger events include hospitalization,

change in home setting, and change in caregiver or informal

supports. New assessments and PCSPs are also required

when a participant has an unmet needs or service gaps. *See*

*Community HealthChoices Waiver* at 247-48, 249-50 (Exh. A);

DHS, *Community HealthChoices Question and Answer*

*Document: CHC Assessment Process*, Questions 5, 12 (Rev.

Dec. 2, 2019),

http://www.healthchoices.pa.gov/cs/groups/webcontent/docume

nts/document/c_274784.pdf (Exh. D).

The facts reveal both the shortcomings of the system and how it

utterly failed Plaintiff.

▪ While Defendants suggest that the March 2, 2020 needs-based

assessment reflects a determination by health care profes-

sionals that Plaintiff did not need residential habilitation
services, it did no such thing.  Plaintiff did not receive any
assessment by a doctor that specifically addressed whether or
not she needed and was eligible for residential habilitation and,
indeed, no such assessment is required by DHS's Community
HealthChoices program.  *See* Doxzon Decl. dated July 11,
2020 ¶ 2 (Exh. H); discussion, *supra,* at 19-20.

- Plaintiff's service coordinator never reviewed the various
  services available under the Community HealthChoices Waiver
  or asked if she needed or wanted them, contrary to the
  system's requirements.  Doxzon Decl. dated July 11, 2020 ¶ 3
  (Exh. H); *see* discussion, *supra,* at 21.

- Plaintiff had conversations with her service coordinator about
  her needs.  Doxzon Decl. dated July 11, 2020 ¶ 4 (Exh. H);
  Keystone First Progress Notes at KFCHC000096, 105-106, 112
  (Exh. F).  But, as discussed, *infra*, at 23-25, the service
  coordinator did not assure that all services were included in
  Plaintiff's PCSP to address those needs.

- Plaintiff told her service coordinator that she wanted to live in
  an apartment in the community and even specifically requested

23

residential habilitation services.  *See* Doxzon Decl. dated July 11, 2020 ¶¶ 6,7 (Exh. H); Doxzon Decl. dated July 1, 2020 ¶ 6 (Exh. E); Doxzon Decl. dated Apr. 27, 2020 ¶ 49 (Doc. 18-3 at 9-10); Keystone First Progress Notes at KFCHC000105-06, 107 (Exh. F).

- On or about April 24, 2020, Plaintiff Doxzon also specifically asked her service coordinator to authorize Spectrum Community Services, Inc. (which had provided her with services and supports in a community apartment before she aged out of the child welfare system) to provide her with services through Community HealthChoices, but the service coordinator refused with no explanation.  Doxzon Decl. dated Apr. 27, 2020 ¶¶ 30-31 (Doc. 18-3 at 7); Keystone First Progress Notes at KFCHC000087 (Exh. F).

- On January 10, 2020, Plaintiff's representative also specifically asked for Plaintiff to be provided with residential habilitation services, but she initially was incorrectly told that the service was not available.  KFCHC000106, 107-08 (Exh. F).

- Despite these repeated requests for residential services and the lack of any specific determination that such services were

not necessary or appropriate, residential habilitation was not included in her PCSP.  *See* Plaintiff's PCSP dated Mar. 2, 2020 (Doc. 18-3 at 74-75).

▪  Plaintiff told her service coordinator about other services she wants to receive – including job training, education, and skills development to help her live and care for herself more independently, but those services were not authorized in her PCSP.  *See* Doxzon Decl. dated July 11, 2020 ¶¶ 13-20 (Exh. H); Plaintiff's PCSP dated Mar. 2, 2020 (Doc. 18-3 at 74-75); *see also* Keystone First Progress Notes KFCHC000110 (Exh. F) (assessed to need vocational training).

▪  Although participants are supposed to receive the services in their PCSPs, inclusion of a service in Plaintiff's PSCP did not ensure that it would be provided.  For instance, Plaintiff's PSCP indicates that home modifications were supposed to have been made to her friend's home so that she would be able to enter and exit safely and use the bathroom, but those modifications were never made.  *See* Doxzon Decl. dated Apr. 27, 2020 ¶¶ 26-27 (Doc. 18-3 at 6); Burrell Decl. ¶¶ 11-12 (Exh. G).

