# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| Miranda Doxon, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | **C.A. No: 1:20-cv-00236-JEJ** |
| | : | |
| Department of Human Services of the | : | **Jury Trial Demanded** |
| Commonwealth of Pennsylvania, | : | |
| Teresa D. Miller, in her official | : | |
| capacity as Secretary of the | : | |
| Department of Human Services and | : | |
| in her individual capacity, and Kevin | : | |
| Hancock, in his individual capacity, | : | |
| | : | |
| Defendants. | : | |

## EXHIBITS IN SUPPORT OF PLAINTIFF'S REPLY IN SUPPORT OF HER MOTION FOR A PRELIMINARY INJUNCTION

## TABLE OF EXHIBITS

Exhibit              Document

A.            Community Health Choices ("CHC") Waiver Application (last amended January 1, 2020)

B.            *Pennsylvania Preadmission Screening Resident Review (PASRR) Evaluation Level II Form* (Rev. Sept. 1, 2018)

C.            *Community HealthChoices Question and Answer Document: Service Coordination*

D.           *Community HealthChoices Question and Answer Document: CHC Assessment Process*, Question 6 (Rev. Dec. 2, 2019),

E.            Miranda Dozon July 1, 2020 Declaration

F.            Keystone First CHC Records

G.           Declaration of Joy Burrell

H.            Miranda Doxzon July 11, 2020 Declaration

# PLAINTIFF EXHIBIT  A

Case 1:20-cv-00236-SES   Document 61-1   Filed 07/11/20   Page 4 of 80

# Application for a §1915(c) Home and Community-Based Services Waiver

## PURPOSE OF THE HCBS WAIVER PROGRAM

The Medicaid Home and Community-Based Services (HCBS) waiver program is authorized in §1915(c) of the Social Security Act. The program permits a state to furnish an array of home and community-based services that assist Medicaid beneficiaries to live in the community and avoid institutionalization. The State has broad discretion to design its waiver program to address the needs of the waivers target population. Waiver services complement and/or supplement the services that are available to participants through the Medicaid State plan and other federal, state and local public programs as well as the supports that families and communities provide.

The Centers for Medicare & Medicaid Services (CMS) recognizes that the design and operational features of a waiver program will vary depending on the specific needs of the target population, the resources available to the state, service delivery system structure, state goals and objectives, and other factors. A State has the latitude to design a waiver program that is cost-effective and employs a variety of service delivery approaches, including participant direction of services.

## Request for a Renewal to a §1915(c) Home and Community-Based Services Waiver

### 1. Major Changes

Describe any significant changes to the approved waiver that are being made in this renewal application:

> The Commonwealth operates this §1915(c) waiver application concurrently with a §1915(b) waiver application to implement Community HealthChoices (CHC). The CHC 1915(b) waiver was approved by CMS for the time period of January 1, 2018 through December 31, 2022. CHC is Pennsylvania's managed long-term services and supports initiative.  The 1915(b)/1915(c) concurrent waivers allow the Commonwealth to require Medicaid beneficiaries to receive nursing facility, hospice, home and community-based services (HCBS), behavioral health, and physical health services through managed care organizations (MCOs) selected by the state through a competitive procurement process.

**Specify the §1915(b) authorities under which this program operates** *(check each that applies):*

    **§1915(b)(1) (mandated enrollment to managed care)**

    **§1915(b)(2) (central broker)**

    **§1915(b)(3) (employ cost savings to furnish additional services)**

    **§1915(b)(4) (selective contracting/limit number of providers)**

**A program operated under §1932(a) of the Act.**

Specify the nature of the state plan benefit and indicate whether the state plan amendment has been submitted or previously approved:

 

**A program authorized under §1915(i) of the Act.**

**A program authorized under §1915(j) of the Act.**

**A program authorized under §1115 of the Act.**

*Specify the program:*

 

**H. Dual Eligiblity for Medicaid and Medicare.**

    Check if applicable:

        **This waiver provides services for individuals who are eligible for both Medicare and Medicaid.**

## 2. Brief Waiver Description

**Brief Waiver Description.** *In one page or less*, briefly describe the purpose of the waiver, including its goals, objectives, organizational structure (e.g., the roles of state, local and other entities), and service delivery methods.

The Commonwealth of Pennsylvania operates this §1915(c) waiver application concurrently with a §1915(b) waiver application to implement Community HealthChoices (CHC). CHC is Pennsylvania's managed Long-Term Services and Supports (LTSS) initiative. The 1915(b)/1915(c) waivers allow the Commonwealth to require Medicaid beneficiaries to receive both LTSS, including nursing facility, hospice, home and community-based services (HCBS), and physical health services through managed care organizations (MCOs). The MCOs were selected by the state through a competitive procurement process.

The CHC program serves the following:
• Individuals who are 21 years of age or older and who are financially and clinically eligible to receive Medicaid LTSS (whether in the community or in a nursing facilities).
• Individuals who are 21 years of age or older and who are fully eligible for both Medicaid and Medicare, regardless of whether they need or receive LTSS (referred to as "Dual Eligibles") excluding participants who are enrolled in the OBRA waiver or a home and community-based waiver administered by the Office of Developmental Programs.

The CHC 1915(c) waiver will serve individuals who are 21 years of age or older and who are financially and clinically eligible to receive Medicaid LTSS in the community.

CHC operates across 5 geographical zones that comprise all 67 counties. CHC will be the sole Medicaid option for full Dual Eligibles. Other nursing facility clinically-eligible consumers residing in these five zones will have the choice between CHC and the Living Independence for the Elderly (LIFE) program.

CHC serves an estimated 450,000 individuals. CHC-MCOs are accountable for most Medicaid-covered services, including preventive services, primary and acute care, LTSS (HCBS and nursing facilities), prescription drugs, and dental services. Dual Eligibles have the option to have their Medicaid and Medicare services coordinated by the same MCO.

Behavioral Health Services are excluded from CHC-MCO Covered Services. The CHC-MCO must coordinate with the HealthChoices behavioral health MCOs.

Individuals served in the CHC waiver will receive any required behavioral health services (including drug and alcohol services) from behavioral health MCOs in Pennsylvania's other 1915(b) waiver, HealthChoices. The HealthChoices waiver (designated as PA-67) was renewed for a five-year time period beginning January 1, 2017. As renewed, the HealthChoices waiver includes additional populations to accommodate individuals who participate in CHC and who need behavioral health services.

The CHC waiver is administered by the Pennsylvania Department of Human Services (DHS), Office of Long-Term Living (OLTL), an office within the Single State Medicaid Agency. OLTL contracts with the CHC-MCOs to provide services and to enforce waiver obligations. The CHC-MCOs are paid a monthly capitation rate for services. CHC-MCOs may use written contracts meeting the requirements of 42 CFR 434.6 to deliver other services. Entities or individuals under contract or subcontract with the CHC-MCO must meet provider standards described elsewhere in the waiver application.

CHC emphasizes deinstitutionalization and provides an array of services and supports in community-integrated settings.

## 3. Components of the Waiver Request

**The waiver application consists of the following components.** *Note: Item 3-E must be completed.*

    **A. Waiver Administration and Operation. Appendix A** specifies the administrative and operational structure of this waiver.

    **B. Participant Access and Eligibility. Appendix B** specifies the target group(s) of individuals who are served in this waiver, the number of participants that the state expects to serve during each year that the waiver is in effect, applicable Medicaid eligibility and post-eligibility (if applicable) requirements, and procedures for the evaluation and reevaluation of level of care.

    **C. Participant Services. Appendix C** specifies the home and community-based waiver services that are furnished through the waiver, including applicable limitations on such services.

    **D. Participant-Centered Service Planning and Delivery. Appendix D** specifies the procedures and methods that the state uses to develop, implement and monitor the participant-centered service plan (of care).

    **E. Participant-Direction of Services.** When the state provides for participant direction of services, **Appendix E** specifies the

participant direction opportunities that are offered in the waiver and the supports that are available to participants who direct their services. (*Select one*):

- ⦿ **Yes. This waiver provides participant direction opportunities.** *Appendix E is required.*
- ○ **No. This waiver does not provide participant direction opportunities.** *Appendix E is not required.*

**F. Participant Rights. Appendix F** specifies how the state informs participants of their Medicaid Fair Hearing rights and other procedures to address participant grievances and complaints.

**G. Participant Safeguards. Appendix G** describes the safeguards that the state has established to assure the health and welfare of waiver participants in specified areas.

**H. Quality Improvement Strategy. Appendix H** contains the Quality Improvement Strategy for this waiver.

**I. Financial Accountability. Appendix I** describes the methods by which the state makes payments for waiver services, ensures the integrity of these payments, and complies with applicable federal requirements concerning payments and federal financial participation.

**J. Cost-Neutrality Demonstration. Appendix J** contains the state's demonstration that the waiver is cost-neutral.

## 4. Waiver(s) Requested

**A. Comparability.** The state requests a waiver of the requirements contained in §1902(a)(10)(B) of the Act in order to provide the services specified in **Appendix C** that are not otherwise available under the approved Medicaid state plan to individuals who: (a) require the level(s) of care specified in Item 1.F and (b) meet the target group criteria specified in **Appendix B**.

**B. Income and Resources for the Medically Needy.** Indicate whether the state requests a waiver of §1902(a)(10)(C)(i)(III) of the Act in order to use institutional income and resource rules for the medically needy *(select one)*:

- ○ **Not Applicable**
- ○ **No**
- ⦿ **Yes**

**C. Statewideness.** Indicate whether the state requests a waiver of the statewideness requirements in §1902(a)(1) of the Act *(select one)*:

- ⦿ **No**
- ○ **Yes**

If yes, specify the waiver of statewideness that is requested *(check each that applies)*:

☐ **Geographic Limitation.** A waiver of statewideness is requested in order to furnish services under this waiver only to individuals who reside in the following geographic areas or political subdivisions of the state. *Specify the areas to which this waiver applies and, as applicable, the phase-in schedule of the waiver by geographic area:*

☐ **Limited Implementation of Participant-Direction.** A waiver of statewideness is requested in order to make *participant-direction of services* as specified in **Appendix E** available only to individuals who reside in the following geographic areas or political subdivisions of the state. Participants who reside in these areas may elect to direct their services as provided by the state or receive comparable services through the service delivery methods that are in effect elsewhere in the state. *Specify the areas of the state affected by this waiver and, as applicable, the phase-in schedule of the waiver by geographic area:*

Case 1:20-cv-00236-SES Document 61-1 Filed 07/11/20 Page 8 of 80 Page 19 of 357

render them.
— Inform participants of the method to request updates to the service plan.
— Ensure and document the participant's participation in the development of the service plan.
· Develop and update the service plan in accordance with Appendix D, based upon the standardized needs assessment and participant-centered planning process annually, or more frequently as needed.
· Coordinate with the participant's family, friends and other community members to cultivate the participant's natural support network, to the extent that the participant (adult) has provided permission for such coordination.

In the performance of the monitoring function, the Service Coordinator will:
· Ensure that services are furnished in accordance with the service plan.
· Ensure that services meet participant needs.
· Monitor the health, welfare and safety of the participant and service plan implementation through regular contacts (monitoring visits with the participant, paid and unpaid caregivers and others) at a minimum frequency as required by the Department.
· Respond to and assess emergency situations and incidents and assure that appropriate actions are taken to protect the health, welfare and safety of the participant in accordance with Appendix G.
· Monitor the effectiveness of back-up plans.
· Review provider documentation of service provision and monitor participant progress on outcomes and initiate service plan team discussions or meetings when services are not achieving desired outcomes.
· Through the service plan monitoring process, solicit input from participant and/or family, as appropriate, related to satisfaction with services.
· Arrange for modifications in services and service delivery, as necessary, to address the needs of the participant, consistent with an assessment of need and Department requirements, and modify the service plan accordingly.
· Advocate for continuity of services, system flexibility and integration, proper utilization of facilities and resources, accessibility and participant rights.
· Participate in any Department identified activities related to quality oversight.

Services must be delivered in a manner that supports the participant's communication needs, including, but not limited to, age appropriate communication, translation services for participants that are of limited-English proficiency or who have other communication needs requiring translation, assistance with the provider's understanding and use of communication devices used by the participant.

Service Coordination includes functions necessary to facilitate community transition for participants who received Medicaid-funded institutional services (i.e. Nursing Facilities) and who lived in an institution for at least 90 consecutive days prior to their transition to the waiver. Service Coordination activities for participants leaving institutions must be coordinated with, and must not duplicate, institutional discharge planning. This service may be provided up to 180 days in advance of anticipated movement to the community. Essential functions necessary for completion of a successful transition include at a minimum:
· Acting as a liaison between the facility where the participant will be transitioning from and the Independent Enrollment Entity for waiver services
· Performing a comprehensive assessment of the services needed to transition from an institution to the community, while assuring the participant's health and welfare. The comprehensive assessment gathers information about the need for health services, social supports, housing, transportation, financial resources and other needs.
· Providing information to the individual about community resources and assisting the individual, family, Nursing Facility staff and others to ensure timely and coordinated access to Medicaid services, behavioral health services, financial counseling and other services to meet needs.
· Providing housing pre-tenancy and transition services that prepare and support the participant's move to supportive housing in a community integrated setting. Functions include but are not limited to:
o   Conducting a housing assessment, including a comprehensive budget plan, to determine the participant's housing needs and preferences as well as identifying potential barriers to transition.
o   Developing an assessment-based housing support plan that identifies the housing services and supports required and will provide the participant with the opportunity to have an informed choice of living options.
o   Developing a crisis plan that identifies emergent situations that could jeopardize housing and the appropriate

interventions.

o   Assisting with finding and securing housing, completing housing applications, and working with private landlords, housing authorities, Regional Housing Coordinators or other housing entities.

o   Assessing home adaptation needs. Acting as a liaison between contractors and physical or occupational therapists.

o   Assisting, or acting on the behalf of, the participant to obtain needed documentation (e.g., social security card, birth certificate, prior rental history), or resources with Social Security, social services, or community agencies.

o   Conducting or facilitating a housing inspection to ensure unit readiness for occupancy.

o   Coordinating the participant's move to the community and educating the individual on how to retain housing.

o   Providing tenancy sustaining services to assist the participant to retain housing and integrate into the community, foster independence and assist in developing community resources to support successful tenancy and maintain residency in the community.  Functions include but are not limited to:

o   Assisting or coordinating training to develop or restore skills on being a good tenant and/or neighbor and accessing community resources.

o   Assisting or coordinating training with necessary life skills such as budgeting and routine home maintenance.

o   Assisting the participant to manage and reduce behaviors that may jeopardize housing.

o   Assisting the participant to manage their household and understand the terms of a lease or mortgage agreement.

o   Monitoring and updating the participant's housing support plan as requisite housing skills change.


The following activities are excluded from Service Coordination:

•   Outreach or eligibility activities (other than transition services) before participant enrollment in the waiver.

•   Travel time incurred by the Service Coordinator may not be billed as a discrete unit of service.

•   Services that constitute the administration of another program such as protective services, parole and probation functions, legal services, and public guardianship.

•   Representative payee functions.

•   Other activities identified by the Department.


Service Coordination must be conflict free and may only be provided by agencies and individuals employed by agencies who are not:

•   Related by blood or marriage to the participant or to any paid service provider of the participant.

•   Financially or legally responsible for the participant.

•   Empowered to make financial or health-related decisions on behalf of the participant.

•   Sharing any financial or controlling interest in any entity that is paid to provide care for or conduct other activities on behalf of the participant.

•   Individuals employed by agencies paid to render direct or indirect services (as defined by the Department) to the participant, or an employee of an agency that is paid to render direct or indirect services to the participant.


CHC-MCOs must develop, submit for DHS approval, and implement a plan to monitor the performance of Service Coordinators.


Every Participant who has a PCSP developed must have a Service Coordinator assigned to implement and coordinate the services called for in the PCSP.


Service Coordinators and Service Coordinator supervisors must meet the following qualifications:


Service Coordinators must:

•   Be a registered nurse (RN) or have a Bachelor's degree in social work, psychology or other related fields with practicum experience, or in lieu of a Bachelor's degree, have at least three (3) or more years of experience in a social service or health care related setting. Service Coordinators hired prior to the CHC zone Implementation Date must have the qualifications and standards proposed by the CHC-MCOs and approved by the department;

•   Comply with Department standards, regulations, policies and procedures relating to provider qualifications, including 55 PA Code Chapter 52 except those excluded in the CHC Agreement;

•   Have criminal clearances as per 35 P.S. §10225.101 et seq. and 6 PA Code Chapter 15;

• Have a child abuse clearance (as per 23 PA C.S. Chapter 63); and
• Have a valid driver's license from Pennsylvania or a contiguous state if the operation of a vehicle is necessary to provide the service.

Service Coordinator supervisors must:

• Be an RN or have a Master's degree in a social work or in a human services or healthcare field and three (3) years of relevant experience with a commitment to obtain either a Pennsylvania social work or mental health professional license within one year of hire. Service Coordinator supervisors hired prior to the CHC zone Implementation Date (who do not a have a license) must either: 1) obtain a license within their first year under the new CHC contract in their zone or 2) have the qualifications and standards proposed by the CHC-MCOs and approved by the department;

• Comply with Department standards, regulations, policies and procedures relating to provider qualifications, including 55 PA Code Chapter 52 except those excluded in the CHC Agreement;
• Have criminal clearances as per 35 P.S. §10225.101 et seq. and 6 PA Code Chapter 15;
• Have a child abuse clearance (as per 23 PA C.S. Chapter 63); and
• Have a valid driver's license from Pennsylvania or a contiguous state if the operation of a vehicle is necessary to provide the service.

Service Coordination Entities under contract with the CHC MCO must:

• Comply with Department standards, regulations, policies and procedures relating to provider qualifications, including 55 PA Code Chapter 52 except those excluded in the CHC Agreement;
• Meet the conflict free requirements pursuant to 55 PA Code, Chapter 52, §52.28;
• Have or ensure automobile insurance for any automobiles owned, leased and/or hired when used as a component of the service;
• Have Worker's Compensation insurance in accordance with State statute and in accordance with Department policies;
• Have Commercial General Liability insurance; and
• Ensure that employees (direct, contracted or in a consulting capacity) have been trained to meet the unique needs of the participant, for example, communication, mobility and behavioral needs.


*** Continued from Appendix G, Quality Improvement ***

HW-5: trend analysis were addressed by the CHC-MCO. Denominator: Total number of incidents for CHC waiver participants with reported incidents within the past 12 months where a trend analysis was performed.

## Appendix A: Waiver Administration and Operation

**1. State Line of Authority for Waiver Operation.** Specify the state line of authority for the operation of the waiver (*select one*):

◉ **The waiver is operated by the state Medicaid agency.**

Specify the Medicaid agency division/unit that has line authority for the operation of the waiver program *(select one)*:

○ **The Medical Assistance Unit.**

Specify the unit name:

*(Do not complete item A-2)*

◉ **Another division/unit within the state Medicaid agency that is separate from the Medical Assistance Unit.**

Specify the division/unit name. This includes administrations/divisions under the umbrella agency that has been

identified as the Single State Medicaid Agency.

| Office of Long-Term Living |
| --- |

*(Complete item A-2-a).*

○ **The waiver is operated by a separate agency of the state that is not a division/unit of the Medicaid agency.**

Specify the division/unit name:

| |
| --- |

In accordance with 42 CFR §431.10, the Medicaid agency exercises administrative discretion in the administration and supervision of the waiver and issues policies, rules and regulations related to the waiver. The interagency agreement or memorandum of understanding that sets forth the authority and arrangements for this policy is available through the Medicaid agency to CMS upon request. *(Complete item A-2-b).*

## Appendix A: Waiver Administration and Operation

2. **Oversight of Performance.**

   a. **Medicaid Director Oversight of Performance When the Waiver is Operated by another Division/Unit within the State Medicaid Agency.** When the waiver is operated by another division/administration within the umbrella agency designated as the Single State Medicaid Agency. Specify (a) the functions performed by that division/administration (i.e., the Developmental Disabilities Administration within the Single State Medicaid Agency), (b) the document utilized to outline the roles and responsibilities related to waiver operation, and (c) the methods that are employed by the designated State Medicaid Director (in some instances, the head of umbrella agency) in the oversight of these activities:

The CHC waiver is administered by the Pennsylvania Department of Human Services (DHS), Office of Long-Term Living (OLTL), an office within the Single State Medicaid Agency.  OLTL exercises administrative discretion in the administration and is responsible for oversight of the waiver, as well as all policies, procedures and regulations.

The Deputy Secretary of the Office of Long-Term Living reports directly to the Secretary of the Department of Human Services (DHS), the head of the Single State Medicaid agency.  The Secretary of DHS and the Deputy Secretary of the Office of Long-Term Living meet weekly to discuss operations of the waiver and other long-term living programs, and gain consent on Waiver policies, rules and guidelines.  In addition, the OLTL Policy staff meet with the State Medicaid Director on a monthly basis.

All waiver-related policies, renewals and amendments undergo an extensive review process, which includes review by the State Medicaid Director.  Policy guidance, which is authorized through the 55 Pa. Code, Chapter 52 regulations, is issued after it is reviewed by OLTL Bureau Directors, the Long-Term Services and Supports Subcommittee of the Medical Assistance Advisory Committee, DHS leadership offices, including Legal, Policy, and Budget (if applicable) and the State Medicaid Director, and issued after signature by OLTL's Deputy Secretary.  All waiver-related documents go through the same process but are additionally issued for public comment through the PA Bulletin, OLTL ListServs and a disability advocacy group.  They are then further reviewed by the DHS Secretary's Office, the Governor's Offices of Budget, General Counsel, and Policy and, finally, by the Legislative Reference Bureau.

The following details waiver-related organizational responsibilities within OLTL:
•   The Bureau of Coordinated and Integrated Services (BCIS) is responsible for the administration and oversight of the Community Health Choices (CHC) Managed Care Organizations (MCO) and the Living Independently for the Elderly (LIFE) managed care program, known nationally as the Program for All-Inclusive Care for the Elderly, which provide managed long-term services and supports to eligible recipients  The bureau negotiates agreements with managed care organizations and contracts with other vendors that support bureau functions; monitors CHC MCO agreements through the readiness review monitoring process; recommends program sanctions and penalties, where appropriate; and directs corrective action plans for CHC MCOs and other contractors.  The BCIS also manages the enrollment contracts, including participant outreach, assessment, and the independent enrollment broker (IEB).

•   The Bureau of Policy Development and Communications Management (BPDCM) supports the strategic policy and communication goals across all bureaus and the Deputy Secretary's Office.  The BPDCM plans, coordinates, evaluates, and develops policies and procedures across the OLTL, and coordinates internal and external communication with stakeholders.  The bureau serves as a liaison with other DHS programs and policy offices and other commonwealth agencies, supports all bureaus in the development of consistent policy, evaluating impact, and improving strategic direction.  The bureau responds to all right to know requests, develops and processes new regulations, and submits state plan and waiver documents to the federal government.