25

- Plaintiff had no understanding that the services she wants should be recorded in the PCSP and has no practical ability to edit the document.  *See* Doxzon Decl. dated July 11, 2020 ¶¶ 5, 20 (Exh. H).

- Plaintiff's service coordinator knew that Plaintiff experienced significant service gaps and multiple trigger events since the March 2, 2020 needs assessment and PCSP.  Yet, Plaintiff still did not receive the services she needed.[13]

The purported safeguards in Defendants' system failed.  If the system worked as it should have, Plaintiff would have been aware of the various types of services available under the Community HealthChoices Waiver.  If it had, numerous services, including residential habilitation, would have been included in her PCSP since she requested them and she meets the criteria to receive them established in the service definitions of the Community HealthChoices Waiver.

Defendants cannot credibly contend that four-month old documents are an accurate reflection of Plaintiffs' current service needs.  They cannot use woefully outdated documents to excuse their ongoing failure to provide

---

[13] In fact, according to the March 2, 2020 PCSP, it should have been updated on June 2, 2020.  Plaintiff's Person-Centered Service Plan dated Mar. 2, 2020 (Doc. 18-3 at 65).

Plaintiff with residential habilitation and other services and supports that she needs and to which she is entitled under the Community Health-Choices Waiver.  Even if Plaintiff's PSCP had been updated, the failure to include residential habilitation would not reflect a conclusion that Plaintiff does not need and is not eligible for that service.  The needs assessment did not (and was not supposed to) specifically assess her need for any specific types of services and there is no other evidence to support a conclusion that residential habilitation was excluded from her PSCP because DHS or its contractors evaluated Plaintiff and explicitly determined Plaintiff to not need and be ineligible for the service.

Moreover, Defendants' argument that exclusion of a service from a PSCP forecloses any challenge to the denial of that service is contrary to the law.  A Waiver participant is eligible for any available service that she needs.  *See* Health Care Financing Admin., *Olmstead Update No. 4*, at 5 (Jan. 10, 2001) ("A State is obliged to provide all people enrolled in the waiver with the opportunity for access to all needed services covered by the waiver and the Medicaid State Plan.") (Doc. 18-3 at 88); *Boulet v. Celluci*, 107 F. Supp. 2d 61, 76 (D. Mass. 2000) ("[O]nce a state opts to implement a waiver program and sets out eligibility requirements for that

program, eligible individuals are entitled to those services and to the associated protections of the Medicaid Act.").

To accept Defendants' argument that the failure to include an available Waiver service in a participant's PCSP is dispositive proof that the participant is not eligible for the service would allow them to engage in de facto denials of service that are unassailable simply by declining to include the service in the PCSP. Yet, it is beyond dispute that Medicaid Waiver participants whose requests for services are denied – and thus those services will not be reflected in their PCSPs – have the right to challenge those denials and, if sustained, they will be deemed eligible and the services are put into the PCSPs.  *See Community HealthChoices Waiver* at 286 (Exh. A) ("A participant may request a State Fair Hearing any time the following circumstances occur … The participant is denied his or her request for a new waiver-funded service(s)"); *cf. Murphy ex rel. Murphy*, 421 F. Supp. 3d 695, 707-08 (D. Minn. 2019) (in holding that the state violated the Medicaid statute by failing to provide due process to waiver participants when the agency does not authorize a service that a beneficiary requests and refused to construe "denials" narrowly since it is

28

"illogical" to "presuppose that Disability Waiver recipients know exactly what services are available and to specifically apply for them").[14]

Defendants' citation to *Cohen v. Chester County Dept' of Mental Health/Intellectual Disabilities Services*, Defs.' Br. at 13, does not support their contention that services not written in a service plan are beyond review. Indeed, it actually undermines their argument. In *Cohen*, a woman enrolled in a Medicaid home and community-based services waiver brought a federal action alleging, *inter* alia, that DHS violated the federal Medicaid statute both by failing to provide some services in her service plan and by denying her requests for other services, including behavioral support. *Cohen*, 2016 WL 3031719, at *1, *8. While the court noted in passing that the defendants did not contest that the plaintiff was eligible for all of the services that had been denied, *id.* at *8, that surely is not dispositive of whether the plaintiff could challenge the denial of services not in the plan.