•   The Bureau of Fee for Service Programs (BFFSP)manages provider focused activities and functions in OLTL.  The BFFSP coordinates all provider enrollment activities and manages the financial management services contract, which provides payroll assistance to participants of the self-directed model of care.  The BFFSP provides programmatic guidance to service providers and general training and technical support for the bureau, OLTL, business partners and contracted staff. The bureau also directs the Quality Management Efficiency Teams (QMETs) that conduct reviews of enrolled providers to ensure compliance with federal regulations related to the HCB Settings Rule.

•   The Bureau of Quality Assurance and Program Analytics (BQAPA) is responsible for ensuring that valid statistical and procedural methodologies are used to collect and analyze quality control data to evaluate and improve service delivery.  The bureau manages data analysis to measure the effectiveness of program design and operations, and ensures required reports are provided to CMS and other regulatory entities.  The bureau also supports OLTL management in the development and implementation of policies and procedures, oversees the analysis of data obtained through consumer satisfaction surveys and provider performance measures, and directs all activities related to incident management and risk reduction.

•   Bureau of Finance (BOF) manages and monitors OLTLs appropriations and operating budget.  The BOF

**License** *(specify):*

N/A

**Certificate** *(specify):*

N/A

**Other Standard** *(specify):*

Support Service workers must:
• Comply with 55 PA Code 1101 and have a signed Medicaid waiver provider agreement;
• Comply with Department standards, regulations, policies and procedures relating to provider qualifications, including 55 PA Code Chapter 52;
• Have or ensure automobile insurance for any automobiles owned, leased and/or hired when used as a component of the service;
• Have a valid driver's license from Pennsylvania or a contiguous state if the operation of a vehicle is necessary to provide the service;
• Have Worker's Compensation insurance in accordance with State statute and in accordance with Department policies;
• Be a resident of Pennsylvania or a state contiguous to Pennsylvania;
• Be 18 years of age or older;
• Possess basic math, reading, and writing skills;
• Possess a valid Social Security number;
• Submit to a criminal records check;
• Have a child abuse clearance as required in Appendix C-2-b;
• Have the required skills to perform Personal Assistance Services as specified in the participant's service plan;
• Complete any necessary pre/in-service training related to the participant's service plan;
• Agree to carry-out outcomes included in the participant's service plan; and
• Be able to demonstrate the capability to perform health maintenance activities specified in the participant's service plan or receive necessary training

**Verification of Provider Qualifications**

**Entity Responsible for Verification:**

OLTL or its designee

**Frequency of Verification:**

At time of enrollment and revalidation or more frequently when deemed necessary by the Department.

## Appendix C: Participant Services

### C-1/C-3: Service Specification

State laws, regulations and policies referenced in the specification are readily available to CMS upon request through the Medicaid agency or the operating agency (if applicable).

**Service Type:**

Statutory Service

**Service:**

Residential Habilitation

**Alternate Service Title (if any):**

Residential Habilitation

**HCBS Taxonomy:**

**Category 1:**

02 Round-the-Clock Services

**Sub-Category 1:**

02011 group living, residential habilitation

**Category 2:**

**Sub-Category 2:**

**Category 3:**

**Sub-Category 3:**

**Category 4:**

**Sub-Category 4:**

*Complete this part for a renewal application or a new waiver that replaces an existing waiver. Select one* **:**

○ **Service is included in approved waiver. There is no change in service specifications.**

◉ **Service is included in approved waiver. The service specifications have been modified.**

○ **Service is not included in the approved waiver.**

**Service Definition** *(Scope):*

Residential Habilitation Services are delivered in provider owned, rented/leased or operated settings. They can be provided in Licensed and unlicensed settings.

Licensed Settings are settings in which four or more individuals reside and are licensed as Personal Care Homes (reference 55 PA Code Chapter 2600) or Assisted Living Residences (reference 55 PA Code Chapter 2800). Unlicensed settings are provider owned, rented/leased or operated settings with no more than three residents.

Residential Habilitation services are provided for up to 24 hours a day.  This service is authorized as a day unit.  A day is defined as a period of a minimum of 8 hours of service rendered by a residential habilitation provider within a 24-hour period beginning at 12:00 am and ending at 11:59 pm.  Residential Habilitation services are designed to assist an individual in acquiring the basic skills necessary to maximize their independence in activities of daily living and to fully participate in community life.  Residential Habilitation services are individually tailored to meet the needs of the individual as outlined in the person-centered service plan.

Residential Habilitation includes supports that assist participants with acquiring, retaining, and improving the self-help, socialization, and adaptive skills necessary to reside successfully in the community.  These services are individually tailored supports that can include activities in environments designed to foster the acquisition of skills, appropriate behavior, greater independence and personal choice.  Supports include cueing, on-site modeling of behavior, and/or assistance in developing or maintaining maximum independent functioning in community living activities, including domestic and leisure activities.  Residential Habilitation also includes community integration, personal assistance services and night-time assistance.  This includes any necessary assistance in performing activities of daily living (i.e., bathing, dressing, eating, mobility, and toileting) and instrumental activities of daily living (i.e., cooking, housework, and shopping).

Transportation is provided as a component of the Residential Habilitation service, and is therefore reflected in the rate for Residential Habilitation. Providers of (unlicensed and licensed) Residential Habilitation are responsible for the full range of transportation services needed by the individuals they serve to participate in services and activities specified in their person-centered service plans (PCSP).  This includes transportation to and from day habilitation and employment services. Transportation included in the rate for Residential Habilitation Services may NOT be duplicated through the inclusion of the transportation service on an individual's PCSP.

Individual considerations may be available for those individuals that require continual assistance as identified on their needs assessment to ensure their medical or behavioral stability.  By the nature of their behaviors, individuals are not able to participate in activities or are unable to access the community without direct staff support.  Residential Enhanced Staffing is treated as an add-on to the Residential Habilitation service and is only available when participants require additional behavioral supports. Residential Enhanced Staffing is authorized as an hourly unit.

Residential Enhanced Staffing may be provided at the following levels:
• Level 1: staff-to-individual ratio of 1:1.
• Level 2: staff-to-individual ratio of 2:1 or greater.

Licensed settings serving individuals enrolled in the CHC Waiver may not exceed a licensed capacity of more than 8 unrelated individuals.  Both licensed and unlicensed settings must be community-based as well as maintain a home-like environment. A home-like environment provides full access to typical facilities found in a home such as a kitchen and dining area, provides for privacy, allows visitors at times convenient to the individual, and offers easy access to resources and activities in the community. Residences are expected to be located in residential neighborhoods in the community.  Participants have access to community activities, employment, schools or day programs. Each facility shall assure to each participant the right to live as normally as possible while receiving care and treatment. Home and Community character will be monitored by the CHC-MCOs through ongoing monitoring. Additionally, Service Coordinators will monitor the community character of the residence during regularly scheduled contact with residents. Results of this monitoring will be reported to OLTL. Service Coordinators assist participants in transitioning to homes of their own.

**Specify applicable (if any) limits on the amount, frequency, or duration of this service:**

Payment is not made for room and board.

Residential Habilitation services do not include the provision of a structured day habilitation, adult daily living, job coaching, employment skills development, and therapies provided on a one to one basis.

Community Integration, Home Health Care Aide services, Non-Medical Transportation, Personal Assistance Services, TeleCare, Vehicle Modifications, and Respite cannot be provided at the same time as Residential Habilitation.

Long-term or Continuous Nursing cannot be on the same service plan as Residential Habilitation. The CHC-MCO may consider an exception to the limitation on long-term or continuous nursing and Residential Habilitation Services with documentation from the Service Coordinator that supports the participant's need to receive both services.

The frequency and duration of this service are based upon the participant's needs as identified and documented in the participant's service plan.

**Service Delivery Method** *(check each that applies)*:

☐ **Participant-directed as specified in Appendix E**

☒ **Provider managed**

**Specify whether the service may be provided by** *(check each that applies)*:

☐ **Legally Responsible Person**

☐ **Relative**

☐ **Legal Guardian**

**Provider Specifications:**

| Provider Category | Provider Type Title |
|---|---|
| Agency | Unlicensed Residential Habilitation Provider |
| Agency | Licensed Residential Habilitation Provider |

## Appendix C: Participant Services

### C-1/C-3: Provider Specifications for Service

**Service Type: Statutory Service**
**Service Name: Residential Habilitation**

**Provider Category:**

Agency

**Provider Type:**

Unlicensed Residential Habilitation Provider

**Provider Qualifications**

**License** *(specify)*:

N/A

**Certificate** *(specify)*:

CARF Community Housing accreditation or CARF Brain Injury Residential Rehabilitation Program (Adult) accreditation

**Other Standard** *(specify)*:

a.  The CHC-Service Coordinator provides information to the individual and to their representative, if any, in advance of the planning meeting so that he/she can make informed choices about their services and service delivery in order to effectively develop a person-centered service plan (PCSP). A PCSP is a written description of Participant-specific healthcare, Long-Term Services and Supports (LTSS), and wellness goals to be achieved, and the type, scope, amount, duration, and frequency of the covered services to be provided to a Participant in order to achieve such goals. Services and supports are based on the comprehensive needs assessment of the Participant's healthcare, LTSS and wellness needs. The PCSP will consider the current and unique psycho-social and medical needs and history of the participant, as well as the participant's functional level and support systems. The PCSP process must address the full array of medical and non-medical services needed by the Participant and supports provided by the CHC-MCO and available in the community to ensure the maximum degree of integration and the best possible health outcomes and participant satisfaction.

Prior to the PSCP meeting(s), the CHC Service Coordinator works with the participant and/or their representative to coordinate invitations and PCSP dates, times and locations.  The process of coordinating invitations includes the participant's input as to who to invite to the meeting(s) and at times and locations of convenience to the participant.

The CHC Service Coordinators provide Participants and their representative, if any, with a participant orientation packet within 5 days of enrollment.  The packet contains information on participant rights and responsibilities; participant choice; the role of the CHC Service Coordinator; the role of the Person-Centered Planning Team (PCPT); participant complaints; appeals and fair hearings; how to connect to other community resources; abuse, neglect and exploitation; and fraud and abuse.  The packet provides Participants with a basis for self- advocacy safeguards. If the participant uses an alternative means of communication or if their primary language is not English, the process utilizes the participant's primary means of communication or an interpreter in accordance with Appendix B-8.  In addition, the CHC Service Coordinator must educate the participant on the following:
•   Strategies for solving conflict or disagreement within the PCPT process, including clear conflict-of-interest guidelines for all planning Participants;
•   Offer informed choices to the participant regarding the services and supports they receive and from whom;
•   A method for the participant to request updates to the PCSP as needed; and
•   The Participant's due process and appeal rights when the Participant:
o   is denied his or her request for a new Waiver-funded service(s), including the amount, duration, and scope of service(s),
o   experiences a reduction in the amount, duration, and scope of services,
o   is denied the choice of willing and qualified Waiver provider(s),
o   experiences a decision or an action which denies, suspends, reduces, or terminates a Waiver-funded service authorized on the Participant's PCSP, or
o   is involuntarily terminated from participant direction.

The CHC Service Coordinator provides Participants and/or their representative with information and training on services and supports available to the participant and the processes for selecting qualified providers of services. The CHC-MCO shall be required to provide its Participants with LTSS Provider directories upon request, which include, at a minimum, the following information:
•   The names, addresses and telephone numbers of LTSS Providers;
•   Identification of the services provided by each LTSS Provider listed;
•   Identification of special services, languages spoken and communication competencies, etc.; and
•   Experience or expertise in serving individuals with particular medical conditions or disabilities.

b.  Person-Centered Service Planning is a process directed by the participant with long-term service and support needs. The Participant has the authority to include a representative who is authorized to make personal decisions for the participant. The Participant also has the authority to include family members, legal guardians, friends, caregivers, members of the PCPT, and any others the participant or his/her representative wishes to include. The person-centered service planning process helps to identify outcomes based on the participant's goals, interests, strengths, abilities, and preferences. The process assists the participant to articulate a plan for the future and helps determine the supports and services that the participant needs to achieve these outcomes. The CHC Service Coordinator is responsible to include all of those elements into the PCSP.

The PCPT approach must provide the necessary level of support to ensure that the individual directs the process to the maximum extent possible and is enabled to make informed choices and decisions. The CHC-MCO must annually submit and obtain Department approval of its PCPT policy on PCSP development and implementation.

## Appendix D: Participant-Centered Planning and Service Delivery

### D-1: Service Plan Development (4 of 8)

**d. Service Plan Development Process.** In four pages or less, describe the process that is used to develop the participant-centered service plan, including: (a) who develops the plan, who participates in the process, and the timing of the plan; (b) the types of assessments that are conducted to support the service plan development process, including securing information about participant needs, preferences and goals, and health status; (c) how the participant is informed of the services that are available under the waiver; (d) how the plan development process ensures that the service plan addresses participant goals, needs (including health care needs), and preferences; (e) how waiver and other services are coordinated; (f) how the plan development process provides for the assignment of responsibilities to implement and monitor the plan; and, (g) how and when the plan is updated, including when the participant's needs change. State laws, regulations, and policies cited that affect the service plan development process are available to CMS upon request through the Medicaid agency or the operating agency (if applicable):

a. Who develops the plan, who participates in the process and the timing of the plan:

The Participant will lead the PCPT.  The PCSP process will also include individuals chosen by the Participant, who may include family members, legal guardians, friends, caregivers, and any others the participant or his/her representative wishes to include as members of the PCPT. The PCSP process helps to identify outcomes based on the participant's goals, interests, strengths, abilities, and preferences, as well as assists the participant to articulate a plan for the future and helps determine the supports and services that the participant needs to achieve these outcomes.  The CHC Service Coordinator is responsible to include all of those elements into the PCSP.

Prior to the PCSP meeting(s), the CHC Service Coordinator works with the participant to coordinate invitations and PCSP/Annual Review meetings, dates, times and locations.  The process of coordinating invitations includes the participant's input as to who to invite to the meeting(s) and at times and locations of convenience to the participant.

The CHC Service Coordinator ensures that the PCSP is completed prior to services being delivered.  The CHC Service Coordinator will initiate a process to re-evaluate the PCSP at least annually (at least once every 365 days) and when either there is a significant change in the Participant's situation or condition or the Participant requests re-evaluation. The CHC Service Coordinator ensures that the PCSP is updated, approved, and authorized as changes occur.  The CHC Service Coordinator schedules the service planning meetings at times and places that are convenient to the participant. PCSPs must be completed no later than 30 days from the date the comprehensive needs assessment or reassessment is completed.

The CHC Service Coordinator gathers information on an ongoing basis to assure the PCSP reflects the participant's current needs.  The CHC Service Coordinator discusses potential revisions to the PCSP with the Participant and individuals important to the Participant.  All changes to existing PCSPs must be documented in the Participant's record.

Once the PCSP is authorized by the MCO, the CHC Service Coordinator communicates the service plan content to the Participant and to the Participant's appropriate service provider or providers to ensure that service delivery matches the approved PCSP.

b. The types of assessments that are conducted:

Part of the enrollment process involves the completion of clinical eligibility determination tool to determine whether the Participant meets the Nursing Facility level of care.  In addition, a physician completes a physician certification form which indicates the physician's level of care recommendation.

Once enrolled into CHC, the CHC Service Coordinator completes OLTL's standardized needs assessment which secures information about the participant's strengths, capacities, needs, preferences, health status, risk factors, physical health, behavioral health, social, psychosocial, environmental, caregiver, LTSS, and other needs as well as preferences, goals, housing, and informal supports.  The comprehensive needs assessment and reassessment processes completed by the CHC-MCO must also capture the following:

• Need for traditional comprehensive care management of chronic conditions and disease management.
• Functional limitations, including cognitive limitations, in performing ADL and IADLs and level of supports required by the Participant.
• Ability to manage and direct services and finances independently.
• Level of supervision required.
• Supports for unpaid caregivers.
• Identification of risks to the Participant's health and safety.
• Environmental challenges to independence and safety concerns.
• Availability of able and willing informal supports.
• Diagnoses and ongoing treatments.
• Medications.
• Use of adaptive devices.
• Preferences for community engagement.
• Employment and educational goals.

Reassessments must be completed as expeditiously as possible in accordance with the circumstances and as clinically indicated by the Participant's health status and needs, but in no case more than 14 days after the occurrence of any of the following trigger events:
• A significant healthcare event to include but not be limited to a hospital admission, a transition between healthcare

settings, or a hospital discharge.
•   A change in functional status.
•   A change in caregiver or informal support status if the change impacts one or more areas of health or functional status.
•   A change in the home setting or environment if the change impacts one or more areas of health or functional status.
•   A change in diagnosis that is not temporary or episodic and that impacts one or more area of health status or functioning.
•   As requested by the Participant or designee, the caregiver, the provider, the PCPT or a PCPT Participant, or the Department.

In addition to the trigger events listed above, if the CHC-MCO identifies that a participant has not been receiving services for five (5) or more consecutive service days to assist with activities of daily living as indicated on the service plan, and if the suspension of services was not pre-planned, then the CHC-MCO must communicate with the participant to determine the reason for the service suspension within 24 hours of identifying the issue.  If the participant's health status or needs have changed, then the CHC-MCO must conduct a comprehensive needs reassessment of the participant's needs within fourteen (14) days of identifying the issue.

c. How the participant is informed of the services available under the waiver:
The PCPT is established to identify services based on the participant's needs and preferences, as well as availability and appropriateness of services. The CHC Service Coordinator describes and explains the concept of person-centered service planning, as well as the types of services available through the Waiver and other resources. The CHC Service Coordinator also provides detailed information (described further in Appendix E) regarding opportunities for participant-directed services and responsibilities for directing those services. These discussions between the CHC Service Coordinator and the Participant will be documented in the Participant's record.

d. How the process ensures that the service plan addresses participant's desired goals, outcomes, needs and preferences:
The CHC Service Coordinator reviews the Participant's assessed needs with the Participant to identify waiver and non-waiver services that will best meet the individual's goals, needs, and preferences.  In addition, CHC Service Coordinators ensure that the PCSP includes sufficient and appropriate services to maintain health, safety and welfare, and provides the support that an individual needs or is likely to need in the community and to avoid institutionalization.

The CHC Service Coordinator, along with the PCPT, utilizes the assessments, documentation obtained from direct service providers and discussions with the Participant to secure information about the Participant's needs, including health care needs, preferences, goals, and health status to develop the PCSP.  This information is captured by the CHC Service Coordinator and then documented in the participant's record.

The CHC Service Coordinator reviews, in conjunction with the Participant, the Participant's services to ensure the services are adequate to meet the desired outcomes. Revisions are discussed with the Participant and incorporated into the PCSP. The Service Coordinator shares updated service information service providers. All service plan meetings and discussions with the participant are documented in the participant's record.

e. How responsibilities are assigned for implementing the plan:
The CHC-MCO must implement a written, holistic PSCP for each Participant who receives home and community-bases services.  The CHC-MCO must comply with the requirements specified in 42 CFR 441.301(c)(1)-(3) and any additional requirements established by OLTL in implementing the PCSP.

The PCSP must address how the Participant's physical, cognitive, and behavioral health needs will be managed, including how Medicare coverage (if the Participant is dual eligible) will be coordinated and, how the Participants' LTSS services will be coordinated.  The holistic PCSP for LTSS Participants, at a minimum, must include the following:
•   Active chronic problems, current non-chronic problems, and problems that were previously controlled or classified as maintenance care but have been exacerbated by disease progression or other intervening conditions.
•   Current medications.
•   All services authorized, and the scope, amount, duration and frequency of the services authorized, including any services that were authorized by the CHC-MCO since the last PCSP was finalized that need to be authorized moving forward.
•   A schedule of preventive service needs or requirements.
•   Disease management action steps.
•   Known needed physical, cognitive and behavioral healthcare and services.

• All designated points of contact and the Participant's authorizations of who may request and receive information about the Participant's services.
• How the CHC Service Coordinator will assist the Participant in accessing Covered Services identified in the PCSP.
• How the CHC-MCO will coordinate with the Participant's Medicare, Veterans, BH-MCO, and other health coverage.

The PCSP for LTSS Participants must identify how their LTSS needs will be met and how their Service Coordinator will ensure that services are provided in accordance with the PCSP.  The LTSS Service Plan section of the PCSP must include the following:
• All LTSS services necessary to support the Participant in living as independently as possible and remaining as engaged in their community as possible.
• Reflect that the setting in which the individual resides is chosen by the participant.
• For the needs identified in the comprehensive needs assessment, the interventions to address each need or preference, reasonable long-term and short-term goals, the measurable outcomes to be achieved by the interventions, the anticipated time lines in which to achieve the desired outcomes, and the staff responsible for conducting the interventions and monitoring the outcomes.
• Potential problems that can be anticipated, including the risks and how these risks can be minimized to foster the Participant's maximum functioning level of well-being.
• Participant decisions around self-directed care and whether the Participant is participating in Participant-Direction.
• Communications plan.
• The scope, amount, duration and frequency that specific services will be provided.
• Whether and, if so, how technology and telehealth will be used.
• Participant choice of Providers.
• Individualized Back-Up Plan.
• Emergency Back-Up Plan.
• The person(s)/Providers responsible for specific interventions/services.
• Participant's available, willing, and able informal support network and services.
• Participant's need for and plan to access community resources and non-covered services, including any reasonable accommodations.
• How to accommodate preferences for leisure activities, hobbies, and community engagement.
• Any other needs or preferences of the Participant.
• Participant's goals for the least restrictive setting possible, if they are being discharged or transitioned from an inpatient setting.
• How the CHC-MCO will coordinate with the Participant's Medicare, Veterans, BH-MCO, other health coverage, and other supports.
• Participant's employment and educational goals.
• Emergency back-up plan.

The CHC Service Coordinator must obtain the signatures of the Participant, Participant's representative and any others involved in the planning process, indicating they participated in, approve and understand the services outlined in the PCSP and that services are adequate and appropriate to the participant's needs. A Participant may also sign indicating disapproval of the plan if the Participant disagrees with the PCSP.  When this occurs, the Service Coordinator must provide the Participant with their due process and appeal rights.  Every Participant must receive a copy of his/her PCSP. A copy of the signed PCSP is given to the participant as well as all members of the PCPT.

The CHC Service Coordinator, in conjunction with the Participant and PCPT, are responsible for updating the PCSP annually by performing the minimum following roles in accordance with specific requirements and time frames, as established by OLTL:
• Conducting the annual re-assessment at least once every 365 days and whenever the Participant's needs change;
• Documenting contacts with individuals, families and providers;
• Record keeping;
• Locating services;
• Coordinating service coverage through internal or external sources;
• Monitoring services;
• Ensuring health and welfare of waiver Participants;
• Follow-up and tracking of remediation activities;
• Assuring information is in completed PCSP;
• Participating in PCSP reviews;

- Coordinating recommended services; and
- Reviewing plan implementation.