---

[14] Defendants' note that *Olmstead Update No. 4* states that a waiver participant is entitled to receive services available under the waiver that he or she is "determined to need on the basis of an assessment and a written plan of care/support." Defs.' Br. at 14. But this simply puts the rabbit in the hat. Even if there had been a determination in Plaintiff's case that a waiver service was not needed, she would be entitled to challenge that determination and the resulting exclusion from his or her service plan. If the participant succeeds, the service will be included in his or her service plan. To hold that the initial exclusion from the service plan ends the inquiry would strip participants of due process rights.

Otherwise, defendants could defeat any challenge to denial of services simply by contesting that the participant is eligible for services.

### d.  Defendant Miller Can Be Sued in Her Official Capacity for Injunctive Relief Under Section 1983.

Defendants contend that the Court cannot provide preliminary injunctive relief to Plaintiff on her Medicaid claims because Defendant Miller had no "personal involvement" in the decisions at issue, which they state is a prerequisite for liability under Section 1983.  Defs. Br. at 5, 15-16.[15] While personal involvement is usually necessary to hold a defendant liable for damages under Section 1983,[16] Plaintiff in this Motion seeks only injunctive relief and named Defendant Miller in her official capacity to secure such injunctive relief.  First Am. Compl. ¶ 13 & Count III (Doc. 26). The Third Circuit has explicitly held that the head of a state agency can be

---

[15] Defendants assert the same argument with respect to Defendant Hancock, the former Deputy Secretary of DHS's Office of Long-Term Living.  Plaintiff only sued Defendant Hancock in his individual capacity for damages; she does not seek any injunctive relief against him.  First Am. Comp. ¶ 14 and Count III (Doc. 26).

[16] Plaintiff's damage claims against Defendants Miller and Hancock are not dependent on their personal involvement.  Policymakers, like Defendants Miller and Hancock, "may be liable under § 1983 if it is shown that they 'with deliberate indifference to the consequences, established and maintained a policy, practice or custom which directly caused [the] … harm.'"  *A.M. ex rel. J.M.K. v. Luzerne Cnty. Juvenile Det. Ctr.*, 372 F.3d 572, 586 (3d Cir. 2004).

subject to injunctive relief with no showing of personal involvement and, indeed, a plaintiff seeking prospective injunctive relief "*is required* to name an official or officials 'who can appropriately respond to injunctive relief.'" *Parkell v. Danberg*, 833 F.3d 313, 332 (3d Cir. 2016) (emphasis added); *accord Gonzalez v. Feinerman*, 663 F.3d 311, 315 (7th Cir. 2011) (per curiam); *Carrasquillo v. DelBalso*, No. 3:19-cv-0853, 2019 WL 7562729, at *5 (M.D. Pa. Dec. 18, 2019), *report and recommendation adopted*, 2020 WL 201729 (M.D. Pa. Jan. 10, 2020).  Defendant Miller, as the head of DHS, is the appropriate party to implement any injunctive relief.

### B.  Defendants' Arguments that Injunctive Relief Will Harm Plaintiff and the Public Are Specious.

Defendants contend that the Court should not issue a preliminary injunction because doing so would harm the Plaintiff and the public.  Defs.' Br. at 5, 16-17.  While these claims reflect a certain level of chutzpah, they cannot be countenanced.

Defendants contend that providing Plaintiff with residential habilitation and other Community HealthChoices services in the community she needs "would be dangerous and counterproductive" because no health care professional has determined that they are appropriate for her.  Defs.' Br. at 5, 16-17. Again, no health care professional has ever determined that residential habilitation is *not* appropriate for Plaintiff.  And it is unclear how

such services could possibly be dangerous.  Residential habilitation is not

some sort of experimental and risky medical procedure.  It is simply a

combination of habilitation services (life skills training) and personal care

assistance that is provided 24 hours a day in a residential setting.