The Service Coordinator must communicate the service plan content to the provider or providers to ensure that service delivery matches the approved PCSP. The Service Coordinator must provide an authorization of service that includes the type, scope, amount, duration, and frequency of services to be provided and any preferences the participant has related to service delivery.

The direct service provider is responsible for providing the services in the amount, type, frequency, and duration that is authorized in the PCSP.  The provider is responsible to notify the Participant's CHC Service Coordinator when the Participant refuses services or is not home to receive the services as indicated in the authorized PCSP.

The Participant is responsible to notify their service provider when they are unable to keep scheduled appointments, or when they will be hospitalized or away from home for a significant period of time. The Participant is responsible for notifying their CHC Service Coordinator when a provider does not show up to provide the authorized services and is responsible to initiate their individual back-up plan in such instances.  If a participant is not capable of notifying their Service Coordinator or initiating a back-up plan a family member, or the participant's representative, will be designated the responsibility to do so.

f. How waiver and other services are coordinated:
The CHC-MCO and Service Coordinator must coordinate all necessary Covered Services and other services for Participants. The CHC-MCO and Service Coordinator must provide for seamless and continuous coordination of services across a continuum of services for the Participant with a focus on improving healthcare outcomes and independent living. These activities should be done as part of Person-Centered Service Planning and the PCSP implementation process.

The CHC Service Coordinator supports the Participant in identifying and gaining access to a continuum of services including HCBS services, as well as needed medical, social, educational, and other services, regardless of the funding source. The PCPT also reviews for the availability of informal supports in the person's community such as friends, family, neighbors, local businesses, schools, civic organizations and employers.  Coordination of these services is guided by the principles of preventing institutional placement and protecting the person's health, safety and welfare in the most cost-effective manner.  All identified services, whether available through the waiver or other funding sources, are outlined in the participant's PCSP, which is distributed by the CHC Service Coordinator to the Participant, PCPT and providers of service.  The CHC Service Coordinator is responsible for ensuring the ongoing coordination between services in the PCSP, as well as ensuring consistency in service delivery among providers.

g. The assignment of responsibility to monitor and oversee the implementation of the service plan:
CHC-MCOs are responsible for monitoring the implementation of the PCSP, including access to waiver and non-waiver services, the quality of service delivery, and the health, safety and welfare of participants. After the initiation of services identified in the Participant's PCSP, CHC-MCOs monitor the provision of services, to confirm services have been initiated and are being provided on an ongoing basis as authorized in the PCSP. CHC-MCOs also identify and address service gaps and ensure that back-up plans are being implemented and are functioning effectively. CHC-MCOs must develop methods for prompt follow-up and remediation of identified problems; policies and procedures regarding required time frames for follow-up and remediation must be submitted to OLTL for review and approval. CHC-MCOs must report on monitoring results to OLTL. Furthermore, CHC-MCOs must annually submit and obtain OLTL approval of their Service Coordination staffing, Participant contact plan, caseloads, the required and the frequency of in-person contact with Participants.  The CHC-MCO is responsible for on-going monitoring of PCSP implementation and of direct service providers. CHC-MCOs must conduct a formal administrative review annually for monitoring of direct service providers.

CHC Service Coordinators are responsible for documenting and monitoring at a minimum the following:
- The Participant is receiving the amount (units) of services that are in the PCSP.
- The Participant is receiving the frequency of services that are in PCSP.
- The participant receives the authorized services that are in the PCSP.
- The Participant is receiving the duration of services that are in the PCSP.

In addition, CHC service coordinators are responsible to use the standardized participant review tool designed by OLTL to capture information on Participants' health, welfare, and service needs in all HCBS settings.  The tool also captures

An individual/participant is advised routinely of his or her due process and appeal rights in accordance with OLTL policies. As stated before, this waiver application operates concurrently with an application to operate a managed care payment system for LTSS (i.e., CHC). A participant in CHC will have his or her rights to file a fair hearing request discussed as follows: at the time of enrollment, after enrollment, annually during the PCSP annual review meeting, and at any time the participant requests to change services or add new services.

At the time of application, the IEB is required to provide general information on due process and appeal rights to the applicant utilizing OLTL issued standard forms. A denial notice with appeal rights will be provided to applicants by the IEB if they do not complete the waiver application process, by OLTL if they do not meet the clinical or program eligibility requirements, or by the County Assistance Office (CAO) if they do not meet the financial eligibility requirements. The applicant has 30 calendar days from the mailing date of the written notifications to file an appeal.

In the event the applicant is enrolled into the waiver, the CHC-MCO is required to have a complaint and grievance system in compliance with 42 CFR Part 438, Subpart F. An enrolled participant may request a State Fair Hearing only after exhausting the CHC-MCO's complaint and grievance process referenced in the CHC 1915(b) waiver. Upon determining that it will uphold an adverse benefit determination, the CHC-MCO is required to utilize Department issued standard forms to provide information on how the participant may appeal the CHC-MCO's decision by requesting a State Fair Hearing. A participant has 120 calendar days from the date of the CHC-MCO's notice of adverse resolution to request a State Fair Hearing. A participant may request a State Fair Hearing any time the following circumstances occur:

1.   The participant is not given the choice of home or community-based waiver services, including the Living Independence for the Elderly (LIFE) program for individuals aged 55 and over, as an alternative to institutional care.

2.   The individual is denied his or her preference of waiver, LIFE or nursing facility services.

3.   The participant is denied his or her request for a new waiver-funded service(s), including the amount, duration, and scope of service(s).

4.   The participant experiences a reduction in the amount, duration and scope of services.

5.   The participant is denied the choice of willing and qualified waiver provider(s).

6.   The participant is denied the opportunity to self-direct their services.

7.   A decision or an action is taken to deny, suspend, reduce, or terminate a waiver-funded service authorized on the participant's ISP or when the participant is involuntarily terminated from participant direction.

Should the applicant/participant choose to file an appeal, they must do so with the agency that made the determination being questioned. Title 55 Pa. Code §275.4(a)(2) states that individuals must file an appeal with the agency that made the determination being questioned, and §275.1(a)(3) specifically includes social service agencies: "the term Department includes, in addition to County Assistance Offices, agencies which administer or provide social services under contractual agreement with the Department." The agency which receives the appeal from the participant will forward it to the Department's Bureau of Hearings and Appeals (BHA) for action.

It is the responsibility of the CHC-MCO and the IEB to provide any assistance the participant/applicant needs to request a hearing. The IEB provides assistance during the enrollment process and the CHC-MCO provides assistance after the participant has been enrolled. This may include the following:
•   Clearly explaining the basis for questioned decisions or actions.
•   Explaining the rights and fair hearing proceedings of the applicant or participant.
•   Providing the necessary forms and explaining to the applicant or participant how to file his or her appeal and, if necessary, how to fill out the forms.
•   Advising the applicant or participant that he or she may be represented by an attorney, relative, friend or other spokesperson and providing information to assist the applicant or participant to locate legal services available in the county.

Certain Waiver actions related to level of care and Medicaid ineligibility are also subject to fair hearing and appeal procedures established through the local CAO. The conflict-free entity making the Functional Eligibility Determination is required to participate in preparation for the hearing and at the hearing whenever an applicant appeals the clinical eligibility determination as part of the application process. CHC-MCOs are expected to participate when the Department sends a notice confirming the annual Functional Eligibility Redetermination and the individual appeals that notice.

Case 1:20-cv-00236-SES   Document 61-1   Filed 07/11/20   Page 24 of 80

The Office of Long-Term Living (OLTL) is responsible for the statewide administration of Pennsylvania's long-term services and support program, the Community HealthChoices (CHC).  OLTL's quality strategy will be to meet federal and state requirements in a manner which will bring about maximization of the quality of life, functional independence, health and well-being, and satisfaction of participants in OLTL programs.

OLTL responsibilities include assessing and improving the quality of services received by participants in various long-term living settings and monitoring fiscal and regulatory compliance.  Key bureaus focused on the operations of the Community HealthChoices program include:

• Bureau of Fee for Service Programs (BFFSP)
• Bureau of Quality Assurance and Program Analytics (BQAPA)
• Bureau of Coordinated and Integrated Services (BCIS)
• Bureau of Policy Development and Communications Management (BPDCM)
• Bureau of Finance (BOF)

All Bureaus play a role in ensuring CHC-MCOs and other related contractors comply with contractual obligations, and federal and state regulations.  Data analysis is utilized to measure effectiveness of program design and operations, which will help in identifying strategies for continuous quality improvements in the delivery of service.  Each of the contracts will have a contract manager to ensure vendor is meeting all contractual obligations, which includes IEB, F/EA, independent assessment, and the external quality review organization (EQR).

As part of stakeholder engagement, OLTL includes the Long-Term Services and Supports (LTSS) and Managed Long-Term Services and Supports (MLTSS) subcommittees of the Medical Assistance Advisory Committee to request feedback on quality management activities.

BQAPA's work consists of quantifying, analyzing, trending, and making initial recommendations regarding priorities and specific quality improvements to OLTL systems, and then monitoring system improvement changes for effectiveness.  All bureaus will work collectively to review data that has been compiled from the CHC-MCOs, on-site OLTL monitoring and data analysis conducted by the External Quality Review Organization, (EQRO).  These data sources are utilized to identify issues, trends and quality oversight, and is used in waiver reporting.  All CHC-MCOs are expected to adhere to contract requirements, and follow all OLTL bulletins, operational memo, and notices and meet expected time frames.

OLTL will implement a process for trending discovery and remediation information received from various points in the OLTL system as well as from the contracted EQR and the CHC-MCOs.  Reports will be created by BQAPA to trend various aspects of quality including administrative authority, health and welfare, financial accountability, service plan development and implementation, level of care review, and provider qualifications.  More detailed information, including performance measures, is available under each of the appendices that pertain to the six waiver assurances (see individual Appendix A, B, C, D, G and I, respectively).

CHC-MCOs are also required to annually administer the HCBS CAHPS Survey to gather feedback on HCBS participants' experience receiving long-term services and supports. CHC-MCOs will administer the most current version of the instruments and report survey results to DHS/OLTL as required under the CHC agreement. This includes using the Supplemental Employment Module specifically designed to be used alongside the HCBS CAHPS Survey tool as well as Pennsylvania specific questions designated by OLTL that relate to service plan, transportation, housing, and preventative health care. In 2018, each individual CHC-MCO will survey a random sample that generates a targeted number of complete surveys. Starting in 2019, the CHC-MCO will select a statistically valid random sample based on a 95% Confidence Level, ± 5% Confidence Interval, and a 50% Distribution, proportioned by region.

The overall results of the Pennsylvania OLTL HCBS CAHPS Survey will be provided to DHS/OLTL. MCOs will report on the aggregate information about experience of care related to the services and supports provided to the surveyed population. The current level and trend over time in the HCBS CAHPS composite measure scores will be reviewed by CHC-MCOs together with the component survey items that indicate actionable aspects of the experience of care. Opportunities for improving the experience of care will be identified and implemented. CHC-MCOs will submit a narrative report to DHS/OLTL with the results of each HCBS CAHPS Survey data

# PLAINTIFF EXHIBIT  B

# PENNSYLVANIA PREADMISSION SCREENING RESIDENT REVIEW (PASRR)
## EVALUATION LEVEL II FORM (Revised 9/1/2018)

When a Pennsylvania Preadmission Screening Resident Review (PASRR) Evaluation Level II form is completed, all supporting documents (see list in Section X) must be sent to the appropriate Department of Human Services (DHS) program office (Office of Mental Health and Substance Abuse Services, Office of Developmental Programs, or Office of Long-Term Living (ORC)).

**DATE OF ASSESSMENT:** _____

## SECTION I - DEMOGRAPHICS

| APPLICANT/RESIDENT'S NAME: | SOCIAL SECURITY NUMBER: | AGE: | BIRTH DATE: | COUNTY OF ORIGIN: |
|---|---|---|---|---|
| | | | | |

Is the applicant/resident enrolled in or applying for Medical Assistance (MA)?

☐ YES   ☐ NO        MA NUMBER:

## SECTION II - MEDICAL DOCUMENTATION

### II-A:  MEDICAL DIAGNOSIS(ES) AND ONSET

1. List all current diagnosis(es) related to his/her MI, ID/DD, or ORC and approximate date of onset (attach additional page(s) as necessary):

| DIAGNOSIS | DATE OF ONSET | DIAGNOSIS | DATE OF ONSET |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

### II-B:  BEHAVIORS

Does the individual currently display any of the following symptoms or behaviors to the degree that he/she may injure him/herself or endanger other nursing facility residents if not constantly supervised by healthcare personnel?

| | | | |
|---|---|---|---|
| Assaultive and/or self-abusive: | ☐ NO ☐ YES | Depression: | ☐ NO ☐ YES |
| Aggressive: | ☐ NO ☐ YES | Anxiety: | ☐ NO ☐ YES |
| Disruptive: | ☐ NO ☐ YES | Feelings of loneliness: | ☐ NO ☐ YES |
| Inappropriateness: | ☐ NO ☐ YES | Feelings of worthlessness: | ☐ NO ☐ YES |

Explanation of any of the symptoms or behaviors above:

_____

_____

### II-C:  MEDICATIONS

1. List all current medications and the diagnosis(es) for taking the medication (attach additional page(s) as necessary):

| MEDICATION | DIAGNOSIS | DOSE | FREQUENCY | SIDE EFFECTS |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

MA 376.2   9/18

NAME                                                                          SSN (LAST 4 DIGITS)

2.   Does the individual have any allergies or adverse reactions to any medications?   ☐ NO   ☐ YES - List below:

_____

_____

_____

## II-D:  NEUROLOGICAL

Check all that apply:

☐ Right-sided weakness                    ☐ Weakness in arms
☐ Left-sided weakness                     ☐ Weakness in legs
☐ Right-sided paralysis                   ☐ Weakness in hands
☐ Left-sided paralysis                    ☐ Weakness in feet
☐ Unsteady gait                           ☐ Alteration in response to pain/touch/temperature
☐ Shuffling gait                          ☐ Uncontrolled movements
☐ Excessively slow movements              ☐ History of falls - Last fall date: _____
☐ Use of assistive device(s) - List type(s): _____

## II-E:  FUNCTIONAL STATUS

Is the individual able to:

1.   Perform own ADLs?      ☐ NO   ☐ YES

     If not, list what individual is unable to do: _____

2.   Perform own IADLs?

     Treat own minor physical problems:          ☐ NO  ☐ YES    Prepare meals:                        ☐ NO  ☐ YES
     Schedule medical/mental health appointments: ☐ NO  ☐ YES    Maintain an adequately balanced diet: ☐ NO  ☐ YES
     Keep scheduled medical/mental health appointments: ☐ NO  ☐ YES    Manage personal finances:            ☐ NO  ☐ YES
     Take medications as prescribed:             ☐ NO  ☐ YES    Use money appropriately:              ☐ NO  ☐ YES
     Use transportation:                         ☐ NO  ☐ YES    Dress appropriately for season:       ☐ NO  ☐ YES

     Explain the assistance required for each "NO" response:

     _____

     _____

3.   Receptively and expressively communicate?

     Turn head toward speaker:                   ☐ NO  ☐ YES    Summarize topic/story logically:      ☐ NO  ☐ YES
     Understand one-step instructions:           ☐ NO  ☐ YES    Point to an item on request:          ☐ NO  ☐ YES
     Understand multi-step instructions:         ☐ NO  ☐ YES    Speak in at least 3-4 word sentences: ☐ NO  ☐ YES
     Shake head/nod appropriately in response to questions: ☐ NO  ☐ YES    Communicate pain/discomfort:          ☐ NO  ☐ YES
     Say at least ten words which can be understood: ☐ NO  ☐ YES    Communicate basic wants:              ☐ NO  ☐ YES

     For "NO" response, what are deficits/problems:

     _____

     _____

## II-F:  SUPPORTS/SOCIALIZATION

1.   Individual appropriately responds to others' initiations?   ☐ NO   ☐ YES

2.   Individual appropriately initiates contact with others?     ☐ NO   ☐ YES

3.   Individual has inappropriate responses/interactions?        ☐ NO   ☐ YES    If yes, descr be: _____

4.   List the individual's current medical and social/family supports:

     _____

     _____

     _____

     _____

MA 376.2  9/18

NAME

SSN (LAST 4 DIGITS)

5.  List activities that demonstrate the individual socializes with others:

_____

_____

_____

_____

## SECTION III - REVIEW TYPE

Select type(s) of Program Office review:

☐ Mental Health (MH) - Section IV

☐ Intellectual Disabilities/Developmental Disabilities (ID/DD) - Section V

☐ Other Related Conditions (ORC) - Section VI

**Complete each section(s) for the review type(s) checked above. Once the appropriate section(s) noted above have been completed, complete the remaining Sections VII through XI.**

MA 376.2   9/18

NAME _____    SSN (LAST 4 DIGITS) _____

## SECTION IV - MENTAL HEALTH (MH)

### IV-A:  DOCUMENTATION OF THE DIAGNOSIS

1. For **PASRR** purposes, Serious Mental Illness includes the following. Provide a response for each diagnosis listed. When checking "YES" for a current diagnosis, enter the year of onset and attach documentation. Examples of acceptable documentation include a current psychiatric assessment with diagnosis or other professionally accepted diagnostic practices by a qualified physician or psychiatrist, (see CFR §483.134).

| DIAGNOSIS | CURRENT? | ONSET YEAR | DIAGNOSIS | CURRENT? | ONSET YEAR |
|---|---|---|---|---|---|
| Schizophrenia | ☐ NO ☐ YES | | Panic or other severe anxiety disorder | ☐ NO ☐ YES | |
| Schizoaffective disorder | ☐ NO ☐ YES | | Somatic Symptom disorder | ☐ NO ☐ YES | |
| Delusional disorder | ☐ NO ☐ YES | | Personality disorder | ☐ NO ☐ YES | |
| Bipolar disorder | ☐ NO ☐ YES | | Depressive disorder | ☐ NO ☐ YES | |
| Psychotic disorder | ☐ NO ☐ YES | | Other | ☐ NO ☐ YES | |

2. Does a review of the applicant/resident's case history and/or medical record substantiate that the mental disorder is responsible for the functional limitations **in the last 3-6 months** in the following areas? (See PASRR Level I for definitions).

| | |
|---|---|
| Interpersonal functioning | ☐ NO ☐ YES |
| Concentration, persistence, and pace | ☐ NO ☐ YES |
| Adaptation to change | ☐ NO ☐ YES |
| Describe | |

3. Does a review of the applicant/resident's treatment history substantiate that the individual experienced **at least one** of the following **in the past two years**?

   a. Psychiatric treatment more intensive than outpatient care:   ☐ NO   ☐ YES

   If yes, descr be: _____

   b. An episode of significant disruption to the normal living situation for which supportive services were required to maintain functioning at home, or in a residential treatment environment, or which resulted in intervention by housing or law enforcement officials. (Supportive services include crisis intervention, intensive case management, and/or other social service agency intervention).   ☐ NO   ☐ YES

   If yes, descr be: _____

   c. Suicide ideation with a plan or attempt as reported by the individual, other, or verified by a psychiatric consult:   ☐ NO   ☐ YES

   If yes, descr be: _____

   d. Electroconvulsive Therapy - ECT (related to the Mental Health Condition):   ☐ NO   ☐ YES

   If yes, descr be: _____

   e. Mental Health Intensive Case Manager (ICM), Blended or Targeted Case Manager, Resource Coordinator (RC), Community Treatment Team (CTT) or Assertive Community Treatment (ACT):   ☐ NO   ☐ YES

   If yes, descr be: _____

### IV-B:  SUPPORTING INFORMATION

1. The assessor submits the items below to the Office of Mental Health and Substance Abuse Services for an evaluation of the individual's functional level and to identify the needs of the individual. Check off each item that has been included in the submission and attach the documentation to the PASRR Level II Evaluation.

| | |
|---|---|
| ☐ | Complete medical history. |
| ☐ | Review of all body systems. |
| ☐ | Specific evaluation of the person's neurological system in the areas of motor functioning, sensory functioning, gait, deep tendon reflexes, cranial nerves, and abnormal reflexes; additional evaluations conducted by appropriate specialists. |
| ☐ | A comprehensive drug history including current or immediate past use of medications that could mask symptom or mimic mental illness. |
| ☐ | A psychosocial evaluation of the individual, including current living arrangements, medical, and support systems. |
| ☐ | A comprehensive psychiatric evaluation including a complete psychiatric history, evaluation of intellectual functioning, memory functioning and orientation, description of current attitudes and overt behaviors, affect, suicidal or homicidal ideation, paranoia, and degree of reality testing (presence and content of delusions) and hallucinations. |
| ☐ | Functional assessment of the individual's ability to engage in activities of daily living. Include the level of support that would be needed to assist the individual to perform these activities while living in the community.  The assessment must also determine whether this level of support can be provided to the individual in an alternative community setting or whether the level of support needed is such that nursing facility placement is required. The functional assessment must address the following areas: Self-monitoring of health status, self-administering and scheduling of medical treatment, including medication compliance, or both, self-monitoring of nutritional status, handling money, dressing appropriately, and grooming. |

2. Was a Saint Louis University Mental Status (SLUMS) exam performed as part of the Long-Term Services and Supports (LTSS) assessment?

   ☐ NO - Please complete (see last page).      ☐ YES - Score: _____      ☐ Refused Test

3. Estimated level of intelligence of the individual during this evaluation:   ☐ High   ☐ Average   ☐ Low   ☐ Unknown

MA 376.2  9/18

NAME                                                                SSN (LAST 4 DIGITS)

## SECTION V:  INTELLECTUAL DISABILITY/DEVELOPMENTAL DISABILITY (ID/DD)

**V-A:  DOCUMENTATION OF THE DIAGNOSIS**

1.  Does the documentation indicate a diagnosis of an ID/DD?   ☐ NO   ☐ YES

Documentation can include, but is not limited to, IQ and adaptive testing (preferably before the age of 18), psychological reports, psychiatric reports, school records, summaries from the county ID/DD program or ID/DD agency, and other relevant professional reports.