*Community HealthChoices Waiver* at 90-93 (Exh. A).  Plaintiff received very

similar services in the community for 18 months and came to no harm until

she lost those services when she turned 21 and became enrolled in

Defendants' Community HealthChoices Waiver.  Defendants' argument

also ignores Plaintiff's current situation.  She is effectively homeless and

remains isolated in a hotel.  Surely, residential habilitation offered by a

qualified provider in accordance with the standards set by DHS could not

possibly put her in a worse situation than that she is currently in.

Defendants assert that providing residential habilitation services

would be "paternalistic" because the Plaintiff participated in development of

her plan and providing her with different services undermines her

autonomy.  Defs.' Br. at 17.  Again, Defendants are relying on a four-month

old plan that does not reflect her current circumstances and does not

consider that Plaintiff did not know that certain words or services needed to

be included.  Moreover, the PSCP does not reflect what Plaintiff wants; to

the contrary, as discussed, *supra,* at 23-25, Plaintiff repeatedly asked for

32

residential habilitation.  It is Defendants who paternalistically assume that Plaintiff – who filed this litigation and signed declarations in support of this Motion and the Motion for a Temporary Restraining Order – does not know what she is saying or seeking and that – contrary to the message she has been trumpeting most of her life – she really does not want to live in the community.[17]

Defendants hyperbolically assert that the relief sought is contrary to the public interest because it could lead to all Community HealthChoices Waiver participants filing lawsuits rather than filing grievances with the MCOs and "the system collapsing of its own weight."  Defs.' Br. at 5, 17.  It is well-established that Medicaid participants need not exhaust administrative remedies before filing suit under Section 1983.  *James v. Richman*, 547 F.3d 214, 217-18 (3d Cir. 2008) (citing *Patsy v. Bd. of Regents*, 457 U.S. 496, 516 (1982)).  So, the use of litigation, rather than grievances, cannot be contrary to the public interest.  Indeed, Medicaid participants have been filing lawsuits against state agencies for decades without exhausting administrative remedies and the system endures.  In contrast, Defendants' failure to comply with their obligations under the federal

---

[17] Throughout its Brief, Defendants refer to "DRP" – Disabilities Rights Pennsylvania, which is Plaintiff's counsel – as if it is the Plaintiff, further reflecting their denigration of Plaintiff's autonomy.

Medicaid statute – as well as the ADA and RA – contravene the public's interest and support issuance of a preliminary injunction.  Plaintiff's Br. at 21-22 (Doc. 18).

## **CONCLUSION**

For the reasons set forth above and in her initial Brief and at the hearing, Plaintiff respectfully requests that the Court grant her Motion for a Preliminary Injunction.

Respectfully submitted,


Dated:  July 11, 2020          By:   /s/ Brynne Madway_____
                                      Shanon S. Levin (PA ID 86040)
                                      Brynne Madway (PA ID 316422)
                                      Rachel Mann (PA ID 49267)
                                      Disability Rights Pennsylvania
                                      1800 John F. Kennedy Blvd.
                                      Suite 900
                                      Philadelphia, PA  19103-7421
                                      215-238-8070
                                      215-772-3126 (fax)
                                      bmadway@disabilityrightspa.org

                                      Counsel for Plaintiff

## <u>LOCAL RULE 7.8(b)(2) CERTIFICATE</u>

I certify under penalty of perjury that as noted by the Court during a status conference with counsel on July 9, 2020, adherence to the word count limitation pursuant to Local Rule 7.8(b)(2) is not required.

Executed this 11th day of July, 2020.


/s/ Brynne Madway
Brynne Madway

## <u>CERTIFICATE OF SERVICE</u>

I, Brynne Madway, hereby certify that the Plaintiff's Reply in Support of her Motion for a Preliminary Injunction and Exhibits were filed on July 11, 2020 with this Court's ECF system and is available for viewing and downloading from the ECF system by the following counsel who consented to electronic service:

Alexander T. Korn
Deputy Attorney General
Pennsylvania Office of Attorney General
Civil Law Division - Litigation Section
15th Fl., Strawberry Square
Harrisburg, PA 17120

/s/ Brynne Madway
Brynne Madway