List the documentation that supports ID/DD diagnosis:

_____

_____

No documentation exists, but family member, significant other, or legal representative state the following to indicate ID/DD diagnosis:

_____

_____

2.  Does the documentation provide evidence of the following characteristics?

    a. Significantly sub-average intellectual functioning with an IQ of approximately 70 or below on standardized intelligence testing identified by a qualified psychologist?   ☐ NO   ☐ YES

    b. Onset prior to the age of 18 (consider all relevant and informed sources)?   ☐ NO   ☐ YES

    c. Deficits in adaptive behavior or functioning on formal assessment?   ☐ NO   ☐ YES

3.  Indicate level of ID/DD:   ☐ Mild (50-69)   ☐ Moderate (35-49)   ☐ Severe (25-34)   ☐ Profound (<25)   ☐ Unspecified   ☐ Not known (scores not available)   ☐ None

**V-B:  SUPPORTING INFORMATION**

1.  Does the individual have a Supports Coordinator?   ☐ NO   ☐ YES -  List name of Supports Coordinator and Agency:

_____

2.  The assessor submits the items below to the Office of Developmental Programs for an evaluation of the individual's functional level and to identify the needs of the individual. Check off each item that has been included in the submission and attach the documentation to the PASRR Level II Evaluation.

| | |
|---|---|
| ☐ | Self-monitoring of health status. |
| ☐ | Self-administering and scheduling of medical treatments. |
| ☐ | Self-monitoring of nutritional status. |
| ☐ | Self-help development such as toileting, dressing, grooming and eating. |
| ☐ | Sensorimotor skills such as ambulation, positioning, transfer skills, gross motor dexterity, visual motor perception, fine motor dexterity, eye-hand coordination and the extent to which prosthetic, orthotic, corrective or mechanical supportive devices can improve the individual's functional capacity. |
| ☐ | Communication skills including expressive and receptive language and the extent to which a communication system, amplification device and/or program of amplification could improve the individual's functional capacity. |
| ☐ | Social skills including relationships, interpersonal, and recreation-leisure skills. |
| ☐ | Academic and educational skills including functional learning skills. |
| ☐ | Independent living skills involving meal preparation, budgeting and personal finances, survival skills, mobility skills (orientation to neighborhood, town, city, etc.), orientation skills for individuals with visual impairments, laundry, housekeeping, shopping, bed making, and care of clothing. |
| ☐ | Vocational skills. |
| ☐ | Affective skills including interests, ability to express emotion, making judgements, and independent decision-making. |
| ☐ | Presence of maladaptive or inappropriate behaviors including their description, frequency, and intensity. |

## SECTION VI:  OTHER RELATED CONDITIONS (ORC)

"Other Related Conditions" include physical, sensory or neurological disabilities which manifested before age 22 are likely to continue indefinitely and result in substantial functional limitations in **three or more** of the following areas of major life activity: self-care, receptive and expressive language, learning, mobility, self-direction, and capacity for independent living. It is important to note that a person can have an "Other Related Condition" **regardless of whether the ORC impairs their intellectual abilities.**

**VI-A:  DOCUMENTATION OF THE DIAGNOSIS**

1.  Is there documentation to substantiate that the individual meets the following criteria for an ORC?   ☐ NO   ☐ YES

Documentation is to include, but not limited to, a psychological evaluation, physician's note which indicates that the diagnosis and three functional limitations **occurred prior to age 22**, or a statement to this effect from the individual or family.

List the documentation that supports ORC diagnosis:

_____

_____

MA 376.2   9/18

| NAME | SSN (LAST 4 DIGITS) |
|------|---------------------|

2. Does the documentation provide evidence of the following characteristics?

   a. Has a physical, sensory, or neurological disability which is considered an "Other Related Condition".

      ☐ NO     ☐ YES - Specify condition/diagnosis(es): _____

   b. The condition manifested before age 22?        ☐ NO      ☐ YES

   c. The condition is expected to continue indefinitely.    ☐ NO      ☐ YES

**VI-B: SUPPORTING DOCUMENTATION**

1. Indicate areas where the individual has a **SUBSTANTIAL FUNCTIONAL LIMITATION** which has manifested prior to age 22.

   ☐ **Self-care:** A long-term condition which requires the individual to need significant assistance with personal needs such as eating, hygiene and appearance. Significant assistance may be defined as assistance at least one-half of all activities normally required for self-care.

   ☐ **Receptive and expressive language:** An individual is unable to effectively communicate with another person without the aid of a third person, a person with special skill or with a mechanical device, or a condition which prevents articulation of thoughts.

   ☐ **Learning:** An individual that has a condition which seriously interferes with cognition, visual or aural communication, or use of hands to the extent that special intervention or special programs are required to aid in learning.

   ☐ **Mobility:** An individual that is impaired in his/her use of fine and/or gross motor skills to the extent that assistance of another person and/or a mechanical device is needed in order for the individual to move from place to place.

   ☐ **Self-direction:** An individual that requires assistance in being able to make independent decisions concerning social and individual activities and/or in handling personal finances and/or protecting own self-interest.

   ☐ **Capacity for independent living:** An individual that is limited in performing normal societal roles or is unsafe for the individual to live alone to such as extent that assistance, supervision or presence of a second person is required more than half the time (during waking hours).

2. The assessor submits the items below to the Office of Long Term Living for an evaluation of the individual's functional level and to identify the needs of the individual. Check off each item that has been included in the submission and attach the documentation to the PASRR Level II Evaluation.

| | |
|--|--|
| ☐ | Sensorimotor development (ambulation, positioning, transfer skills, gross motor dexterity, visual motor perception, fine motor dexterity, eye-hand coordination) |
| ☐ | Speech and language development (includes expressive and receptive language, disorders, i.e. Communication disorders). |
| ☐ | Social development (includes interpersonal skills, recreation-leisure skills, and relationships with others). |
| ☐ | Academic/educational development (grade level of school completed and/or functional learning skills). |
| ☐ | Independent living development (includes meal preparation, budgeting and personal finances, survival skill, mobility skills [orientation to the neighborhood, town, etc.], laundry, housekeeping, shopping, bed making, care of clothing, and orientation skills for individuals with visual impairments). |
| ☐ | Vocational development (include present vocational skills). |
| ☐ | Affective development (such as interests and skills involved with expressing emotions, making judgments, and making independent decisions). |
| ☐ | IQ and adaptive function testing. |
| ☐ | Psychological evaluation. |
| ☐ | Presence of identifiable maladaptive or inappropriate behaviors of the individual based on systemic observation (include frequency and intensity of behavior). |
| ☐ | Extent to which prosthetic, orthotic-corrective or mechanical-supportive devices can improve the individual's functional capacity. |
| ☐ | Extent to which non-oral communication systems can improve the individual's functional capacity. |

## SECTION VII:  FINDINGS & RECOMMENDATION

### VII-A: EVALUATOR'S RECOMMENDATION

1. Does the individual have a suspected or confirmed serious mental illness, intellectual disability/developmental disability, or related condition which meets the criteria for further review by the respective program office?   ☐ NO   ☐ YES

2. Does the individual currently receive services in the community for the mental health condition, intellectual disability/developmental disability, or related condition?   ☐ NO   ☐ YES

   If yes, list what service(s): _____

3. Is individual seeking NF placement?   ☐ NO   ☐ YES

   If no, what placement setting is the individual seeking? _____

   If yes, what is the NF name? _____

4. Does the individual need health rehabilitative services (physical therapy, occupational therapy, speech therapy, restorative nursing) provided by the nursing facility for his/her mental illness, intellectual disability/developmental disability, or other related condition?   ☐ NO   ☐ YES

   If yes, list what service(s): _____

### VII-B: DESIRE FOR SPECIALIZED SERVICES

1. Explain to the individual, his/her legal representative and family member or significant other (if the individual agrees to family participation) that:

   Federal regulations state that a person with a serious mental illness, intellectual disability/developmental disability, or an other related condition must be provided services and supports, related to their mental health condition, intellectual disability/developmental disability, or other related condition that are necessary to assist him/her in attaining the highest practicable physical, mental, and psychological well-being. These specialized services are individualized and exceed the services and supports normally provided in a nursing facility.

   An individual may choose whether to participate in recommended specialized services.

      MA 376.2  9/18

NAME                                                                    SSN (LAST 4 DIGITS)

2.   Explain available Specialized Services using the definitions below.

Check the applicable program office box indicating that the individual, his/her representative, family member, or significant other has been informed of the services available.

☐   **a. Mental Health**

Specialized services for an individual that meets the clinical criteria for a serious mental illness include appropriate community-based mental health services such as:

- **Partial Psychiatric Hospitalization** – Services provided in a non-residential treatment setting which includes psychiatric, psychological, social, and vocational elements under medical supervision. Designed for patients with moderate to severe mental illness who require less than 24-hour continuous care but require more intensive and comprehensive services than offered in outpatient. Services are provided on a planned and regularly scheduled basis for a minimum of three hours, but less than 24 hours in any one day.

- **Psychiatric Outpatient Clinic** – Psychiatric, psychologist, social, educational, and other related services provided under medical supervision in a non-residential setting designed for the evaluation and treatment of patients with mental or emotional disorders.

- **Mobile Mental Health Treatment (MMHT)** – A service array for adults and older adults with a mental illness who encounter barriers to, or have been unsuccessful in attending an outpatient clinic. The purpose of MMHT is to provide therapeutic treatment to reduce the need for intensive levels of service including crisis intervention or inpatient hospitalization. MMHT provides treatment which includes evaluation; individual, group, or family therapy; and medication visits in an individual's residence or an approved community site.

- **Crisis Intervention Services** – Immediate, crisis-oriented services designed to ameliorate or resolve precipitating stress. Provided to persons who exhibit acute problems of disturbed thought, behavior, mood, or social relationships.

- **Targeted Mental Health Case Management (Intensive Case Management (ICM) and Resource Coordination (RC))** – ICM services are provided to assist adults with serious and persistent mental illness to gain access to needed resources such as medical, social, educational, and other services. Activities undertaken by staff providing ICM services include: linking with services, monitoring of service delivery, gaining access to services, assessment and service planning, problem resolution, informal support network building, and use of community resources. RC is provided to persons who do not need the intensity and frequency of contacts provided through ICM, but who do need assistance in accessing, coordinating, and monitoring of, resources and services.

- **Peer Support Services** – Person-centered and recovery-focused services for adults with serious and persistent mental illness. The services are provided by individuals who have been served in the public behavioral health system. The service is designed to promote empowerment, self-determination, understanding and coping skills through mentoring and service coordination supports that allow people with severe and persistent mental illness to achieve personal wellness and cope with the stressors and barriers encountered when recovering from their disabilities. Peer Specialists may provide site-based and/or mobile peer support services, off-site in the community.

- **Outpatient D&A Services, including Methadone Maintenance Clinic** – An organized, non-residential, drug-free treatment service providing psychotherapy in which the client resides outside the facility. Services are usually provided in regularly scheduled treatment sessions for, at most, five contact hours per week.

If the individual meets the clinical criteria for a serious mental illness and is admitted to a nursing facility, some mental health or substance use disorder services may need to continue to be provided to the individual. The provision of specialized services should be assured by the nursing facility and county mental health office.

☐   **b. Intellectual Disability/Developmental Disability**

Specialized services for an individual that meets the clinical criteria for an intellectual disability/developmental disability include appropriate community-based intellectual/developmental disability services which result in:

- The acquisition of behaviors necessary for an individual to function with as much self-determination and independence as possible; and
- The prevention or deceleration of regression or loss of current optimal functional status.

Specialized services are authorized for applicants/residents with an "intellectual disability/developmental disability" by the Office of Developmental Programs or its agent. For individuals with ID/DD, community specialized services may include but are not necessarily limited to the following:

- **Assistive Technology** – An item, piece of equipment, or product system that is used to increase, maintain, or improve an individual's functioning. Assistive technology services include direct support to an individual in the selection, acquisition, or use of an assistive technology device.

- **Behavioral Support** – This service includes functional assessment; development of strategies to support the individual based on assessment; and the provision of training to individuals, staff, parents, and caregivers. Services must be required to meet the current needs of the individual.

- **Communication Specialist** – Supports participants with non-traditional communication needs by determining the participant's communication needs, educating the participant and his/her caregivers on the participant's communication needs and the best way to meet those needs in their daily lives.

- **Companion Services** – Services are provided to individuals for the limited purposes of providing supervision and assistance focused on the health and safety of the adult individual with an intellectual disability/developmental disability. This service can also be used to supervise individuals during socialization or non-habilitative activities when necessary to ensure the individual's safety.

- **Housing Transition and Tenancy Sustaining Services** – This service includes <u>pre-tenancy</u> and housing sustaining supports to assist participants in being successful tenants in private homes owned, rented, or leased by the participants.

- **In-Home and Community Support** – In-home and Community Support is a direct service provided in home and community settings to assist participants in acquiring, maintaining, and improving the skills necessary to live in the community, to live more independently, and to participate meaningfully in community life.

- **Supports Coordination** – This is a service that involves the primary functions of locating, coordinating, and monitoring needed services and supports. Locating services and supports consists of assistance to the individual and his or her family in linking, arranging for, and obtaining services specified in an ISP, including needed medical, social, habilitation, education, or other needed community services.

- **Support (Medical Environment)** – This service may be used to provide support in general hospital or nursing home settings, when there is a documented need and the county program administrator or director approves the support in a medical facility. The service is intended to supply the additional support that the hospital or nursing home is unable to provide due to the individual's unique behavioral or physical needs.

- **Transportation** – Transportation is a direct service that enables individuals to access services and activities specified in their approved Individual Support Plan.

MA 376.2   9/18

NAME                                                                                              SSN (LAST 4 DIGITS)

☐ **c. Other Related Condition**

Specialized services for an individual that meets the clinical criteria for an other related condition include appropriate community-based services which result in:

- The acquisition of behaviors necessary for an individual to function with as much self-determination and independence as possible; and
- The prevention or deceleration of regression or loss of current optimal functional status.

Specialized services are authorized for applicants/residents with an "Other Related Condition" by the Office of Long-Term Living or its agent.  For individuals with ORC, community specialized services may include but are not necessarily limited to the following:

- **Service Coordination/Advocacy Services** – Development and maintenance of a specialized service plan, facilitating and monitoring the integration of specialized services with the provision of nursing facility and specialized rehabilitative services, and assisting or advocating for residents on issues pertaining to residing in nursing facilities.
- **Peer Counseling/Support Groups** – Linking residents to "role models" or "mentors" who are persons with physical disabilities and who reside in community settings.
- **Training** – In areas such as self-empowerment/self-advocacy, household management in community settings, community mobility, decision making, laws relating to disability, leadership, human sexuality, time management, self-defense/victim assistance, interpersonal relationships, certain academic/development activities, and certain vocational/development activities.
- **Community Integration Activities** – Exposing residents to a wide variety of unstructured community experiences which they would encounter in the event that they must or choose to leave the nursing facilities or engage in activities away from the nursing facilities.
- **Equipment/Assessments** – Purchase of equipment and related assessment for residents who plan, within the next two years, to relocate to community settings.
- **Transportation** – Facilitation of travel necessary to participate in the above specialized services.

3.  Based on your evaluation, will specialized services be needed if the individual will be served in a nursing facility?     ☐ NO   ☐ YES

    If yes, what specialized service(s) are recommended?

    _____
    _____

4.  If the individual will be served in a nursing facility, would he/she need any services of a lesser intensity than the previously mentioned specialized services?     ☐ NO   ☐ YES

    If yes, what service(s) are recommended?

    _____
    _____

5.  Does the individual understand what you have said about specialized services?     ☐ NO   ☐ YES

6.  If recommended, does the individual want to receive any specialized services?     ☐ NO   ☐ YES

    If yes, what service(s)?

    _____
    _____

## SECTION VIII:  NOTICE OF REFERRAL FOR FINAL DETERMINATION

You must now explain to the individual, legal representative, family member and/or significant other (if the individual agrees to family participation) that persons with a serious Mental Illness, Intellectual Disability, or an Other Related Condition may not always need nursing facility services, and should be in places more suited to their needs. Explain that this assessment is a way for making sure the individual is receiving the appropriate services to meet his/her needs and receiving the services in the setting that best fits his/her needs.

**For Persons with a Mental Health Condition:** You have (your relative/friend/responsible party has) been identified as requiring further evaluation by the DHS Office of Mental Health and Substance Abuse Services (OMHSAS). This form and related information will be forwarded in order to obtain a final determination regarding the need and appropriateness for nursing facility care and specialized services. You will receive a letter from OMHSAS outlining their decision.

**For Persons with Intellectual Disability/Developmental Disability:** You have (your relative/friend/responsible party has) been identified as requiring further evaluation by the DHS Office of Developmental Programs (ODP). This form and related information will be forwarded in order to obtain a final determination regarding the need and appropriateness for nursing facility care and specialized services. You will receive a letter from ODP outlining their decision.

**For Persons with an Other Related Condition:** You have (your relative/friend/responsible party has) been identified as requiring further evaluation by the DHS Office of Long-Term Living (OLTL). This form and related information will be forwarded in order to obtain a final determination regarding the need and appropriateness for nursing facility care and specialized services. You will receive a letter from OLTL outlining their decision.

MA 376.2  9/18

| NAME | SSN (LAST 4 DIGITS) |
|---|---|

## SECTION IX:  NAME AND CONTACT INFORMATION OF INDIVIDUAL COMPLETING THIS FORM

| PRINT NAME: | TITLE: | DATE: |
|---|---|---|
| SIGNATURE: | DATE: | TELEPHONE: |
| AGENCY: | | EMAIL: |

Does the individual want a copy of this evaluation?   ☐ NO   ☐ YES

If yes, please give individual a copy of the PASRR Level II Evaluation form. If you have questions about this form, please contact the person completing this form, identified above.

## SECTION X:  DOCUMENTATION TO INCLUDE FOR PROGRAM OFFICE REVIEW

Send the below documentation to the Program Office in the order it is listed below:

| MH | ID | ORC |
|---|---|---|
| ☐ Program Office Transmittal Sheet – This should be the 1st sheet in packet. | ☐ Program Office Transmittal Sheet – This should be the 1st sheet in packet. | ☐ Program Office Transmittal Sheet – This should be the 1st sheet in packet. |
| ☐ MA 51 (NF Field Operations may not have this) | ☐ MA 51 (NF Field Operations may not have this) | ☐ MA 51 (NF Field Operations may not have this) |
| ☐ Notification Sheet – Reminder – Include the FAX number for the hospital/NF. | ☐ Notification Sheet – Reminder – Include the FAX number for the hospital/NF. | ☐ Notification Sheet – Reminder – Include the FAX number for the hospital/NF. |
| ☐ PASRR Level I & Level II Reminder – for the Notification (page 10, PASRR Level II) list home address, NOT hospital unless client is homeless. | ☐ PASRR Level I & Level II Reminder – for the Notification (page 10, PASRR Level II) list home address, NOT hospital unless client is homeless. | ☐ PASRR Level I & Level II Reminder – for the Notification (page 10, PASRR Level II) list home address, NOT hospital unless client is homeless. |
| ☐ Comprehensive History & Physical Exam | ☐ Long-Term Services and Supports (LTSS) assessment | ☐ Long-Term Services and Supports (LTSS) assessment |
| ☐ Comprehensive Medication History (most current and immediate past) | ☐ Admission Report – To include History, Diagnoses, Physical Exam | ☐ Comprehensive History & Physical Exam |
| ☐ Comprehensive Psychosocial Evaluation | ☐ Nurses Notes – only the most recent (1 week prior to NF Admission) | ☐ Nurses notes including what Specialized Service would be helpful |
| ☐ Comprehensive Psychiatric Evaluation | ☐ Current Medication record | ☐ Course of Stay – any important issues during stay |
| ☐ Long-Term Services and Supports (LTSS) assessment | ☐ Course of Stay – any important issues during stay | ☐ Psychological evaluation |
| ☐ Last 3 days of the most current Physician's orders and progress notes at time of review, (if applicable). | ☐ Psychological evaluation – include school records with an IQ score before age of 18 if possible. | ☐ PT/OT/ST/SS/Physician Notes – only the most recent note (dates 1 week before anticipate admission to NF) |
| ☐ Last 3 days of the most current nurses' notes, (if applicable). | ☐ PT/OT/ST/SS/Physician Notes – only the most recent note (dates 1 week before anticipate admission to NF) | ☐ D/C Plans |
| ☐ Current medication record | ☐ D/C Plans | ☐ MDS – if individual is already in the NF |
| ☐ CT/Neurology Consults if applicable | ☐ MDS – if individual is already in the NF | |
| ☐ MDS – if individual is already in the NF | | |

MA 376.2  9/18

NAME                                                                                    SSN (LAST 4 DIGITS)

## SECTION XI:  NOTIFICATION SHEET

Assessor should:

• Complete the notification information below for all assessments,

• Make a copy of the assessment packet for their records; and then,

• Forward the assessment packet to the appropriate program office or its designee for a final determination.

**COPIES OF THE EVALUATION REPORT SHOULD BE SENT TO EACH OF THE FOLLOWING:**

**1. THE INDIVIDUAL BEING ASSESSED**

| NAME: | SOCIAL SECURITY NUMBER: | TELEPHONE NUMBER: |
|---|---|---|
| | | |

**2. THE LEGAL REPRESENTATIVE - A PERSON DESIGNATED BY STATE LAW TO REPRESENT THE INDIVIDUAL. THIS INCLUDES A COURT-APPOINTED GUARDIAN OR AN INDIVIDUAL HAVING POWER OF ATTORNEY.**

| NAME: | | TELEPHONE NUMBER: |
|---|---|---|
| ADDRESS: | | |
| CITY: | STATE: | Z P CODE: |

**3. ADMITTING/RETAINING NURSING FACILITY (NF)  (if known)**

| NAME: | | TELEPHONE NUMBER: |
|---|---|---|
| ADDRESS: | | FAX NUMBER: |
| CITY: | STATE: | Z P CODE: |
| ATTENTION: | | |

**4. INDIVIDUAL'S ATTENDING PHYSICIAN**

| NAME: | | TELEPHONE NUMBER: |
|---|---|---|
| ADDRESS: | | FAX NUMBER: |
| CITY: | STATE: | Z P CODE: |

**5. LIST FULL NAME OF DISCHARGING HOSPITAL (if individual is seeking nursing facility admission directly from a hospital)**

| NAME: | | TELEPHONE NUMBER: |
|---|---|---|
| ADDRESS: | | FAX NUMBER: |
| CITY: | STATE: | Z P CODE: |
| **CONTACT PERSON** | **CONTACT TELEPHONE** | **CONTACT EMAIL** |

**Have you listed the fax number for the Hospital/Nursing Facility on the Notification Sheet (this page) above?**      ☐ No    ☐ Yes

MA 376.2  9/18

# SLUMS EXAMINATION

Instructions can be found at: http://www.elderguru.com/downloads/SLUMS_instructions.pdf

| NAME: | AGE: |
|---|---|
| IS THE PATIENT ALERT? | LEVEL OF EDUCATION: |

___ / 1  **1** 1. What day of the week is it?

___ / 1  **1** 2. What is the year?

___ / 1  **1** 3. What state are we in?

4. Please remember these five objects. I will ask you what they are later.

   **Apple    Pen    Tie    House    Car**

___ / 3  5. You have $100 and you go to the store and buy a dozen apples for $3 and a tricycle for $20.

   **1** How much did you spend?

   **2** How much do you have left?

___ / 3  6. Please name as many animals as you can in one minute.

   **0** 0-4 animals    **1** 5-9 animals    **2** 10-14 animals    **3** 15+ animals

___ / 5  7. What were the five objects I asked you to remember? 1 point for each one correct.

___ / 2  8. I am going to give you a series of numbers and I would like you to give them to me backwards. For example, if I say 42, you would say 24.

   **0** 87    **1** 648    **1** 8537

___ / 4  9. This is a clock face. Please put in the hour markers and the time at ten min-utes to eleven o'clock.

   **2** Hour markers ok.

   **2** Time correct.

**1** 10. Please place an X in the triangle

___ / 2

**1** Which of the above figures is larg-est?

___ / 8  11. I am going to tell you a story. Please listen carefully because afterwards, I'm going to ask you some questions about it.

Jill was a very successful stockbroker. She made a lot of money on the stock market. She then met Jack, a devastatingly handsome man. She married him and had three children. They lived in Chicago. She then stopped work and stayed at home to bring up her children. When they were teenagers, she went back to work. She and Jack lived happily ever after.

   **2** What was the female's name?    **2** What work did she do?

   **2** When did she go back to work?    **2** What state did she live in?

**TOTAL SCORE:**

| SCORING | | |
|---|---|---|
| HIGH SCHOOL EDUCATION | | LESS THAN HIGH SCHOOL EDUCATION |
| 27 - 30 | NORMAL | 25 - 30 |
| 21 - 26 | MILD NEUROCOGNITIVE DISORDER | 20 - 24 |
| 1 - 20 | DEMENTIA | 1 - 19 |

CLINICIAN'S SIGNATURE                    DATE                    TIME

SH Tariq, N Tumosa, JT Ch bnall, HM Perry III, and JE Morley. The Saint Louis University Mental Status (SLUMS) Examination for detecting mild cognitive impairment and dementia is more sensitive than the Mini- Mental Status Examination (MMSE) - A pilot study. Am J Geriatr Psych 14:900-10, 2006.

MA 376.2  9/18

# PLAINTIFF EXHIBIT  C

## Service Coordination

**Q1. When will participants select their service coordinators for CHC implementation and then after the 180-day continuity-of-care period?**

A. Participants who transition into CHC at the implementation date for the CHC zone will have a 180-day continuity-of-care period for their long-term services and supports (LTSS), including service coordination. This means that the CHC-MCOs are required to continue services through all existing providers, including service coordination entities, for 180 days.

Before expiration of the 180-day continuity-of-care-period, CHC-MCOs will notify participants how their service coordination will be provided and whether their existing service coordination entity (SCE) will continue to provide services as the CHC-MCO's subcontractor. If the CHC-MCO does not contract with the participants existing SCE, the CHC-MCO will give participants the opportunity to choose a new service coordinator from amongst those employed by or under contract with the CHC-MCO.

**Q2. How and when will providers know which CHC-MCO is contracting with which service coordination entity? And when will providers receive this information?**

A. The CHC-MCOs will be responsible for service coordination under CHC. Providers should discuss service coordination with the MCOs.

**Q3. What happens to Service Coordination Entities (SCEs) after the Continuity-of-Care period?**

A. All existing SCEs on the date of implementation for each CHC zone are covered by the continuity-of-care period. After the continuity-of-care period ends, the CHC-MCO can decide to continue contracting with the SCE, conduct service coordination themselves, or execute a mixture of contracting and direct service coordination. CHC-MCOs are responsible for service coordination under the CHC agreement and are given the flexibility to decide how it is administered.

**Q4. Will CHC-MCOs have their own internal Service Coordination Entities (SCE) or will that be subcontracted to the existing SCEs?**

A. CHC-MCOs are responsible for service coordination under the CHC agreement and are given the flexibility to decide how to administer it. All existing SCEs that are enrolled in the PA Medical Assistance Program on the date of implementation for each CHC zone are covered by the continuity-of-care period. After the continuity-of-care period, the CHC-MCO can decide to continue contracting with SCEs, conduct service coordination themselves, or do a mixture of contracting and direct service coordination. If a CHC-MCO chooses to discontinue with a SCE at the end of the continuity-of-care period, the CHC-MCO must comply with the provider termination requirements in Exhibit V, which includes notifying the Department of Human Services (DHS) and the participants and providing the DHS with a termination work plan. If a SCE chooses to end contracting with a CHC-MCO at the end of the continuity-of-care period, the CHC-MCO must also comply with the provider notification requirement in Exhibit V.

**Q5. How many service coordination entities will be contracted by the CHC-MCOs?**

A.   During the continuity-of-care period, the CHC-MCOs must contract with all willing and qualified entities. After the continuity-of-care period, the CHC-MCOs will determine subcontracting arrangements. The CHC-MCOs should be contacted to discuss this topic.

**Q6. Will the CHC-MCOs have a local office in each region?**

A.   The CHC-MCO must have an administrative office within each CHC zone. In its discretion, the Department of Human Services (DHS) may grant exceptions if the CHC-MCO has administrative offices located elsewhere in Pennsylvania and the CHC-MCO is in compliance with all standards set forth by the Pennsylvania Department of Health (DOH) and Pennsylvania Insurance Department (PID).

**Q7. Will referrals be made from the service coordinators or from the CHC-MCOs and what is the process?**

A.   The CHC-MCOs will develop and issue the Person-Centered Service Plan, which includes referrals. Providers should contact the CHC-MCOs to discuss any questions.

**Q8. If a service coordination entity contracts with all CHC-MCOs, should participants expect to continue working with the same service coordinator as they have now?**

A.   CHC-MCOs are responsible for service coordination under the CHC Agreement and are given the flexibility to decide how to administer it. Every participant receiving long-term services and supports will choose a service coordinator. While participants who are transitioning into CHC at the implementation date for the CHC zone will have a continuity-of-care period for their service coordinator, participants who transition between CHC-MCOs after the implementation date will not have a continuity-of-care period for their service coordinators. If requested after the continuity- of-care period, participants may continue working with the same service coordinator if the service coordination entity is contracted with the CHC-MCO.

**Q9. Can service coordinators and supervisors only work with participants from one of the CHC-MCOs?**

A.   No, if a Service Coordination Entity subcontracts with multiple CHC-MCOs, they could potentially serve participants from all MCOs. Service Coordination Entities interested in providing ongoing service coordination under CHC should contact the CHC-MCOs to discuss potential subcontractor agreements. Service coordinators will continue providing services through the Office of Long-Term Living (OLTL) OBRA Waiver and ACT 150 Program.

**Q10. Can service coordinators and supervisors subcontract with more than one CHC-MCO or is it exclusive?**

A.   Yes, a Service Coordination Entity may subcontract with one or more CHC-MCOs. During the continuity-of-care period, the CHC-MCOs must contract with all willing and qualified entities. After the continuity-of-care period, the CHC-MCOs will determine subcontracting arrangements. The CHC-MCOs should be contacted to discuss this topic.

**Q11. Are Service Coordination Entities (SCE) required to be conflict free under CHC?**

    A.   Yes, the conflict-free requirements apply whether the CHC-MCOs own employees act as service coordinators or the CHC-MCO contracts with an SCE. SCEs, either CHC-MCO employees or subcontracted arrangements, cannot be a related party to a Medicaid provider.

**Q12. From a participant's perspective, how will a conflict of interest impact them?**

    A.   The conflict of interest restriction helps to ensure that the participant has the freedom to choose the long-term services and supports provider of their choice without undue pressure or incentives to steer individuals toward or away from certain choices.

**Q13. If service coordination is provided by non-CHC-MCO staff and contracted out, does the service coordination entity need to be an "enrolled Medicaid provider" in order for the CHC-MCO to contract with them for this service?**

    A.   Service Coordination Entities (SCEs) do not need to be enrolled as a Medical Assistance provider after the continuity-of-care period to subcontract with a CHC-MCO to provide SCE. However, SCEs will be required to maintain their enrollment status as a Medical Assistance provider with the Office of Long-Term Living (OLTL) in order to provide, and be reimbursed for, services under the OLTL OBRA Waiver and Act 150 Program.

**Q14. If the service coordination entity is a Medicaid provider only, do they need to become a Medicare provider as well in order to participate in CHC?**

    A.   Current Service Coordination Entities (SCE) should check with the CHC-MCOs on their credentialing requirements. CHC-MCOs are responsible for service coordination under the CHC Agreement and are given the flexibility to decide how to administer it. All existing SCEs that are enrolled in the Pennsylvania Medical Assistance Program on the date of implementation for each CHC zone are covered by the continuity-of-care period. After the continuity-of-care period, the CHC-MCO can decide to continue contracting with SCEs, conduct service coordination themselves, or do a mixture of contracting and direct service coordination.

**Q15. Will there be a process by which a service coordinator who has multiple years of direct experience providing service coordination be grandfathered if they don't have a social work or a related degree?**

A. Service coordinators hired prior to the CHC zone implementation date must have the qualifications and standards proposed by the CHC-MCOs and be approved by the Department of Human Services (DHS). Service coordinator supervisors hired prior to the CHC zone implementation date (who are not an RN or have a Master's degree in social work or in a human services or healthcare field and three years of relevant experience and be a Pennsylvania-licensed social worker or Pennsylvania-licensed mental health professional) must either: 1) obtain a license within one year of the implementation date of CHC in the applicable CHC zone; or 2) have the qualifications and standards proposed by the CHC-MCOs and approved by the DHS. Current service coordination entities should check with the CHC-MCOs on this question.

**Q16. Are the three CHC-MCOs working together regarding service coordination and supervisor educational requirements for consistency across the CHC-MCOs? If yes, what are they and what is the process for consideration?**

A. The CHC-MCOs should be contacted to discuss this topic.

**Q17. Will each CHC-MCO provide specific training for service coordinators and supervisors to learn compliance?**

A. The CHC-MCOs are required to train providers on service coordination. The CHC Agreement requires that each CHC-MCO must submit and obtain prior approval from the Department of Human Services of an annual provider education and training work plan that outlines its plans to educate and train network providers. This includes educating contracted and non-contracted providers regarding needs screening, comprehensive needs assessment and reassessment, service planning system and protocols, and a description of the provider's role in service planning and service coordination. Current service coordination entities should contact the CHC- MCOs to learn more about their training plans.

**Q18. Will Service Coordinators be available 24-hours a day?**

A.  The CHC-MCO's participant services functions must be operational at a minimum during regular business hours (9:00 a.m. to 5:00 p.m., Monday through Friday), plus one evening per week (5:00 p.m. to 8:00 p.m.) or one weekend per month to address non-emergency problems encountered by participants. The CHC-MCO must have arrangements to receive, identify, and resolve in a timely manner emergency participant issues on a 24 hour-per-day, seven day-per-week basis. The CHC-MCO must forward all telephone calls received by the participant service area in which the caller requests his or her service coordinator to the participant's service coordinator.

In the event a call is received beyond the hours of availability, CHC-MCO staff must record a message, including the participant's name, participant identification number and call back number, and forward the information to the service coordinator staff for a return call. The service coordinator or the service coordinator's designated back-up person must return the call as soon as possible but no longer than two business days from the receipt of the call unless the participant indicates the need for immediate assistance. The CHC-MCO will then direct the participant to the Nurse Hotline for assistance.

**Q19. For participants who have Medicare with a different health plan than the CHC MCO, how will these plans share medical information so that service coordinators are informed about hospitalizations in a timely manner?**

A.  The CHC-MCO must specify how it will coordinate with the participant's Medicare coverage in the participant's Person-Centered Service Plan.

**Q20. What will be the service coordination case load?**

A.  The CHC-MCOs are required to have sufficient staff to service participants. The CHC-MCO must annually submit and obtain the Department of Human Services approval of its service coordination staffing plan, including a staff-to-participant ratio. Providers should contact the CHC-MCOs to learn their specific staffing ratios.

**Q21. What is the anticipated caseload for service coordinators, and will this conflict with behavioral health case management services?**

A.  The CHC-MCOs are required to have sufficient staff to service participants. Providers should contact the CHC-MCOs to learn their specific staffing ratios. To enhance the treatment of participants who need both CHC and behavioral health services, the CHC-MCO must develop and implement written agreements with each BH-MCO in the CHC zone regarding the interaction and coordination of services provided to participants.

**Q22. How will the service coordinator role be different whether internal at the CHC-MCO or external at a contracted provider? Will the CHC-MCOs share the scope for contracted services?**

A. The CHC-MCOs will determine the roles of employed service coordination staff versus subcontract service coordination staff. The CHC-MCOs should be contacted to discuss the roles.

**Q23. What will the role of the CHC-MCO housing coordinator be in relation to the service coordinator?**

A. The service coordinator oversees the Person-Centered Service Plan (PSCP). Housing is one component of the PSCP, and the housing coordinator is part of the PCSP team. The CHC-MCO should be contacted to learn more details on the roles.

**Q24. Will nursing home transition and service coordination be merging under CHC?**

A. During the continuity-of-care period, the CHC-MCOs must contract with all willing and qualified nursing home transition and service coordination entities. After the continuity-of-care period, the CHC-MCOs will determine the roles and subcontracting arrangements for nursing home transition. The CHC-MCOs should be contacted to discuss this topic.

**Q25. How important is transitions of care in CHC and to the CHC-MCOs?**

A. Transitions of care are vitally important to the CHC program. Many of the CHC goals are dependent on improved transitions of care to serve more individuals in the community, strengthening coordination, enhance quality, and increase efficiency and effectiveness.

## Questions Added on December 2, 2019

**Q26. Does each participant get assigned a specific service coordinator with the CHC-MCO?**

A. Per Section V-J of the CHC Agreement, CHC-MCOs must provide each Participant with a choice of at least two Service Coordinators.

**Q27. What is the CHC-MCO's/SC's role while a consumer is in the hospital? Are they calling for updates and discharge information?**

A. The fundamental requirements of a service coordinator are the same as they were in the fee-for-service waivers. One of the objectives of CHC is to improve the coordination of care for participants. Under CHC, the service coordinator will coordinate Medicare, long-term services and supports, physical health services and behavioral health services. This includes actively engaging with hospital social workers and other health care providers to ensure seamless coordination between physical, behavioral and support services.

# PLAINTIFF EXHIBIT  D

## CHC Assessment Process

**Q1. Who will perform the level of care assessment, the participants needs assessment and redeterminations? What will the process be for those residing in nursing facilities?**

A.  DHS contracts with an Independent Assessment Entity (IAE) to conduct the initial level of care determinations for individuals seeking long-term services and supports (LTSS). The IAE is subcontracting with local Area Agencies on Aging to do the initial level of care determinations. CHC-MCOs are responsible for using the interRAI™ Home Care (HC) tool to perform comprehensive needs assessments and reassessments of participants receiving home and community-based LTSS no more than 12 months following the most recent prior comprehensive needs assessment. These comprehensive assessments must be conducted at least once every 12 months, unless a "trigger event" occurs, which would require a more frequent assessment. Trigger events are defined in the 1915(c) home and community-based waiver and CHC Agreement including but not limited to a hospitalization or change in functional status. The data collected by the CHC-MCOs on the interRAI™ tool during the comprehensive needs assessments will be provided to the IAE to use in making the annual redeterminations for functional eligibility. The process for the initial level of care determination is the same for nursing facility residents and those residing in the community. The Minimum Data Set (MDS) 3.0 is the assessment tool used in nursing facilities.

**Q2. Will the assessment process for the OPTIONS program change after CHC is implemented?**

A.  No, the assessment process will not change for the OPTIONS program after CHC implementation. Local Area Agencies on Aging will continue to perform the level of care assessment for OPTIONS.

**Q3. With the Centers for Medicare and Medicaid Services (CMS) currently focusing on similar data collection across the continuum of care, how does the interRAI™ HC assessment fit?**

A.  All CHC-MCOs are required to use the interRAI™ HC assessment tool to perform needs assessments and reassessments of HCBS LTSS participants' physical health, behavioral health, social, psychosocial, environmental, caregiver, LTSS, and other needs, as well as preferences, goals, housing, and informal supports. While CMS data was not used in developing the interRAI™ HC assessment tool, it is currently used worldwide and in many states, and is consistent with the information collected on the Minimum Data Set (MDS) 3.0, the assessment tool used in nursing facilities.

**Q4. Will clinical eligibility be reviewed periodically?**

A.  **Revised December 2, 2019.** Please see Q1, Q5 and Q6 in the CHC Assessment Process section of this document for more information.

**Q5. With reassessments being completed every 12 months or based on trigger events, what are the requirements for CHC-MCO contacts (phone and in-person) with participants?**

A.  CHC-MCOs must conduct an in-person comprehensive needs assessment of all NFCE participants, as well as any participant who has an immediate need for services, unmet needs, service gaps, or a need for service coordination. The CHC-MCO must perform a comprehensive needs reassessment every 12 months unless a trigger event occurs. If a trigger event occurs, the CHC-MCO must complete a reassessment as expeditiously as possible in accordance with the circumstances and as clinically indicated by the participant's health status and needs, but in no case more than 14 days after the occurrence of the trigger event. Trigger events are defined in the 1915(c) home and community-based waiver and CHC Agreement including but not limited to a hospitalization or change in functional status.

In addition, if the CHC-MCO identifies that a Participant has not been receiving services to assist with activities of daily living as indicated on the service plan for a period of 5 days or more, and the suspension of services was not pre-planned, the CHC-MCO must communicate with the Participant to determine the reason for the service suspension within 24 hours of identifying the issue. If, after communicating, the CHC-MCO determined that the Participant's health status or needs have changed, then the CHC-MCO must conduct a comprehensive needs assessment within 14 days of identifying the issue.

The CHC-MCOs must annually submit and obtain Department approval of its service coordination staffing plan including the required frequency of in-person service coordinator contact.

**Q6. Will a service coordinator conduct the annual comprehensive needs assessment?**

A.  The CHC-MCO will determine if the comprehensive needs assessment is done by CHC-MCO staff or by a contracted service coordinator. Service coordination entities that have subcontracted with a CHC-MCO should discuss this topic with the CHC-MCO.

**Q7. How does the Functional Eligibility Determination (FED) comply with nursing facility clinically eligible when it has no medical questions? What role do physicians play in the FED?**

A.  Determination of whether an individual is nursing facility clinically eligible (NFCE) requires input from an individual's physician in the form of a physician certification. The physician's certification form indicates the physician's diagnosis and clinical eligibility recommendation. The FED tool is a determination of an individual's long-term care needs, and focuses on whether the individual needs help with essential activities of daily living, such as moving around the house and eating. DHS uses both the physician's medical certification and the FED tool to determine whether an individual is NFCE.

**Q8. If the CHC-MCO makes a referral to the Independent Enrollment Broker (IEB), is the CHC-MCO required to have a process in place to follow that referral from phone call through completed enrollment?**

  A. The CHC-MCO is not required to have a process in place to monitor an individual's enrollment application however, if the CHC-MCO is a COMPASS community partner, then the CHC-MCO will have the ability to track an individual's application.

**Q9. When will the FED and needs assessment be available to the service coordination entities to review?**

  A. The interRAI™ HC assessment tool, which will be used for needs assessments and the annual level of care redetermination, will be available to service coordinators when CHC is implemented in each respective zone.

**Q10. What qualifications will the person conducting comprehensive needs assessments and reassessments have?**

  A. Service Coordinators are responsible for conducting the comprehensive needs assessments and reassessments. Service coordinators must: (1) be a Registered Nurse (RN); or (2) have a Bachelor's degree in social work, psychology, or another related fields with practicum experience; or (3) have at least three (3) or more years of experience in a social service or healthcare related setting. Service Coordinators hired prior to the CHC zone implementation date must have the qualifications and standards proposed by the CHC-MCOs and approved by the Department.

**Q11. When participants switch to a different CHC-MCO, their service coordinator will also change. Does this mean services will be reassessed?**

  A. The current CHC-MCO will transfer a participant's information to the new CHC-MCO. The new CHC-MCO may conduct a reassessment based on its review of the previous information and discussion with the participant. Some CHC-MCOs may gather additional information in their assessments that supplements information from the standard assessment tool all CHC-MCOs must use. In that case, participants may be reassessed or asked supplemental questions.

**Q12. What are expectations around the timeframes for the various assessments which are required?**

A. The IEB is responsible for facilitating enrollment in CHC. The FED, which determines whether a participant is clinically eligible for LTSS, will be conducted by the IAE. After an individual submits their application for LTSS enrollment to the IEB, the IEB has three days to notify the IAE of the need for an FED. The FED must be completed within ten business days of a request from the IEB. The IAE must transmit the results back to the IEB within 15 days of the request.

Once a participant is enrolled in a CHC-MCO, the CHC-MCO must complete an in-person comprehensive needs assessment in accordance with the following timeframes:

1. For nursing facility clinically eligible participants who are not receiving long-term services and supports on their enrollment date, no later than five business days from the start date.
2. For dual eligible participants identified by the IEB as having a need for immediate services, no later than five business days from the start date.
3. For participants who are identified as having unmet needs, service gaps, or a need for service coordination, no later than 15 business days from the date the CHC-MCO is aware of the unmet needs, service gaps, or need for service coordination.
4. For participants with existing Person-Centered Service Plans (PCSP) in place on the start date, within 180 days of the start date, except for participants who are due for a level of care redetermination prior to the 180th day following the start date, within five business days of the level of care redetermination.
5. When requested by a participant or a participant's designee or family member, no later than 15 days from the request.

The CHC-MCO must conduct a comprehensive needs reassessment of NFCE participants annually, unless a trigger event (such as a hospitalization, change in caregivers, or change in home setting) occurs. If a trigger event occurs, the CHC-MCO must complete a reassessment as quickly as possible, given the circumstances and the Participant's health status and needs, but in no case more than 14 days after a trigger event.

**Q13. Will the Case Management Instrument (CMI) for participants receiving HCBS be replaced with the FED tool or will the CHC-MCOs have their own assessment tool for use at the annual reassessment or to assess a change in need?**

A.   The Department of Human Services uses the FED to determine whether an LTSS applicant meets the required level of care and is clinically eligible for LTSS. The IAE completes the initial FED.

For participants who are clinically eligible for LTSS ("NFCE") and enrolled in a CHC-MCO, the CHC-MCO will conduct the initial comprehensive needs assessments and reassessments using a tool designated by DHS. DHS selected the interRAI™ HC assessment tool for needs assessments and reassessments. Reassessments are conducted once every 12 months or when a trigger event, (such as a hospitalization or change in functional status) occurs.

As required by federal law, annual redeterminations of clinical eligibility will still be conducted under CHC. The CHC-MCO will transmit the information gathered using the interRAI™ HC tool during the needs reassessment to the IAE for the annual eligibility redetermination. The IAE will make the redetermination decision, subject to oversight by DHS.

**Q14. What was the outcome of the assessor's training held in April of 2017?**

A.   **Revised December 2, 2019.**  The assessors who participated in the testing phase of the FED development were trained in April of 2017. The training was successful in informing and preparing the assessors to administer the new FED tool.  All assessors were trained prior to the implementation of the FED in April 2019.

## Questions Added on December 2, 2019

**Q15. Can you describe your anticipated procedure for assuring annual FED assessments are done on a timely basis?**

A.   As required by federal law, annual redeterminations of clinically eligibility will still be conducted under CHC. The CHC-MCO will transmit the information gathered using the interRAI™ HC tool during the needs reassessment to the IAE for the annual eligibility redetermination. The IAE will make the redetermination decision, subject to oversight by DHS. DHS monitors the CHC-MCOs to ensure that FED assessments are completed on a timely basis.

# PLAINTIFF EXHIBIT  E

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| Miranda Doxzon, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | C.A. No: 1:20-cv-00236 |
| | : | |
| Department of Human Services of the | : | |
| Commonwealth of Pennsylvania, | : | Jury Trial Demanded |
| Teresa D. Miller, in her official | : | |
| capacity as Secretary of the | : | |
| Department of Human Services and | : | |
| in her individual capacity, and | : | |
| Kevin Hancock in his individual | : | |
| capacity. | : | |
| | : | |
| Defendants. | : | |

## SUPPLEMENTAL DECLARATION OF MIRANDA DOXZON

I, Miranda Doxzon, declare based on personal knowledge as follows:

1.      I am 21 years old.

2.      I am from Philadelphia, Pennsylvania.

3.      I have multiple disabilities, including cerebral palsy, epilepsy, and depression, which substantially limit me in activities such as walking and caring for myself.

4.      I have always wanted to live in the community as independently as possible.

5.     When I was transferred out of the child welfare system and into the adult system, I made this clear to everyone including the service coordinator assigned to me.

6.     I repeatedly asked to be provided with services and an apartment in the community.

7.     In January and February 2020, I was trapped in the nursing home and feeling hopeless and depressed, my friend, Joy Burrell, offered to allow me to stay in her basement with appropriate services until a more permanent community living arrangement was provided.

8.     While I was still living in the nursing facility, I asked my service coordinator about this multiple times, but no one visited the home or contacted Ms. Burrell.

9.     I could not force myself to return to the nursing home after I was hospitalized in February 2020.  Even though the home had not been made accessible and other services were not in place, my friend, Ms. Burrell, agreed to let me move into her basement and to provide and ask her sister to provide personal assistance services.

10.     Since my last declaration in April 2020, I have continued to live in my friend's basement without access to the services and supports that I need.

2

11.   Ms. Burrell has made it clear that I cannot continue to live in her home.

12.   I do not want to continue to live in Ms. Burrell's home.  I want to live more independently in the community.

13.   I want to learn the life and job skills I need to live as independently as possible.

14.   On June 29, 2020, I was taken to the emergency room because I was experiencing leg pain.  Ms. Burrell told me that I would not be permitted to return to her home.

15.   I was advised by hospital personnel that I would be discharged, but I had nowhere to go.

16.   I was very upset and scared that I would be homeless or sent back to an institution.

17.   I do not want to be sent back to an institution or to be homeless.

18.   On the morning of June 30, 2020, I called my service coordinator to find out where I could live and receive services in the community.  I was not able to reach her.

3

19.   Later in the day on June 30, 2020, I was able to reach my service coordinator.  She did not provide me with any options for community-based services.

20.   I need a place to live in the community where services can be provided to me.

21.   Hospital staff told me that they were going to take me back to Ms. Burrell's home.

22.   Ultimately, hospital staff agreed to wait until 5 p.m., after my lawyers spoke to the judge, but that if no solution was found, they would take me to Ms. Burrell's home.

23.   At approximately 5:00 p.m. on June 30, 2020, I was transported back to my friend's house.

24.   I was terrified.

25.   Because I have no other place to go, Ms. Burrell agreed to allow me to stay at her house temporarily.  She has made it clear that I need to leave as soon as possible.  It is my understanding that I need to leave Ms. Burrell's home by the evening of July 2, 2020.  Even if my friend would permit me to stay on a longer-term basis, I do not have access to the services and supports that I need.

4

26.    I am scared and confused.  I do not feel safe continuing to live at Ms. Burrell's home.  I do not understand why no options for community-based services are being offered to me.

27.    I do not understand why the Department of Human Services wants to lock me away in an institution.

28.    I want to live in the community and can live in the community if I receive the appropriate services.

29.    I want to learn all the skills I need to live as independently as possible.

30.    I hope someone can help me and that the Department of Human Services will provide the services and supports I need in the community.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed this ____ls+____ day of ____Jdy_____, 2020.


_____
Miranda Doxzon



# PLAINTIFF EXHIBIT  F

undefined

**tsaycegoldsby@amerihealthcaritas.com**(On behalf of: Sayce-Goldsby, Theresa)
Organization Unit: ACFC Corporate

Participant: **MIRANDA DOXZON**   Age: 21   ID: █████   DOB: █████

| | | | |
|---|---|---|---|
| **Medicaid #** | █████ | **County:** | Philadelphia |
| **Primary Language:** | English | **Address:** | ████████ |
| **Phone #:** | █████ | | |

---

**Organization Unit:** Keystone First CHC **By:** Sandra Young  Delete Edit
**Contact Type:** Participant Telephonic **Reason:** Potential Quality of Care Concern **April 30, 2020, 9:04 AM**
**Tags:** Successful, 4/29/2020 Eligibility verified and HIPPA confirmed with name, phone number and date of birth. Service coordinator received a call from Ms. Doxzon on this date . Participant wanted me to talk with a "friend" who is helping her to look for apartment, and Ms. Doxzon stated she is still considering moving out of Ms. Burrell's home. Ms. Doxzon stated the friend was someone who took care of her when she was little. Service coordinator explained to MS. Doxzon that without a release that included the person's name I could not speak to anyone saying they were a friend of hers who would call my number. Ms. Doxzon stated the person ( she never did give me their name) had questions for me about her services. Service coordinator suggested that her friend compile a list of questions that Miranda can ask or Ms. Doxzon with her friend could call me together and service coordinator would be happy to answer their questions. Ms. Doxzon was also reminded that if she is to move there should be a plan in place so that agency chosen has been contacted and can accommodate her hours required and has trained staff that can use a Hoyer lift. Sandra Young BA, service coordinator

4/29/2020 Eligibility verified and HIPPA confirmed with name, phone number and date of birth. Service coordinator received a call from Ms. Doxzon on this date . Participant wanted me to talk with a "friend" who is helping her to look for apartment, and Ms. Doxzon stated she is still considering moving out of Ms. Burrell's home. Ms. Doxzon stated the friend was someone who took care of her when she was little. Service coordinator explained to MS. Doxzon that without a release that included the person's name I could not speak to anyone saying they were a friend of hers who would call my number. Ms. Doxzon stated the person ( she never did give me their name) had questions for me about her services. Service coordinator suggested that her friend compile a list of questions that Miranda can ask or Ms. Doxzon with her friend could call me together and service coordinator would be happy to answer their questions. Ms. Doxzon was also reminded that if she is to move there should be a plan in place so that agency chosen has been contacted and can accommodate her hours required and has trained staff that can use a Hoyer lift. Sandra Young BA, service coordinator

---

**Organization Unit:** Keystone First CHC **By:** Sandra Young  Delete Edit
**Contact Type:** State Partner (telephonic) **Reason:** Inquiry **April 28, 2020, 12:06 PM**
**Tags:** Successful, 4/27/2020 Eligibility verified by participant's file and HIPPA confirmed with name, date of birth and address. Service coordinator spoke with Kevin from Adult Protective Services for a follow up after APS spoke with Ms. Doxzon. Ms. Doxzon reported to APS that everything if fine and the incident was due to her having an outburst, and she is not asking to move of Ms. Burrell's home. APS reports the home is clean, handicapped accessible and it appears much was done to accommodate Ms. Doxzon. There are no other concerns at this time regarding Ms. Doxzon. Sandra Young BA, service coordinator.

4/27/2020 Eligibility verified by participant's file and HIPPA confirmed with name, date of birth and address. Service coordinator spoke with Kevin from Adult Protective Services for a follow up after APS spoke with Ms. Doxzon. Ms. Doxzon reported to APS that everything if fine and the incident was due to her having an outburst, and she is not asking to move of Ms. Burrell's home. APS reports the home is clean, handicapped accessible and it appears much was done to accommodate Ms. Doxzon. There are no other concerns at this time regarding Ms. Doxzon. Sandra Young BA, service coordinator.

---

**Organization Unit:** Keystone First CHC **By:** Jennifer Petty  Delete Edit
**Contact Type:** Provider Other (Email, Mail, Text, Fax) **Reason:** Services Initiated **April 24, 2020, 8:49 AM**

**Tags:** Successful, Date Services Initiated: 04/24/2020, UM approved the request for continued 168 hours a week of PAS, SC notified via email., PAS (Agency)(W1793//)

UM approved the request for continued 168 hours a week of PAS, SC notified via email.

**Organization Unit:** Keystone First CHC **By:** Sandra Young Delete Edit
**Contact Type:** Participant Telephonic **Reason:** Inquiry **April 23, 2020, 6:06 PM**
**Tags:** Successful, 4/23/2020 Eligibility verified and HIPPA confirmed by name, phone number and date of birth. Service coordinator received a call form participant on this date. Miranda has reported that after speaking to Shannon whom she is now working with from Disability Rights. Miranda stated they are working on having the state pay for her to return to Spectrum, and she could move in within 24 hours. She then ask again if Keystone would be willing to pay for her to move back to Spectrum. I tried to get more clarification from Ms. Doxzon regarding the state paying for Spectrum but then asking if Keystone would pay for her to live at Spectrum, but Miranda was not clear. She stated she wanted Shannon to call me directly but Shannon told her it would be better for Miranda to call. Miranda is now wanting this to happen right away. Service coordinator will again send an email detailing this conversation to supervisor Jamie Johnson, Heather Lawson, Jennifer Rogers as well as Theresa Sayce-Goldsby to inform them of requests made by Ms. Doxzon. Sandra Young, BA, service coordinator.

4/23/2020 Eligibility verified and HIPPA confirmed by name, phone number and date of birth. Service coordinator received a call form participant on this date. Miranda has reported that after speaking to Shannon whom she is now working with from Disability Rights. Miranda stated they are working on having the state pay for her to return to Spectrum, and she could move in within 24 hours. She then ask again if Keystone would be willing to pay for her to move back to Spectrum. I tried to get more clarification from Ms. Doxzon regarding the state paying for Spectrum but then asking if Keystone would pay for her to live at Spectrum, but Miranda was not clear. She stated she wanted Shannon to call me directly but Shannon told her it would be better for Miranda to call. Miranda is now wanting this to happen right away. Service coordinator will again send an email detailing this conversation to supervisor Jamie Johnson, Heather Lawson, Jennifer Rogers as well as Theresa Sayce-Goldsby to inform them of requests made by Ms. Doxzon. Sandra Young, BA, service coordinator.

**Organization Unit:** Keystone First CHC **By:** Sandra Young Delete Edit
**Contact Type:** Participant Telephonic **Reason:** Inquiry **April 23, 2020, 5:50 PM**
**Tags:** Successful, 4/23/2020 Eligibility verified by participant's file and HIPPA confirmed by name, date of birth and phone number. Service coordinator received a phone call from Joy Burrell friend/caregiver regarding Ms. Doxzon. Ms. Burrell stated that after a discussion with Miranda earlier where she had asked participant what her timeline would be to move out Ms. Doxzon escalated and there was another outburst from Ms. Doxzon. Ms. Burrell stated she only wanted Ms. Doxzon to provide her with a estimated time frame so that she could assist Ms. Doxzon with coordinating services. Ms. Burrell was tearful and upset that Ms. Doxzon had made the decision to leave after she had done so much to get her there. Ms. Burrell also wanted to inform service coordinator of her concerns for Miranda's safety as she feels that much of this comes from her desire to continue to associate with men she had been meeting online. Ms. Burrell again stated she had never asked Ms. Doxzon to leave nor had she asked her to leave. Ms. Burrell stated she felt Miranda would benefit from therapy and service coordinator suggested that Jamila her counselor from Mobile psych be informed of what is transpiring in hopes she could work with Miranda on her concerns. Ms. Burrell has already been in contact and Jamila has been made aware and has attempted to reach out to participant. Service coordinator will continue to follow up. Sandra Young BA, service coordinator

4/23/2020 Eligibility verified by participant's file and HIPPA confirmed by name, date of birth and phone number. Service coordinator received a phone call from Joy Burrell friend/caregiver regarding Ms. Doxzon. Ms. Burrell stated that after a discussion with Miranda earlier where she had asked participant what her timeline would be to move out Ms. Doxzon escalated and there was another outburst from Ms. Doxzon. Ms. Burrell stated she only wanted Ms. Doxzon to provide her with a estimated time frame so that she could assist Ms. Doxzon with coordinating services. Ms. Burrell was tearful and upset that Ms. Doxzon had made the decision to leave after she had done so much to get her there. Ms. Burrell also wanted to inform service coordinator of her concerns for Miranda's safety as she feels that much of this comes from her desire to continue to associate with men she had been meeting online. Ms. Burrell again stated she had never asked Ms. Doxzon to leave nor had she asked her to leave. Ms. Burrell stated she felt Miranda would benefit from therapy and service coordinator suggested that Jamila her counselor from Mobile psych be informed of what is transpiring in hopes she could work with Miranda on her concerns. Ms. Burrell has already been in contact and Jamila has been made aware and has attempted to reach out to participant. Service coordinator will continue to follow up. Sandra Young BA, service coordinator

**Organization Unit:** Keystone First CHC **By:** Sandra Young Delete Edit
**Contact Type:** State Partner (telephonic) **Reason:** Inquiry **March 3, 2020, 5:02 PM**
**Tags:** Successful, 3/3/2020 Eligibility verified and HIPPA confirmed by name, address and date of birth. Service coordinator spoke with Rachel Mann from disability rights. Service coordinator update Ms. Mann with the plan and services that are being requested for Ms. Doxzon including PAS hours, home-delivered meals, transportation, and home modifications including ramps for front and back entrance and widening of bathroom to make wheelchair accessible. Sandra Young BA service coordinator.

3/3/2020 Eligibility verified and HIPPA confirmed by name, address and date of birth. Service coordinator spoke with Rachel Mann from disability rights. Service coordinator update Ms. Mann with the plan and services that are being requested for Ms. Doxzon including PAS hours, home-delivered meals, transportation, and home modifications including ramps for front and back entrance and widening of bathroom to make wheelchair accessible. Sandra Young BA service coordinator.

**Organization Unit:** Keystone First CHC **By:** Sandra Young Delete Edit
**Contact Type:** Participant Other (Email, Mail, Text, Fax) **Reason:** Inquiry **March 3, 2020, 4:39 PM**
**Tags:** Successful, 3/3/2020 Eligibility verified and HIPPA confirmed by name, date of birth, and address. Addendum to assessment note for 3/2/2020. Home modifications have been requested by participant and agreed upon by home owner. Ms. Burrell had already explored other options for assistance with home modifications including their church and the other agencies Participant is now requesting assistance from Keystone First CHC. Sandra Young BA, service coordinator.

3/3/2020 Eligibility verified and HIPPA confirmed by name, date of birth, and address. Addendum to assessment note for 3/2/2020. Home modifications have been requested by participant and agreed upon by home owner. Ms. Burrell had already explored other options for assistance with home modifications including their church and the other agencies Participant is now requesting assistance from Keystone First CHC. Sandra Young BA, service coordinator.

**Organization Unit:** Keystone First CHC **By:** Lauren Everly Delete Edit
**Contact Type:** Provider Other (Email, Mail, Text, Fax) **Reason:** Inquiry **March 3, 2020, 12:20 PM**
**Tags:** Successful, A request for additional information has been sent via email to the service coordinator. Please provide the additional information by March 17, 2020. A letter has been generated in JIVA to send to the participant regarding the additional information requested. We are reviewing the following participant's request. Please clarify the following: 1.Do you have eh COC from the previous provider showing the participant receiving 24/7 care prior to entering rehab? 2. Who is the participants paid caregiver? Do they live with the participant?

A request for additional information has been sent via email to the service coordinator. Please provide the additional information by March 17, 2020. A letter has been generated in JIVA to send to the participant regarding the additional information requested. We are reviewing the following participant's request. Please clarify the following: 1.Do you have eh COC from the previous provider showing the participant receiving 24/7 care prior to entering rehab? 2. Who is the participants paid caregiver? Do they live with the participant?

**Organization Unit:** Keystone First CHC **By:** Sandra Young Delete Edit
**Contact Type:** Participant Face to Face **Reason:** Assessment **March 2, 2020, 4:37 PM**
**Tags:** Successful, /2/2020 Eligibility verified and service coordinator reviewed file before visit. Service coordinator was meeting with participant with supervisor Jamie Johnson also on this date to complete a Comprehensive Needs Assessment due to participant transitioning from a nursing home facility to a private home. Ms. Doxzon was recently hospitalized at Einstein Hospital and has chosen to move in with a family friend in a small studio-like apartment in the basement of her friend's home. Service coordinator was met by Ms. Joy Burrell, friend and caregiver and brought down to where participant was. Ms. Doxzon was laying her hospital bed because she is unable to transfer to a wheelchair. Ms. Doxzon's wheelchair has not been transferred to her new home from the nursing facility and the one provided she cannot use because here is no safely belt. Ms. Doxzon cannot sit safely without the safety belt. Ms. Doxzon confirmed HIPPA with name, address and date of birth. Miranda is currently living in the basement of a three story home and she does not have access to the other rooms due to no ramp access to the home. Miranda enters the home from the back entrance with a temporary ramp that was borrowed from a church until ramps can be installed. Ms. Doxzon was dressed in a shirt and pajama pants and hygiene was fair. Ms. Doxzon has been only able to hand wash due to limited access to the bathroom. Ms. Doxzon has a commode by her bedside, and is waiting to have her electronic Hoyer lift delivered from her previous placement. Service Coordinator reviewed advanced directives, power of attorney, rights and responsibilities and understanding abuse, neglect and exploitation The InterRai, Plan of Care, PHI consents, PHQ-9, and Personal Services

Support Tool. PHI consents have already been signed and are to be uploaded into file once they are approved. The PHQ-9 score was a 3 and Ms. Doxzon will continue to receive services from Mobile Psych and she will contact her worker to provide her current address. Serviced coordinator did offer a referral to Behavioral Health but this was declined at this time. Ms. Doxzon is diagnosed with cerebral palsy, epilepsy, scoliosis, asthma, acid reflux and tachycardia. Ms. Doxzon is dependent on a motorized wheelchair for ambulation and a Hoyer lift for transfers. Ms. Doxzon is limited to only the apartment she is in due to having no access into the other parts of the home. Home modifications have been requested for ramps into the home for both entrance and exit of the home to allow her safe access to all parts of the home. Home modifications have also been requested to make her bathroom in the basement handicapped accessible for safety and ease of access. Ms. Burrell friend/caregiver and home owner has agreed to have modifications done the home and has already contacted other agencies and her church for assistance with the modifications. Ms. Doxzon has requested 24 hour care which has been what she has received from Spectrum Services before her transfer to adult service and while she was in the nursing home. Ms. Doxzon needs assistance with shopping, meal preparation, housekeeping bathing and supervision due to seizures. This service coordinator discussed additional services available to Ms. Doxzon and she agreed to Personal Assistance Services, Home Delivered Meals, and Non-Medical Transportation and home modifications. Service Coordinator checked to ensure the Premier Home Care was in Keystone First Community Health Choices and advised that a service authorization would be submitted for the Personal Assistance Services and also explained the service authorization review process. Service Authorizations would also be entered for Personal Emergency Response System, Home Delivered Meals, and Non-Medical Transportation. Service Coordinator offered to complete a Person Centered Planning Team meeting in 30 days with Ms. Doxzon and others on her care team. Ms. Doxzon declined the meeting for 30 days and agreed to complete the meeting today. This Service Coordinator will assist Ms. Doxzon with initiating the services selected and will follow up with her monthly to check on the progress of the Personal Assistance Services, Home Delivered Meals, Home Modifications, Non-Medical Transportation and ensure that she is working towards her identified goals and discuss any barriers if not. Prior to leaving the home, this Service Coordinator reviewed with Ms. Doxzon resources in developing home emergency plans (FEMA brochure, PEMA ReadyPA) as well as community resources, including AuntBertha.com and the final Person Centered Plan of Care and authorized services. Visit was ended and next visit will be scheduled for next month. Sandra Young BA, service coordinator , Significant Change, Transition between settings

/2/2020 Eligibility verified and service coordinator reviewed file before visit. Service coordinator was meeting with participant with supervisor Jamie Johnson also on this date to complete a Comprehensive Needs Assessment due to participant transitioning from a nursing home facility to a private home. Ms. Doxzon was recently hospitalized at Einstein Hospital and has chosen to move in with a family friend in a small studio-like apartment in the basement of her friend's home. Service coordinator was met by Ms. Joy Burrell, friend and caregiver and brought down to where participant was. Ms. Doxzon was laying her hospital bed because she is unable to transfer to a wheelchair. Ms. Doxzon's wheelchair has not been transferred to her new home from the nursing facility and the one provided she cannot use because here is no safely belt. Ms. Doxzon cannot sit safely without the safety belt. Ms. Doxzon confirmed HIPPA with name, address and date of birth. Miranda is currently living in the basement of a three story home and she does not have access to the other rooms due to no ramp access to the home. Miranda enters the home from the back entrance with a temporary ramp that was borrowed from a church until ramps can be installed. Ms. Doxzon was dressed in a shirt and pajama pants and hygiene was fair. Ms. Doxzon has been only able to hand wash due to limited access to the bathroom. Ms. Doxzon has a commode by her bedside, and is waiting to have her electronic Hoyer lift delivered from her previous placement. Service Coordinator reviewed advanced directives, power of attorney, rights and responsibilities and understanding abuse, neglect and exploitation The InterRai, Plan of Care, PHI consents, PHQ-9, and Personal Services Support Tool. PHI consents have already been signed and are to be uploaded into file once they are approved. The PHQ-9 score was a 3 and Ms. Doxzon will continue to receive services from Mobile Psych and she will contact her worker to provide her current address. Serviced coordinator did offer a referral to Behavioral Health but this was declined at this time. Ms. Doxzon is diagnosed with cerebral palsy, epilepsy, scoliosis, asthma, acid reflux and tachycardia. Ms. Doxzon is dependent on a motorized wheelchair for ambulation and a Hoyer lift for transfers. Ms. Doxzon is limited to only the apartment she is in due to having no access into the other parts of the home. Home modifications have been requested for ramps into the home for both entrance and exit of the home to allow her safe access to all parts of the home. Home modifications have also been requested to make her bathroom in the basement handicapped accessible for safety and ease of access. Ms. Burrell friend/caregiver and home owner has agreed to have modifications done the home and has already contacted other agencies and her church for assistance with the modifications. Ms. Doxzon has requested 24 hour care which has been what she has received from Spectrum Services before her transfer to adult service and while she was in the nursing home. Ms. Doxzon needs assistance with shopping, meal preparation, housekeeping bathing and supervision due to seizures. This service coordinator discussed additional services available to Ms. Doxzon and she agreed to Personal Assistance Services, Home Delivered Meals, and Non-Medical Transportation and home modifications. Service Coordinator checked

KFCHC000096

she was comfortable with. Ms. Doxzon explained that on 2/5/2020 she had been sexually assaulted by a male CNA and that on Saturday 2/8/2020 she began to have suicidal thoughts because of the incident and was taken to Lankenau Hospital for observation. It was there that Ms. Doxzon reported what had transpired at Ingles House and the report to APS was called in. Ms. Doxzon was kept at the hospital overnight and was then discharged back to the nursing facility the following day. Ms. Doxzon was interviewed by the police on Sunday 2/9/2020 and a report was filed. The CNA is not working at Ingles House and has been suspended pending an investigation. Ms. Doxzon reported physically she is fine but emotionally she is not. Ms. Doxzon denied any suicidal thoughts at this time. Ms. Doxzon reported she believes she has now been labeled by the staff as a "liar" and was referred to as a "snitch" by others. Ms. Doxzon believes she is now labeled and the staff is treating her differently (i.e. not responding to her call button at a timely fashion, and only responded when her family has called). Service coordinator asked if Ms. Doxzon has been receiving counseling since the incident and she does see the therapist assigned to her at Ingles House, but she doesn't trust easily and doesn't feel comfortable talking to her, participant encouraged to reach out to those she trusts when she needs to talk. Service coordinator also discussed with Ms. Doxzon what her next option will be regarding her housing. Ms. Doxzon reported that Disability Rights is working on getting her back to Spectrum Services and they have already verified that her apartment and staff were still available, while this option would be a good choice for Miranda she acknowledged that it may not be feasible because it would have to be paid for by DHS. Ms. Doxzon also went and looked at another PHA apartment but it was not an appropriate placement because she could not get her wheelchair into the lift to see the apartment. Ms. Doxzon did meet with Liberty Resources with Nursing Facility transition but she was told it could take a year for her placement and she could not wait that long. Ms. Doxzon again reported that her ideal living situation would be in her own apartment and living independently with the plan to eventually go to college to be a pediatric doctor. Service coordinator assured Ms. Doxzon that she will be supported with her goals. Service coordinator scheduled to meet with participant again next week to follow up with any new developments on 2/21/2010. Service coordinator will also follow up with Jacqueline DellaVecchio to report conversation today and her complaints about the staff. Sandra Young BA, service coordinator

---

**Organization Unit:** Keystone First CHC **By:** Sandra Young Delete Edit
**Contact Type:** Participant Telephonic **Reason:** Monthly Telephonic Contact **January 28, 2020, 12:21 PM**
**Tags:** Successful, 1/28/2020 Eligibility verified and HIPA conformed by participant with name, address and date of birth. Service coordinator spoke with Miranda Doxzon for monthly telephone contact. Ms. Doxzon reports that she is doing well and there have been no change sin her health or hospitalizations at this time. Ms. Doxzon went to Social Security today to start the reinstatement of her benefits and will be going to get her ID tomorrow. Participant stated she is still interested in leaving Ingles House and wants to move with her "church mom Joy." Home modifications would need to be made on the home before participant would be able to move in and service coordinator will talk with supervisor regarding the inquiry. Sandra Young BA, service coordinator.

1/28/2020 Eligibility verified and HIPA conformed by participant with name, address and date of birth. Service coordinator spoke with Miranda Doxzon for monthly telephone contact. Ms. Doxzon reports that she is doing well and there have been no change sin her health or hospitalizations at this time. Ms. Doxzon went to Social Security today to start the reinstatement of her benefits and will be going to get her ID tomorrow. Participant stated she is still interested in leaving Ingles House and wants to move with her "church mom Joy." Home modifications would need to be made on the home before participant would be able to move in and service coordinator will talk with supervisor regarding the inquiry. Sandra Young BA, service coordinator.

---

**Organization Unit:** Keystone First CHC **By:** Sandra Young Delete Edit
**Contact Type:** Participant Face to Face **Reason:** Inquiry **January 13, 2020, 4:59 PM**
**Tags:** Successful, 01/10/2020 Eligibility verified and HIPPA confirmed by participant with name and date of birth. Service coordinator met with Ms. Doxzon on this date to discuss her plans for transitioning out of the nursing facility into the community. Service coordinator had Miranda Doxzon sign a new PHI form to include several new agencies and people who are involved in her care. PHI form will be sent for review and added to participants file. When service coordinator arrived Ms. Doxzon stated he did not think the meeting would last very long because she was going to the emergency room. Ms. Doxzon reported that during her Gyn appointment this morning she has been complaining of stomach pains, and breast tenderness and the staff at Ingles House wanted her to have a pregnancy test and check for any other issues that may be causing her stomach pain. Service coordinator offered to reschedule visit but she declined and wanted to move ahead. With participant service coordinator called Rachel Mann from Disability Rights PA so that she could also be a part of the discussion about what Ms. Doxzon would like to do for housing. Ms. Doxzon expressed her desire to leave Ingles House as soon as she can and she has decided her three plans for transitioning out of Ingles House would be 1). Move into Ingles House's Independent Living 2) she would be open to Residential Hab if this is an option and 3). Move in with her friend Joy Burrell who has expressed an interest in having Ms. Doxzon live with her, but must finish making her

home handicapped and wheelchair accessible. Ms. Doxzon will continue to require 24 hour care and there are concerns that is her care provider did not show would there be an emergency backup plan in place. Ms. Doxzon acknowledged that she would be much safer in one of the three options instead of using her PHA voucher. Ms. Doxzon also inquired as to whether there was case assistance to pay her phone bill because she will lose service as of Wednesday and she has not started to receive her money due to the lack of an ID. Service coordinator will speak with Jacqueline DellaVecchio social worker assigned to Ms. Doxzon to assist with some of the issues discussed with participant. Miranda Doxzon also asked about transportation and aide so that she could attend the Career Path Program at CHOP which will be 5 days week when she completes her training. Service coordinator will also submit a Nursing Home Transition referral form for participant as well. Sandra Young BA, service coordinator.

01/10/2020 Eligibility verified and HIPPA confirmed by participant with name and date of birth. Service coordinator met with Ms. Doxzon on this date to discuss her plans for transitioning out of the nursing facility into the community. Service coordinator had Miranda Doxzon sign a new PHI form to include several new agencies and people who are involved in her care. PHI form will be sent for review and added to participants file. When service coordinator arrived Ms. Doxzon stated he did not think the meeting would last very long because she was going to the emergency room. Ms. Doxzon reported that during her Gyn appointment this morning she has been complaining of stomach pains, and breast tenderness and the staff at Ingles House wanted her to have a pregnancy test and check for any other issues that may be causing her stomach pain. Service coordinator offered to reschedule visit but she declined and wanted to move ahead. With participant service coordinator called Rachel Mann from Disability Rights PA so that she could also be a part of the discussion about what Ms. Doxzon would like to do for housing. Ms. Doxzon expressed her desire to leave Ingles House as soon as she can and she has decided her three plans for transitioning out of Ingles House would be 1). Move into Ingles House's Independent Living 2) she would be open to Residential Hab if this is an option and 3). Move in with her friend Joy Burrell who has expressed an interest in having Ms. Doxzon live with her, but must finish making her home handicapped and wheelchair accessible. Ms. Doxzon will continue to require 24 hour care and there are concerns that is her care provider did not show would there be an emergency backup plan in place. Ms. Doxzon acknowledged that she would be much safer in one of the three options instead of using her PHA voucher. Ms. Doxzon also inquired as to whether there was case assistance to pay her phone bill because she will lose service as of Wednesday and she has not started to receive her money due to the lack of an ID. Service coordinator will speak with Jacqueline DellaVecchio social worker assigned to Ms. Doxzon to assist with some of the issues discussed with participant. Miranda Doxzon also asked about transportation and aide so that she could attend the Career Path Program at CHOP which will be 5 days week when she completes her training. Service coordinator will also submit a Nursing Home Transition referral form for participant as well. Sandra Young BA, service coordinator.

**Organization Unit:** Keystone First CHC **By:** Sandra Young Delete Edit
**Contact Type:** State Partner (telephonic) **Reason:** Inquiry January 13, 2020, 4:52 PM
**Tags:** Successful, 1/9/2020 Eligibility verified and HIPPA confirmed by name, date of birth and address. service coordinator recived a call from Rachel Mann regarding participant Miranda Doxzon and the need for Ms. Doxzon to obtain a state ID and additional services that participant may benefit form including case management to support participant's needs and assist with obtaining the necessary resources she may need once she is living in the community. Service coordinator was asked by Rachel Mann to assist participant with obtaining her ID and it was explained that service coordinator can assist with filling out the form but that transporting to DMV would be the nursing facility's responsibility. Service coordinator will talk with participant and will also seek out the social worker assigned yo Ms. Doxzon to discuss her transportation needs. Sandra Young BA, service coordinator.

1/9/2020 Eligibility verified and HIPPA confirmed by name, date of birth and address. service coordinator recived a call from Rachel Mann regarding participant Miranda Doxzon and the need for Ms. Doxzon to obtain a state ID and additional services that participant may benefit form including case management to support participant's needs and assist with obtaining the necessary resources she may need once she is living in the community. Service coordinator was asked by Rachel Mann to assist participant with obtaining her ID and it was explained that service coordinator can assist with filling out the form but that transporting to DMV would be the nursing facility's responsibility. Service coordinator will talk with participant and will also seek out the social worker assigned yo Ms. Doxzon to discuss her transportation needs. Sandra Young BA, service coordinator.

**Organization Unit:** Keystone First CHC **By:** Sandra Young Delete Edit
**Contact Type:** Participant Telephonic **Reason:** Monthly Telephonic Contact **January 7, 2020, 2:26 PM**
**Tags:** Left Message, 1/6/2020 Eligibility verified and HIPPA confirmed by participant with name, date of birth and phone number. Servcie coordinator contacted Ms. Doxzon to set up a meeting for this month to discuss her plans for future housing. phone call disconnected and service coordinator attempted several more times to call back. Service coordinator

left message for Ms. Doxzon to contact service coordinator. Sandra Young BA, service coordinator.

1/6/2020 Eligibility verified and HIPPA confirmed by participant with name, date of birth and phone number. Servcie coordinator contacted Ms. Doxzon to set up a meeting for this month to discuss her plans for future housing. phone call disconnected and service coordinator attempted several more times to call back. Service coordinator left message for Ms. Doxzon to contact service coordinator. Sandra Young BA, service coordinator.

**Organization Unit:** Keystone First CHC **By:** Jamie Johnson Delete Edit
**Contact Type:** Provider Telephonic **Reason:** Inquiry **January 6, 2020, 3:51 PM**
**Tags:** Successful, Service Coordinator Supervisor (SCS), verified eligibility and HIPAA (name, date of birth and address). SCS received a call from Rachel Mann (215-238-8070 ext 205) and attorney Rocco from Disability Rights PA regarding participant Miranda Doxzon. SCS shared communication was received from the Nursing facility transition department and confirmed that Ms. Doxzon can completed the transition process upon her request and the transition department and SC would work together to ensure that housing was addressed as well as services to support the transition were in place before the transition to the community. Ms. Mann inquired about Res Hab and SCS informed Ms. Mann that CHC participants had to have a diagnosis of Traumatic Brain Injury to qualify for those services. Ms. Mann stated she was not aware of this and inquired who she could speak to follow up on this information. SCS informed Ms. Mann, the information was informed to SCS by SCS's manger. Ms. Mann requested to speak with the manger for further information. SCS informed Ms. Mann that she would have her manger reach out to her. Manger information was also requested and provided. Ms. Mann also spoke of concerns that service coordinator, Sandra Young, was unfamiliar with the transition process and that Ms. Doxzon might do better with a more experienced coordinator. SCS ensured Ms. Mann that SC has been informed of what her role is and what she needs to do in her role. SCS explained it would be better to keep Ms. Doxzon with current SC, as the process with transferring to the community might have Ms. Doxzon having multiple worker and not in her best interest. Ms. Mann also inquired about the voucher housing program. SCS shared that if Ms. Doxzon would like a voucher she can be referred, but SCS was informed there was a waiting listing. SCS could not provide a time spend when inquired. SCS will have SC go out to see Ms. Doxzon this month to begin the process with Ms. Doxzon to transfer into the community. Jamie Johnson, MS, MSW

Service Coordinator Supervisor (SCS), verified eligibility and HIPAA (name, date of birth and address). SCS received a call from Rachel Mann (215-238-8070 ext 205) and attorney Rocco from Disability Rights PA regarding participant Miranda Doxzon. SCS shared communication was received from the Nursing facility transition department and confirmed that Ms. Doxzon can completed the transition process upon her request and the transition department and SC would work together to ensure that housing was addressed as well as services to support the transition were in place before the transition to the community. Ms. Mann inquired about Res Hab and SCS informed Ms. Mann that CHC participants had to have a diagnosis of Traumatic Brain Injury to qualify for those services. Ms. Mann stated she was not aware of this and inquired who she could speak to follow up on this information. SCS informed Ms. Mann, the information was informed to SCS by SCS's manger. Ms. Mann requested to speak with the manger for further information. SCS informed Ms. Mann that she would have her manger reach out to her. Manger information was also requested and provided. Ms. Mann also spoke of concerns that service coordinator, Sandra Young, was unfamiliar with the transition process and that Ms. Doxzon might do better with a more experienced coordinator. SCS ensured Ms. Mann that SC has been informed of what her role is and what she needs to do in her role. SCS explained it would be better to keep Ms. Doxzon with current SC, as the process with transferring to the community might have Ms. Doxzon having multiple worker and not in her best interest. Ms. Mann also inquired about the voucher housing program. SCS shared that if Ms. Doxzon would like a voucher she can be referred, but SCS was informed there was a waiting listing. SCS could not provide a time spend when inquired. SCS will have SC go out to see Ms. Doxzon this month to begin the process with Ms. Doxzon to transfer into the community. Jamie Johnson, MS, MSW

**Organization Unit:** Keystone First CHC **By:** Jamie Johnson Delete Edit
**Contact Type:** Provider Telephonic **Reason:** Inquiry **December 20, 2019, 4:06 PM**
**Tags:** Successful, Service Coordinator Supervisor, verified eligibility and HIPAA ( name, date of birth and address). SCS received a call from Rachel Mann from Disability Rights PA regarding participant Miranda Doxzon. Ms. Mann informed SCS that Miranda was discharged from the care of DHS and place in Inglis Nursing Facility by judge orders. Miranda is reported as not wanting to be in the facility and interested in her own place. Ms. Mann requested information on Res Habs that are in Keystone First Network and also inquire about Nursing Home voucher for the Inglis apartments. SCS stated that SCS would follow up with the NR transition team, who could begin the process of transitioning at anytime Miranda was ready. SCS will send Ms. Mann the requested information via e-mail. rmann@disabilityrightsPA.org

Service Coordinator Supervisor, verified eligibility and HIPAA ( name, date of birth and address). SCS received a call from

Rachel Mann from Disability Rights PA regarding participant Miranda Doxzon. Ms. Mann informed SCS that Miranda was discharged from the care of DHS and place in Inglis Nursing Facility by judge orders. Miranda is reported as not wanting to be in the facility and interested in her own place. Ms. Mann requested information on Res Habs that are in Keystone First Network and also inquire about Nursing Home voucher for the Inglis apartments. SCS stated that SCS would follow up with the NR transition team, who could begin the process of transitioning at anytime Miranda was ready. SCS will send Ms. Mann the requested information via e-mail. rmann@disabilityrightsPA.org

**Organization Unit:** Keystone First CHC **By:** Jamie Johnson Delete Edit
**Contact Type:** Provider Telephonic **Reason:** Inquiry **December 20, 2019, 11:50 AM**
**Tags:** Unsuccessful (no answer, wrong number/address, no VM), Service Coordinator Supervisor (SCS), returned the call to Rachel from Disabilities Right of Pa but was unable connect to the worker due to not having her full name. SCS received an e-mail from AmeriHealth Participant Services Representative -Kiarah Myers stating that Rachel (215-238-8070) from Disabilities Right of Pa, called trying to gain information on participant.

Service Coordinator Supervisor (SCS), returned the call to Rachel from Disabilities Right of Pa but was unable connect to the worker due to not having her full name. SCS received an e-mail from AmeriHealth Participant Services Representative - Kiarah Myers stating that Rachel (215-238-8070) from Disabilities Right of Pa, called trying to gain information on participant.

**Organization Unit:** Keystone First CHC **By:** Sandra Young Delete Edit
**Contact Type:** State Partner (telephonic) **Reason:** Inquiry **December 17, 2019, 4:42 PM**
**Tags:** Successful, 12/13/2019 HIPPA verified by name, date of birth and phone number. Service coordinator spoke with Laura DeRiggi regarding plan for Ms. Doxzon once she is discharged from DHS. Ms. DeRiggi conformed that the decision of the judge was that the apartment originally planned for Ms. Doxzon was not an appropriate placement and has placed Ms. Doxzon will be going to Ingles House with a plan to move into their independent housing. Ms. Doxzon will continue to receive the care she needs as well as having mobile psych services and vocational support through (CHOP) Children's Hospital of Philadelphia. Email also sent with information regarding her needs to service coordinator. Sandra Young BA, service coordinator.

12/13/2019 HIPPA verified by name, date of birth and phone number. Service coordinator spoke with Laura DeRiggi regarding plan for Ms. Doxzon once she is discharged from DHS. Ms. DeRiggi conformed that the decision of the judge was that the apartment originally planned for Ms. Doxzon was not an appropriate placement and has placed Ms. Doxzon will be going to Ingles House with a plan to move into their independent housing. Ms. Doxzon will continue to receive the care she needs as well as having mobile psych services and vocational support through (CHOP) Children's Hospital of Philadelphia. Email also sent with information regarding her needs to service coordinator. Sandra Young BA, service coordinator.

**Organization Unit:** Keystone First CHC **By:** Sandra Young Delete Edit
**Contact Type:** Participant Telephonic **Reason:** Inquiry **December 12, 2019, 1:00 PM**
**Tags:** Left Message, 12/12/2019 Service coordinator attempted to contact participant to get an update and conformation regarding her move on Monday. Participant did not answer the phone, message left. Sandra Young, BA, service coordinator.

12/12/2019 Service coordinator attempted to contact participant to get an update and conformation regarding her move on Monday. Participant did not answer the phone, message left. Sandra Young, BA, service coordinator.

**Organization Unit:** Keystone First CHC **By:** Sandra Young Delete Edit
**Contact Type:** Provider Telephonic **Reason:** Inquiry **December 11, 2019, 9:14 AM**
**Tags:** Successful, 12/10/2019 Service coordinator spoke with Angelette Jordon and Michelle Shuler from Spectrum Services regarding Ms. Doxzon and her transition form DHS. Service coordinator inquired as to when the actual move from Ms. Doxzon's current place of residence to her new apartment would take place. Ms. Jordon reported that Ms. Doxzon would not be moving until at least Friday because there are still things that need to be done (i.e. furniture, food and other services need to be put into place for participant). Ms. Jordon will update service coordinator with details of Family Court hearing and decisions that are made regarding Ms. Doxzon's care. Sandra Young, BA service coordinator.

12/10/2019 Service coordinator spoke with Angelette Jordon and Michelle Shuler from Spectrum Services regarding Ms. Doxzon and her transition form DHS. Service coordinator inquired as to when the actual move from Ms. Doxzon's current

place of residence to her new apartment would take place. Ms. Jordon reported that Ms. Doxzon would not be moving until at least Friday because there are still things that need to be done (i.e. furniture, food and other services need to be put into place for participant). Ms. Jordon will update service coordinator with details of Family Court hearing and decisions that are made regarding Ms. Doxzon's care. Sandra Young, BA service coordinator.

**Organization Unit:** Keystone First CHC **By:** Sandra Young Delete Edit
**Contact Type:** State Partner (telephonic) **Reason:** Inquiry **December 11, 2019, 9:09 AM**
**Tags:** Successful, 12/10/2019 Service coordinator spoke with Laura DeRiggi from DHs regarding participant and plan for discharge from DHS on Tuesday 12/10/2019. Ms. DeRiggi confirmed that Ms. Doxzon will be in Family Court tomorrow and she hoped that there would be another plan for participant because she fears for Ms. Doxzon's safety. Ms. DeRiggi has been working on getting participant into Inglis House or another nursing home facility until Ms. Doxzon is ready to move into more independent living. Ms. DeRiggi was notified by service coordinator that Open Health Services would be able to accommodate the hours needed by Ms. Doxzon. Service coordinator will then put in for the service authorization need including PAS hours and Mom's Meals. Service coordinator will be updated by Ms. DeRiggi on the outcome of her Family Court hearing and how to proceed with services. Sandra Young, BA service coordinator.

12/10/2019 Service coordinator spoke with Laura DeRiggi from DHs regarding participant and plan for discharge from DHS on Tuesday 12/10/2019. Ms. DeRiggi confirmed that Ms. Doxzon will be in Family Court tomorrow and she hoped that there would be another plan for participant because she fears for Ms. Doxzon's safety. Ms. DeRiggi has been working on getting participant into Inglis House or another nursing home facility until Ms. Doxzon is ready to move into more independent living. Ms. DeRiggi was notified by service coordinator that Open Health Services would be able to accommodate the hours needed by Ms. Doxzon. Service coordinator will then put in for the service authorization need including PAS hours and Mom's Meals. Service coordinator will be updated by Ms. DeRiggi on the outcome of her Family Court hearing and how to proceed with services. Sandra Young, BA service coordinator.

**Organization Unit:** Keystone First CHC **By:** Sandra Young Delete Edit
**Contact Type:** Provider Telephonic **Reason:** Inquiry **December 6, 2019, 5:08 PM**
**Tags:** Successful, 12/6/2019 Service coordinator spoke with Sean from Open Healthcare Service to confirm they would be able to accommodate the needed hours and service participant would require. It was conformed that they would be able to accommodate participant. They will await conformation from service coordinator on start date. Sandra Young, BA, service coordinator.

12/6/2019 Service coordinator spoke with Sean from Open Healthcare Service to confirm they would be able to accommodate the needed hours and service participant would require. It was conformed that they would be able to accommodate participant. They will await conformation from service coordinator on start date. Sandra Young, BA, service coordinator.

**Organization Unit:** Keystone First CHC **By:** Sandra Young Delete Edit
**Contact Type:** State Partner (telephonic) **Reason:** Inquiry **December 6, 2019, 5:04 PM**
**Tags:** Successful, 12/6/2019 Service coordinator spoke with Laura DeRiggi regarding latest update on Ms. Doxzon. In an email received by service coordinator today these were the needs Ms. Doxzon would need to help with her transition from DHS. 24/7 staffing to include: Companion, Errand/shopping services, Overnight home care, Escorting to and from appointments, Exercise and range of motion activities, and meals. In the email it was also confirmed that Ms. Doxzon's bed and Hoyer lift will be coming with her when she moves. Ms. Doxzon's new address is ████████████████ in the James A Johnson Homes and she is going to visit with participant today. Laura DeRiggi spoke with service coordinator to again express her concern for Ms. Doxzon and the plan for her transition. Ms. DeRiggi stated that plan would be for Ms. Doxzon will be discharged from DHS by the Family Court judge on 12/10/2019 and at that time Ms. Doxzon would be moved into her apartment. Ms. DeRiggi stated to service coordinator that she believes Ms. Doxzon is going to refuse the apartment when she goes to court because she is afraid of moving into the apartment and at that time the judge would order her into a nursing home. Ms. DeRiggi would like Ms. Doxzon to be placed at Ingles Home as was the original plan. Ms. DeRiggi stated she fears for Ms. Doxzon's safety and stated "this story could end up in the newspapers." Ms. Doxzon does not have the option to have her stay with DHS extended. Service coordinator will put in an authorization for both Personal Assistant Services and Mom's meals and other referral can be made once Ms. Doxzon is settled in her apartment or nursing home. Sandra Young, BA, service coordinator.

12/6/2019 Service coordinator spoke with Laura DeRiggi regarding latest update on Ms. Doxzon. In an email received by service coordinator today these were the needs Ms. Doxzon would need to help with her transition from DHS. 24/7 staffing

to include: Companion, Errand/shopping services, Overnight home care, Escorting to and from appointments, Exercise and range of motion activities, and meals. In the email it was also confirmed that Ms. Doxxon's bed and Hoyer lift will be coming with her when she moves. Ms. Doxxon's new address is ████████████████ in the James A Johnson Homes and she is going to visit with participant today. Laura DeRiggi spoke with service coordinator to again express her concern for Ms. Doxxon and the plan for her transition. Ms. DeRiggi stated that plan would be for Ms. Doxxon will be discharged from DHS by the Family Court judge on 12/10/2019 and at that time Ms. Doxxon would be moved into her apartment. Ms. DeRiggi stated to service coordinator that she believes Ms. Doxxon is going to refuse the apartment when she goes to court because she is afraid of moving into the apartment and at that time the judge would order her into a nursing home. Ms. DeRiggi would like Ms. Doxxon to be placed at Ingles Home as was the original plan. Ms. DeRiggi stated she fears for Ms. Doxxon's safety and stated "this story could end up in the newspapers." Ms. Doxxon does not have the option to have her stay with DHS extended. Service coordinator will put in an authorization for both Personal Assistant Services and Mom's meals and other referral can be made once Ms. Doxxon is settled in her apartment or nursing home. Sandra Young, BA, service coordinator.

---

**Organization Unit:** Keystone First CHC **By:** Sandra Young [Delete] [Edit]
**Contact Type:** Provider Telephonic **Reason:** Inquiry **December 6, 2019, 3:56 PM**
**Tags:** Successful, 12/6/2019 HIPPA confirmed by name, date of birth and phone number. Service coordinator spoke with Miranda Doxxon with Michelle Shuler and Angenette Jordon from Spectrum Community Services responding to my inquiry regarding the 24 hours of care Ms. Doxxon receives and the breakdown of services (i.e. skilled nursing, direct care etc.) It was conformed that the 24 hours of care is all direct service care hours. Ms. Doxxon does not receive skilled nursing at this time. Ms. Doxxon confirmed that she would like to use Open health Systems as the care agency. Service coordinator will with care agency that the hours of care needed can be provided by the agency. Sandra Young, BA, service coordinator.

12/6/2019 HIPPA confirmed by name, date of birth and phone number. Service coordinator spoke with Miranda Doxxon with Michelle Shuler and Angenette Jordon from Spectrum Community Services responding to my inquiry regarding the 24 hours of care Ms. Doxxon receives and the breakdown of services (i.e. skilled nursing, direct care etc.) It was conformed that the 24 hours of care is all direct service care hours. Ms. Doxxon does not receive skilled nursing at this time. Ms. Doxxon confirmed that she would like to use Open health Systems as the care agency. Service coordinator will with care agency that the hours of care needed can be provided by the agency. Sandra Young, BA, service coordinator.

---

**Organization Unit:** Keystone First CHC **By:** Sandra Young [Delete] [Edit]
**Contact Type:** State Partner (telephonic) **Reason:** Inquiry **December 6, 2019, 3:35 PM**
**Tags:** Successful, 12/4/2019 Service coordinator spoke with Laura DeRiggi director of Integrated Clinical consultation and who is working with Miranda Doxxon as she transitions from DHS to independent living. Ms. DeRiggi wanted to express concern for the care Ms. Doxxon will receive once she transitions to her own apartment. Information shared with service coordinator contradicted some of the information reported by participant. According to Ms. DeRiggi Ms. Doxxon needs 24 hour care because she has limited use of her hands (she has no grip) and she needs assistance with both dressing and bathing, and she does not have any life skills at this time. Participant will also need assistance with transportation, shopping, meal preparation and housekeeping. The original plan was for Ms. Doxxon was to transition to Inglis House but Ms. Doxxon refused because she has only seen the nursing home side and not the other side which had independent living. Ms. Doxxon has a history of sabotaging all of her past placements and has made up false accusations about staff and other caregivers in the past. Ms. DeRiggi stated that several of the services that were going to be put into place include Mobile Psych Rehabilitation, Certified Peer Specialist, Tenant Service Coordinator and Vocational Training though Children's Hospital of Philadelphia. Service coordinator explained that no authorizations had been submitted yet because Ms. Doxxon at time of the initial assessment did not have a date for the move or an address of the apartment she was moving to. Service coordinator will work with participant and all involved agencies to assure her care needs are met. Sandra Young, BA, service coordinator.

12/4/2019 Service coordinator spoke with Laura DeRiggi director of Integrated Clinical consultation and who is working with Miranda Doxxon as she transitions from DHS to independent living. Ms. DeRiggi wanted to express concern for the care Ms. Doxxon will receive once she transitions to her own apartment. Information shared with service coordinator contradicted some of the information reported by participant. According to Ms. DeRiggi Ms. Doxxon needs 24 hour care because she has limited use of her hands (she has no grip) and she needs assistance with both dressing and bathing, and she does not have any life skills at this time. Participant will also need assistance with transportation, shopping, meal preparation and housekeeping. The original plan was for Ms. Doxxon was to transition to Inglis House but Ms. Doxxon refused because she has only seen the nursing home side and not the other side which had independent living. Ms.

Doxzon has a history of sabotaging all of her past placements and has made up false accusations about staff and other caregivers in the past. Ms. DeRiggi stated that several of the services that were going to be put into place include Mobile Psych Rehabilitation, Certified Peer Specialist, Tenant Service Coordinator and Vocational Training though Children's Hospital of Philadelphia. Service coordinator explained that no authorizations had been submitted yet because Ms. Doxzon at time of the initial assessment did not have a date for the move or an address of the apartment she was moving to. Service coordinator will work with participant and all involved agencies to assure her care needs are met. Sandra Young, BA, service coordinator.

**Organization Unit:** Keystone First CHC **By:** Sandra Young Delete Edit
**Contact Type:** State Partner Other (Email, Mail, Text, Fax) **Reason:** Inquiry December 5, 2019, 9:13 AM
**Tags:** Successful, 12/4/2019 12/4/2019 Service coordinator received an email from Laura Ann DeRiggi , Director of Integrated Clinical consultation for DHS regarding Ms. Doxzon and some concerns with her transition from DHS to independent living. In the email Ms. DeRiggi addressed more thoroughly the needs this participant will require then originally reported by Ms. Doxzen. The main points of concern for this participant are as follows: Miranda requires 24 hour care; she has no life skills, needs help with ADLs, she will require a lift for transfer from wheel chair to her bed, she does not cook, ride the bus and has not performed many tasks independently. There is an apartment available for Ms. Doxzon through Philadelphia Housing Authority although other housing options had been explored. She met the nursing home level of care but thought that the CHC waiver would allow her to live in her own setting with 24/7 support of nursing, home health aide, and equipment while CBH funded her behavioral health supports Mobile psych rehab, Certified Peer Specialist, and Tenant Service Coordinator. Ms. Doxzon has been approved for SSI and will need a representative payee as she is not able to manage her money. Service coordinator forwarded email to supervisor and will also contact Ms. DeRiggi to coordinate the best plan for Ms. Doxzon to assure she has all services she needs in place to provide a successful transition.

12/4/2019 12/4/2019 Service coordinator received an email from Laura Ann DeRiggi , Director of Integrated Clinical consultation for DHS regarding Ms. Doxzon and some concerns with her transition from DHS to independent living. In the email Ms. DeRiggi addressed more thoroughly the needs this participant will require then originally reported by Ms. Doxzen. The main points of concern for this participant are as follows: Miranda requires 24 hour care; she has no life skills, needs help with ADLs, she will require a lift for transfer from wheel chair to her bed, she does not cook, ride the bus and has not performed many tasks independently. There is an apartment available for Ms. Doxzon through Philadelphia Housing Authority although other housing options had been explored. She met the nursing home level of care but thought that the CHC waiver would allow her to live in her own setting with 24/7 support of nursing, home health aide, and equipment while CBH funded her behavioral health supports Mobile psych rehab, Certified Peer Specialist, and Tenant Service Coordinator. Ms. Doxzon has been approved for SSI and will need a representative payee as she is not able to manage her money. Service coordinator forwarded email to supervisor and will also contact Ms. DeRiggi to coordinate the best plan for Ms. Doxzon to assure she has all services she needs in place to provide a successful transition.

**Organization Unit:** Keystone First CHC **By:** Sandra Young Delete Edit
**Contact Type:** Participant Face to Face **Reason:** Assessment December 3, 2019, 4:41 PM
**Tags:** Successful, 12/3/2019 Eligibility confirmed before visit and reminder call given to participant, message left. Service coordinator was greeted by Rasheedah Jones one of Ms. Doxzon caregivers. HIPPA was verified by name, date of birth and address. Ms. Doxzon is transitioning from DHS and ward of the state to independent living. Ms. Doxzon was sitting in her wheelchair in the dining area of the apartment when service coordinator arrived. Ms. Doxzon resides in a one floor apartment that is handicapped accessible and is cared for through Spectrum by two caregivers and has 24 hour care. Ms. Doxzon was dressed neatly in a shirt and jeans and hygiene was good. Ms. Doxzon explained to service coordinator that she has an upcoming court date on December 10, 2019 which is to be her last and this is to release her from being a ward of the state. Ms. Doxzon reported anxiety due to uncertainty of where she will be going, it was her understanding that the current apartment she is living in was only paid for until 11/30/2019. Ms. Doxzon stated she is waiting on a placement with the Philadelphia Housing Authority (PHA) for a handicapped accessible apartment, but does not have a move-in date as of yet. Ms. Doxzon reported that she has been with DHS since birth and has been placed in a foster home twice and adopted twice but these were unsuccessful. Participant stated adoption had been tried a total of 6 times of which none were successful. Her last placement at Woods Services was also unsuccessful due to abuse and she was sent to Children's Hospital of Philadelphia after a hearing and she remained there for two months. Ms. Doxzon was then placed in her current apartment under the care of Spectrum for 18 months. Ms. Doxzon reported that she has no family support. Her mother is incarcerated in Virginia and she does not know where her father is. Ms. Doxzon has two siblings, a brother with whom she has little contact and a younger sister with whom she has no contact. Ms. Doxzon has one close friend that she communicate with often. Ms. Doxzon is diagnosed with Cerebral Palsy and Epilepsy and has limited movement in her

lower body. With participant service coordinator completed the following: Patient Health Questionnaire (PHQ-9), InterRAI, authorization to use/disclose personal health information release, personal services support tool, and the plan of care. Ms. Doxzon need assistance in bathing, doing chores, cooking, walking, transfer to toilet, and due to seizures needs to have someone present to watch for grand mal seizures. Ms. Doxzon is diagnosed with Major Depression and anxiety and is working with Absolute Medical Care to set up an appointment for counseling, and she will follow up with this. Ms. Doxzon also expressed an interest in Vocational to assist with part-time employment and would also like to pursue attending community college. Ms. Doxzon will use agency model and would like to stay with Spectrum but has also stated she would be willing to switch to Open Systems Health Care. This visit will also serve as Ms. Doxzon's Person Centered Planning Meeting as participant does not have anyone she would like to be present for the meeting. Sandra Young BA, service coordinator., Initial

12/3/2019 Eligibility confirmed before visit and reminder call given to participant, message left. Service coordinator was greeted by Rasheedah Jones one of Ms. Doxzon caregivers. HIPPA was verified by name, date of birth and address. Ms. Doxzon is transitioning from DHS and ward of the state to independent living. Ms. Doxzon was sitting in her wheelchair in the dining area of the apartment when service coordinator arrived. Ms. Doxzon resides in a one floor apartment that is handicapped accessible and is cared for through Spectrum by two caregivers and has 24 hour care. Ms. Doxzon was dressed neatly in a shirt and jeans and hygiene was good. Ms. Doxzon explained to service coordinator that she has an upcoming court date on December 10, 2019 which is to be her last and this is to release her from being a ward of the state. Ms. Doxzon reported anxiety due to uncertainty of where she will be going, it was her understanding that the current apartment she is living in was only paid for until 11/30/2019. Ms. Doxzon stated she is waiting on a placement with the Philadelphia Housing Authority (PHA) for a handicapped accessible apartment, but does not have a move-in date as of yet. Ms. Doxzon reported that she has been with DHS since birth and has been placed in a foster home twice and adopted twice but these were unsuccessful. Participant stated adoption had been tried a total of 6 times of which none were successful. Her last placement at Woods Services was also unsuccessful due to abuse and she was sent to Children's Hospital of Philadelphia after a hearing and she remained there for two months. Ms. Doxzon was then placed in her current apartment under the care of Spectrum for 18 months. Ms. Doxzon reported that she has no family support. Her mother is incarcerated in Virginia and she does not know where her father is. Ms. Doxzon has two siblings, a brother with whom she has little contact and a younger sister with whom she has no contact. Ms. Doxzon has one close friend that she communicate with often. Ms. Doxzon is diagnosed with Cerebral Palsy and Epilepsy and has limited movement in her lower body. With participant service coordinator completed the following: Patient Health Questionnaire (PHQ-9), InterRAI, authorization to use/disclose personal health information release, personal services support tool, and the plan of care. Ms. Doxzon need assistance in bathing, doing chores, cooking, walking, transfer to toilet, and due to seizures needs to have someone present to watch for grand mal seizures. Ms. Doxzon is diagnosed with Major Depression and anxiety and is working with Absolute Medical Care to set up an appointment for counseling, and she will follow up with this. Ms. Doxzon also expressed an interest in Vocational to assist with part-time employment and would also like to pursue attending community college. Ms. Doxzon will use agency model and would like to stay with Spectrum but has also stated she would be willing to switch to Open Systems Health Care. This visit will also serve as Ms. Doxzon's Person Centered Planning Meeting as participant does not have anyone she would like to be present for the meeting. Sandra Young BA, service coordinator.



**Organization Unit:** Keystone First CHC **By:** Jamie Johnson Delete Edit
**Contact Type:** Participant Telephonic **Reason:** Inquiry **November 27, 2019, 4:11 PM**
**Tags:** Successful, Verified eligibility; HIPAA verified with name,, date of birth and last four of social security. Service Coordinator Supervisor (SCS) contact Miranda Doxzon at ▮▮▮▮▮▮. Ms. Doxzon informed that she was currently residing at ▮▮▮▮▮▮; housing provided by DHS. Ms. Doxzon stated that she would be moving soon to PHA housing , but wasn't sure when the move would occur. SCS inquired about Ms. Doxzon's health aid services and Ms. Doxzon confirmed that she is still receiving the services. Ms. Doxzon reports that all her medical needs are being met and she is safe in her current placement. SCS requested to have a service coordinator come out to meet with Ms. Doxzon on 12/2/19 to complete the needed assessments. Ms. Doxzon agreed to meet with the service coordinator on 12/2/19 at 10 pm. Ms. Doxzon was informed that it could take up to 3 hours to complete the assessment and that she would need all her medication available at the time of the visit. The case will be assigned to Sandra Young. Jamie Johnson, MS, MSW

Verified eligibility; HIPAA verified with name,, date of birth and last four of social security. Service Coordinator Supervisor (SCS) contact Miranda Doxzon at ▮▮▮▮▮▮. Ms. Doxzon informed that she was currently residing at ▮▮▮▮▮▮ housing provided by DHS. Ms. Doxzon stated that she would be moving soon to PHA housing , but wasn't sure when the move would occur. SCS inquired about Ms. Doxzon's health aid services and Ms. Doxzon confirmed that she is still receiving the services. Ms. Doxzon reports that all her medical needs are being met and she is safe in her current placement. SCS requested to have a service coordinator come out to meet with Ms. Doxzon on 12/2/19 to complete the

needed assessments. Ms. Doxzon agreed to meet with the service coordinator on 12/2/19 at 10 pm. Ms. Doxzon was informed that it could take up to 3 hours to complete the assessment and that she would need all her medication available at the time of the visit. The case will be assigned to Sandra Young. Jamie Johnson, MS, MSW

KFCHC000113

# PLAINTIFF EXHIBIT  G

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| Miranda Doxzon, | : |
| Plaintiff, | : |
| v. | : C.A. No: 1:20-cv-00236 |
| Department of Human Services of the Commonwealth of Pennsylvania, Teresa D. Miller, in her official capacity as Secretary of the Department of Human Services and in her individual capacity, and Kevin Hancock in his individual capacity. | : Jury Trial Demanded |
| Defendants. | : |

## DECLARATION OF JOY BURRELL

I, Joy Burrell, declare based on personal knowledge as follows:

1.    I am over the age of 18 and competent to make this

declaration.

2.    I live in Philadelphia, Pennsylvania.

3.    I am a friend of Miranda Doxzon.

4.    Ms. Doxzon moved into my basement on or about February 26,

2020.

5.     She had been forced to live in an institution and was not provided with any other option to live in the community.

6.     Prior to moving into my basement, she had requested that home modifications and other services be provided so that she could live in my home on a temporary basis, but no action was taken.  No one contacted me or visited my home.

7.     Ms. Doxzon was very distraught and had been hospitalized and did not want to return to the institution.

8.     I allowed her to move into my basement.  I agreed to provide and recruited others to provide personal assistance services to Ms. Doxzon while she was living in my home so she could leave the institution.

9.     Ms. Doxzon has always wanted to live in the community as independently as possible.

10.    I intended for Ms. Doxzon to live in my home on a temporary basis until she acquired the skills necessary to live in the community more independently.

11.    The entirety of my home is not accessible to Ms. Doxzon.  She does not have access to a bathroom, kitchen, or the main portion of my home.

12.    My home was supposed to be modified so that it would be accessible to Ms. Doxzon.  The modifications were never made.

13.    I cannot continue to provide and arrange for others to provide personal assistance services to Ms. Doxzon on a long-term basis.

14.    In addition, because Ms. Doxzon has not been provided with other necessary services, her personal assistants are effectively being asked to attempt to fill in the gaps.  This work is beyond the job description and qualifications of a personal assistant.  This has made the job of providing personal assistance services difficult and has caused strain in the friendship I have with Miranda.

15.    I told Ms. Doxzon some time ago that she could not continue to live in my home.

16.    On June 29, 2020, when Ms. Doxzon was taken to the emergency room, I told her that she could not return to my home.

17.    On June 30, 2020, after receiving calls from a social worker at the hospital indicating that the Department of Human Services would not provide her with any other option, I relented and allowed Ms. Doxzon to return on a temporary and emergency basis.

18.    I am not willing to allow Ms. Doxzon to remain in my home. She needs to leave urgently by no later than tomorrow.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed this ____/____ day of ____July____, 2020.

_____
Joy Burrell

4

# PLAINTIFF EXHIBIT  H

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| Miranda Doxzon, | : |
| Plaintiff, | : |
| v. | : C.A. No: 1:20-cv-00236 |
| Department of Human Services of the Commonwealth of Pennsylvania, Teresa D. Miller, in her official capacity as Secretary of the Department of Human Services and in her individual capacity, and Kevin Hancock in his individual capacity. | : Jury Trial Demanded |
| Defendants. | : |

## DECLARATION OF MIRANDA DOXZON

I, Miranda Doxzon, declare based on personal knowledge as follows:

1.     When I started with Keystone First about seven months ago, a service coordinator was assigned to help me to help me get the services I need.

2.     I have never met with a doctor or anyone else from Keystone First who did any examinations or asked any question about services.

3.      No one from Keystone First reviewed all of the services available to me, explained them and asked me if I want or need each of them.

4.      I have talked with my service coordinator about my needs, but I do not know if there are specific names for services so I may not have used them when asking for services.

5.      I have made various requests to my service coordinator for services.  I do not know whether she is supposed to put them in a plan or other type of document for me to get the services I need.  If she is supposed to do something like that, I do not know if she did.

6.      I told my service coordinator that I did not want to live in a nursing home.

7.      My service coordinator was not able to identify any community living options for me.

8.      At no time did my service coordinator refer to me to someone who could help me find housing in the community.

9.      It is important to me to be able to choose my service providers.

10.     My aides are with me all the time.  They help me perform a bunch of personal and embarrassing activities like washing and changing

2

my clothes. I need to be able to trust them and rely upon them. I am nervous about this because I have been abused before.

11. I also want to be able to choose my food provider. I want a variety of nutritious meals that do not aggravate my acid reflux. I do not want to live on fast food-type meals. While I am not receiving them now, I was receiving two meals per day from a company that seemed to give meals to older people. The meals were like mush. I'm sure there are other companies out there that provide meals.

12. I have not been provided with a directory of service providers.

13. I mentioned in a previous declaration that I want to attend a job training program. I want to work with kids in a daycare.

14. I would also like to go to college and become a pediatrician.

15. In the meantime, I would like to have job training and work in a daycare. I used to volunteer at a daycare and really enjoyed working with kids.

16. I've talked with my service coordinator about getting job training and going to college. I thought she was going to help me with those things.

17. I want to learn life skills such as cooking, grocery shopping, looking for an apartment, accessing benefits and managing money.

3

18.    I also want to learn personal care skills to become more independent.  For example, I want physical and occupational therapy so I can use my hands and legs more.  I want to be able to toilet and care for myself more independently.

19.    I talked to my service coordinator about wanting to learn skills so I can care for myself and live more independently.  I thought she was going to help me with that.

20.    I do not know whether some or all of these and other services I need and want were recorded properly or if they were supposed to be recorded in a document.

21.    While I was living at my friend's house, I did not have access to the kitchen because there was no wheelchair accessible way for me to get into the kitchen.

22.    The first hotel I lived in after moving out of my friend's house on July 2, 2020 had a kitchenette.  I was able to cook eggs with my aide.  This was very exciting for me and I was very proud of myself.  If I can continue to live in the community with appropriate services and supports, I know I can learn the skills I need to become even more independent.

4

23.     I am currently receiving some basic services pursuant to the Court's temporary restraining order in a hotel, but I know that expires next week.

24.     I have not been provided with the services I need through DHS's Medicaid plan and Community HealthChoices waiver to live in the community.

25.     I am afraid I will end up in an institution or homeless.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this ___11___ day of ___July___, 2020

_____
Miranda Doxzon

5