UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MIRANDA DOXZON, | : | **1:20-CV-00236** |
| | : | |
| Plaintiff, | : | (Chief Magistrate Judge Schwab) |
| | : | |
| v. | : | |
| | : | |
| DEPARTMENT OF HUMAN | : | |
| SERVICES OF THE | : | |
| COMMONWEALTH OF | : | |
| PENNSYLVANIA, *et al.*, | : | |
| | : | |
| Defendants. | : | |

**MEMORANDUM OPINION AND ORDER**
July 15, 2020

## I. Introduction.

Currently pending is the plaintiff Miranda Doxzon's motion for a preliminary injunction. For the reasons that follow, we will grant that motion.

## II. Background and Procedural History.

Doxzon is 21 years old. *Doc. 62* (Joint Statement) at ¶ 2. She has cerebral palsy, depression, and epilepsy, and she requires a motorized wheelchair for mobility. *Id*. at ¶¶ 3, 4. She also requires a Hoyer lift for transferring into and out of her wheelchair. *Id*. at ¶ 5. Doxzon needs assistance with activities of daily

living, such as transferring to the toilet and shower and to her bed, meal preparation, cooking, dressing, cleaning, transportation, and doing laundry. *Id*. at ¶ 12.  And due to her epilepsy, she occasionally has seizures requiring an aide to call 9-1-1 and place her on her side until help arrives. *Id*. at ¶ 13.

Doxzon is enrolled in Medical Assistance, which is also known as Medicaid. *Id*. at ¶ 6.  She is enrolled in the Pennsylvania Department of Human Services' Community HealthChoices ("CHC") waiver program. *Id*. at ¶ 7.  She was enrolled in the CHC waiver program on November 4, 2019. *Id*. at ¶ 8.  DHS administers the CHC waiver program, which provides long-term, community-based supports and services for individuals who are at least 21 years old and have been determined to need the level of care offered in a nursing facility, but who wish to remain in the community. *Id*. at ¶¶ 9, 10.  DHS is a recipient of federal financial assistance in connection with its CHC waiver program. *Id*. at ¶ 11.

From June 2018, until December 18, 2019, Doxzon was living in the community in an apartment and with services provided by Spectrum Community Services, Inc. *Id*. at ¶ 14.  On December 18, 2019, Doxzon was taken to Inglis House, a skilled nursing care facility with capacity to house 252 adults who range in age from 20 to 90 and have an average age of 47. *Id*. at ¶¶ 15, 16.

Ms. Doxzon testified that she did not like living at Inglis House, and she told everyone that she wanted to live in the community.  She was not, however, given

options that would allow her to live in the community.  She became suicidal at Inglis House, and she was hospitalized several times.  After one hospitalization, instead of returning to Inglis House, Doxzon moved into a friend's basement. Although her friend's house needed modifications to make it accessible to her and she needed services to support her living at her friend's house, those modifications and not all those supports were provided. *See doc. 18-3* (Doxzon Decl.) at ¶¶ 26–28.  This made it untenable for Doxzon to continue to live at her friend's house. *Id.* at ¶ 26; doc. 36-3 (Burell Decl.) at ¶ 18.

Ms. Doxzon was admitted to the hospital on June 29, 2020. *Doc. 62* (Joint Statement) at ¶ 17.  After Doxzon was admitted to the hospital, Doxzon's friend told her could she not return to her home. *Id.* at ¶ 18.

In this case, Doxzon brings claims under the Americans with Disabilities Act ("ADA"), the Rehabilitation Act ("RA"), and Title XIX of the Medicaid Act. The defendants are the Department of Human Services of the Commonwealth of Pennsylvania ("DHS"); Teresa D. Miller, the Secretary of DHS; and Kevin Hancock, the Deputy Secretary of DHS's Office of Long-Term Living.  Defendant Miller is sued in her official capacity and her individual capacity, and defendant Hancock is sued in his individual capacity.

Doxzon alleges that the defendants failed to plan for her transition from the child welfare system to independent living, and as a result she was placed in a

3

nursing home.  And, according to Doxzon, because the defendants failed to provide her with the services and supports to which she is entitled to under the CHC waiver, she is at serious risk of re-institutionalization.

On April 27, 2020, Doxzon filed a motion for a preliminary injunction and a brief in support of that motion.  The parties subsequently consented to proceed before a magistrate judge pursuant to 28 U.S.C. § 636(c), and the case was referred to the undersigned.

During a conference with court and at the court's suggestion, the parties agreed to meet and confer about the proper placement for Doxzon.  We treated the discussions between the parties and with the court as settlement discussions, and given those settlement discussions, we stayed further briefing on the motion for a preliminary injunction.[1]

On June 30, 2020, we were informed that Doxzon was at the hospital and about to be released with nowhere to go.  We had a conference call with the parties to try to work out that issue, but we were unable to do so.  On July 1, 2020, Doxzon filed a motion for a temporary restraining order ("TRO") and a brief in support of that motion asserting that she was at imminent risk of re-institutionalization or homelessness because her friend would no longer allow her

---

[1]  We also stayed further briefing on the defendants' motion to dismiss the complaint, and later we did the same as to the defendants' motion to dismiss the amended complaint.

4

stay in her basement.  Although the defendants received notice of the motion for a

TRO, given the emergency nature of Doxzon's situation, there was not time for the

defendants to brief the issues or for the court to hold a hearing.  And after

concluding that Doxzon met the requirements for a TRO, on July 1, 2020, at 8:43

p.m., we granted her motion and entered a TRO requiring the following:

> 1.  By 5:00 p.m. July 2, 2020, Defendant DHS and Defendant Miller shall provide Plaintiff Miranda Doxzon with round-the-clock aide services in a safe, wheelchair accessible, community-based location acceptable to Ms. Doxzon in the Philadelphia area.
>
> 2.  By 5:00 p.m. July 2, 2020, Defendants shall transport Ms. Doxzon to the location.
>
> 3.  By 3:00 p.m. July 2, 2020, Defendants' counsel shall advise Ms. Doxzon's counsel as to the name and address of the location, the names of the personal assistants who will provide her with personal assistant services.
>
> 4.  Under no circumstances shall Ms. Doxzon be sent to a congregate care setting, including a nursing facility, shelter or other facility or institution that has multiple people in a single bedroom.
>
> 5.  In addition to the aides, Defendants shall ensure that all requested transportation and adequate food is available to Ms. Doxzon during this temporary placement.

*Doc. 38* at 1-2.  The TRO provides that it "shall expire 14 days after it is entered,

unless before that time the Court, for good cause, extends the Order." *Id*. at 2.  We

also scheduled a telephone status conference with the parties for July 6, 2020, at

9:00 a.m., and we ordered the defendants to respond to Doxzon's most recent settlement demand before then. *Doc. 37* at 4.

The following day, July 2, 2020, we lifted the stay on briefing as to the motion for a preliminary injunction.  Also on July 2, 2020, the defendants appealed the issuance of the TRO to the United States Court of Appeals for the Third Circuit.  They also motioned us to stay the TRO.  We scheduled a hearing (by videoconference) on that motion to stay for July 7, 2020.

During the telephone conference on July 6, 2020, we were informed that Doxzon had been moved to a hotel and the defendants were endeavoring to provide the services and supports to comply with the TRO.  Later on July 6, 2020, the defendants withdrew their motion to stay the TRO, asserting that "Adult Protective Services ("APS") conducted an investigation and determined that Plaintiff met the criteria for need under 35 P.S. §§ 10210.302 and 10210.303," and "APS has since placed [Doxzon] in a hotel." *Doc. 47* at ¶¶ 4, 5.

The parties finished briefing the motion for a preliminary injunction, and we held a hearing on the motion for a preliminary injunction on July 14, 2020.  At that hearing, Doxzon testified as did Randolph Nolen, who is employed by DHS as a director in the Bureau of Coordinated and Integrated Services, Office of Long-Term Living.  Based on the evidence presented and the briefs and arguments of the parties, we will grant Doxzon's motion for a preliminary injunction.

### III.  Preliminary Injunction Standards.

Federal Rule of Civil Procedure 65 governs temporary restraining orders and preliminary injunctions.  The standard for deciding motions for temporary restraining orders and motions for preliminary injunctions are generally the same.  "The difference is that a TRO may be issued with little or no notice and may dissolve on its own accord." *Ameriprise Fin. Servs., Inc. v. Koenig*, No. CIV.A. 11-6140-NLH, 2012 WL 379940, at \*4 (D.N.J. Feb. 6, 2012); Fed.R.Civ.P. 65(b) (providing that the court may issue a temporary restraining order "without written or oral notice to the adverse party" if certain conditions are met).  A motion for preliminary injunctive relief is judged against exacting legal standards.

Preliminary injunctive relief "is not granted as a matter of right." *Kershner v. Mazurkiewicz*, 670 F.2d 440, 443 (3d Cir. 1982).  Rather, it "is an 'extraordinary remedy.'" *Doe by & through Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518, 526 (3d Cir. 2018) (quoting *Kos Pharm., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004)).  A motion for such is properly granted only if such relief is the "only way of protecting the plaintiff from harm." *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 801 (3d Cir. 1989).  "It has been well stated that upon an application for a preliminary injunction to doubt is to deny." *Madison Square Garden Corp. v. Braddock*, 90 F.2d 924, 927 (3d Cir. 1937).

7

"When evaluating a motion for preliminary injunctive relief, a court considers four factors: (1) has the moving party established a reasonable likelihood of success on the merits (which need not be more likely than not); (2) is the movant more likely than not to suffer irreparable harm in the absence of preliminary relief; (3) does the balance of equities tip in its favor; and (4) is an injunction in the public interest?" *Fulton v. City of Philadelphia*, 922 F.3d 140, 152 (3d Cir. 2019).  "The first two factors are prerequisites for a movant to prevail." *Holland v. Rosen*, 895 F.3d 272, 286 (3d Cir. 2018).  "If these gateway factors are met, a court then considers the remaining two factors and determines in its sound discretion if all four factors, taken together, balance in favor of granting the requested preliminary relief." *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017).

Here, we conclude that Doxzon meets the requirements for a preliminary injunction.

## IV.  Discussion.

Before we address whether Doxzon is entitled to a preliminary injunction, we address the defendants' contention that this court lacks subject-matter jurisdiction.  Because Doxzon bring claims arising under federal statutes—the ADA, RA, and 42 U.S.C. § 1983—this court has federal question jurisdiction

under 28 U.S.C. § 1331 ("The district courts shall have original jurisdiction of all

civil actions arising under the Constitution, laws, or treaties of the United States.").

Although the defendants acknowledge that Doxzon brings claim under

federal statutes, they contend that she "does not get to frame [her] own claims."

*Doc. 54* at 5.  They are wrong.[2]  "[T]he question whether a claim 'arises under'

federal law must be determined by reference to the 'well-pleaded complaint.'"

*Merrell Dow Pharm. Inc. v. Thompson*, 478 U.S. 804, 808 (1986) (quoting

---

[2]  In support of their contention that a plaintiff does not get to frame her own claims, the defendants cite *Disability Rights New Jersey, Inc. v. Comm'r, New Jersey Dep't of Human Servs.*, 796 F.3d 293 (3d Cir. 2015).  That case concerned "whether mentally ill residents of New Jersey who have been committed to state custody are entitled to judicial process before they may be forcibly medicated in nonemergency situations." *Id*. at 294.  The plaintiff in that case brought constitutional claims as well as claims under the ADA and RA. *Id*. at 297.  As to the ADA claim, the plaintiff was not clear as to what "service, program, or activity" it was contending was at issue, and the court noted that "[w]here, as here, a party clearly articulates the remedy sought but offers shifting or perhaps ambiguous indications as to the corresponding service, program, or activity, we can (and should) infer from that remedy the true identity of the service, program, or activity." *Id*. at 304.  It is this quote that the defendants cite in support of their contention that the plaintiff does not get to frame her claims.  But *Disability Rights New Jersey* does not stand for the proposition cited by the defendants.  Rather, the court merely recognized that "[a] party's confusion over the contours of its own claim (whether inadvertent or strategic) does not excuse a court from construing it." *Id*.  *Disability Rights New Jersey* does not stand for the proposition that a plaintiff does not get to frame her claims.  Here, although Doxzon's claims are complex, she alleges that she was denied numerous services to which she allegedly was entitled.  Although the precise relief that Doxzon requests has evolved given her changed circumstances and the issuance of the TRO, she has not presented shifting articulations of her claims.  Further, even if she had, that would go to the merits of her claims, not to whether the court has subject-matter jurisdiction.

*Franchise Tax Bd. of State of Cal. v. Constr. Laborers Vacation Tr. for S. California,* 463 U.S. 1, 9-10 (1983)).  Thus, a plaintiff does get to frame her own claims.

Further, "the absence of a valid (as opposed to arguable) cause of action does not implicate subject-matter jurisdiction, *i.e.,* the court's statutory or constitutional *power* to adjudicate the case." *Steel Co. v. Citizens for a Better Environment,* 523 U.S. 83, 89 (1998) (emphasis in original).  Subject-matter jurisdiction is not defeated by the possibility that the averments of the complaint might fail to state a cause of action on which the plaintiff could actually recover. *Id.*  "Dismissal for lack of subject-matter jurisdiction because of the inadequacy of the federal claim is proper only when the claim is 'so insubstantial, implausible, foreclosed by prior decisions of this Court, or otherwise completely devoid of merit as not to involve a federal controversy.' " *Id.* (quoting *Oneida Indian Nation of N.Y. v. County of Oneida,* 414 U.S. 661, 666 (1974)).

Here, although there may be arguments to be made that the complaint does not state a claim upon which relief can be granted or that Doxzon has not shown a likelihood of success on the merits, Doxzon has raised at least arguable claims under the ADA and the RA.[3]

---

[3]  In suggesting otherwise, the defendants rely on a footnote from *Disability Rights New Jersey,* 796 F.3d at 306 n.5.  There, the Third Circuit concluded that "a Title II claim must allege that a disabled person has been denied some benefit that a

10

As to Doxzon's 42 U.S.C. § 1983 claims, defendant Miller[4] contends that
because the services that Doxzon seeks—residential habilitation or housing
services[5]—are not in her written service plan with Keystone First, her request that
the court order such services does not raise a federal issue.  In support of that
argument, Miller cites the following passage from *Solter v. Health Partners of
Philadelphia, Inc.*, 215 F. Supp. 2d 533 (E.D. Pa. 2002):

> [T]he Medicaid Act actually mandates that the participating
> states create a voluntary administrative process whereby
> beneficiaries may seek redress for an allegedly wrongful
> withholding of benefits. *See* 42 C.F.R. § 438.228 (mandating
> that each participating state ensure that all Medicaid managed
> care organizations have a grievance system in effect).  This
> mandate is evidence that Congress anticipated that the states
> would provide the remedy for vindication of the guidelines and
> waiver provisions of the Medicaid Act.  In other words, there is

---

public entity has extended to nondisabled people," and it noted that excusing that
requirement "could improperly transform the ADA from an antidiscrimination
statute into a law regulating the quality of care the States provide to the disabled."
*Id*. at 306, 306 n.5.  Although the defendants suggest that Doxzon's claims are
about the quality of care that she received, they are not.  Rather, Doxzon's ADA
(and RA) claims are based on her facing unnecessary institutionalization, and she
relies, at least in part, on the integration mandate, which the Third Circuit in
*Disability Rights New Jersey* specifically noted was an exception to the rule it set
forth and was not at issue in that case. *Id*. at 305 n.4.

[4]  In her reply brief, Doxzon makes clear that she is seeking injunctive relief under
§ 1983 against only defendant Miller in her official capacity. *Doc. 61* at 36, 36
n.15.  Thus, we refer here to only defendant Miller.

[5]  The defendants contend that residential habilitation and housing services is what
this case is about. *Doc. 54* at 5.  While the case is about those things, it is also
about other services to which Doxzon contends she is entitled.

a remedy available to plaintiffs for the wrong they allege in a
state-created forum, rather than in federal court.

*Id*. at 539.

Defendant Miller's reliance on *Solter* is misplaced as *Solter* is not analogous

to this case.  In *Solter*, Ms. Solter was a Medicaid recipient enrolled in a managed

care organization administered by Health Partners of Philadelphia, Inc. *Id*. at 534.

After Health Partners, through its agent, denied authorization for a dental

procedure for Ms. Solter, Ms. Solter and her husband filed an action in state court

against Health Partners and its agent raising claims of negligence, recklessness,

and breach of contract. *Id*. at 533–34.  The defendants removed the case from state

court to federal court. *Id*. at 534.  Rejecting the defendants' argument that the

Solters' claims arose under federal law—specifically the Medicaid Act—the court

in *Solter* granted the Solters' motion to remand the case to state court. *Id*. at 535–

40.  Here, unlike in *Solter*, Doxzon is not suing a managed care organization.

Rather, she is suing defendant Miller, a state official, under 42 U.S.C. § 1983.

Defendant Miller relies on *Solter* for the proposition that because there is an

administrative process for challenging an allegedly wrongful withholding of

benefits, 42 U.S.C. § 1983 cannot be used to enforce the Medicaid Act provisions

at issue in this case—42 U.S.C. § 1396a(a)(10) (the "entitlement mandate") and 42

U.S.C. §1396a(a)(8) (the "reasonable promptness mandate").  But that argument is

foreclosed by precedent from the United States Court of Appeals for the Third

12

Circuit.  In *Sabree ex rel. Sabree v. Richman*, 367 F.3d 180, 183 (3d Cir. 2004), a

decision that postdates *Solter*, the Third Circuit held that §§ 1396a(a)(10) and

1396a(a)(8) "unambiguously confer rights vindicable under § 1983."[6]  And the

court in *Sabree* concluded that §§ 1396a(a)(10) and 1396a(a)(8) could be enforced

through 42 U.S.C. § 1983 even though "Title XIX does allow for a state

administrative hearing." *Id*. at 193 (footnote citing § 1396a(a)(3) omitted).

Concluding that the administrative remedy process set forth in § 1396(a)(3) fell

short of the comprehensive enforcement schemes at issue in cases where the

Supreme Court found a remedial scheme sufficiently comprehensive to

demonstrate that Congress intended to preclude individual suits, the Third Circuit

observed that "'[a] plaintiff's ability to invoke § 1983 cannot be defeated simply

by "the availability of administrative mechanisms to protect the plaintiff's

interests."'" *Id*. (quoting *Blessing v. Freestone*, 520 U.S. 329, 347 (1997) (in turn

quoting *Golden State Transit Corp. v. City of Los Angeles*, 493 U.S. 103, 106

(1989)) and citing *Wilder v. Virginia Hosp. Ass'n*, 496 U.S. 498, 523 (1990) ("The

availability of state administrative procedures ordinarily does not foreclose resort

to § 1983.")).

---

[6] *Sabree* also addressed 42 U.S.C. § 1396d(a)(15), a provision not at issue in the instant case.

The administrative remedy provision cited by *Sabree* was 42 U.S.C. § 1396a(a)(3), which provides that "[a] State plan for medical assistance must . . . provide for granting an opportunity for a fair hearing before the State agency to any individual whose claim for medical assistance under the plan is denied or is not acted upon with reasonable promptness."  Here, defendant Miller cites a different provision—42 U.S.C.A. § 1396u-2(b)(4), which provides: "Each medicaid managed care organization shall establish an internal grievance procedure under which an enrollee who is eligible for medical assistance under the State plan under this subchapter, or a provider on behalf of such an enrollee, may challenge the denial of coverage of or payment for such assistance."  Although the defendant cites a different administrative-remedy provision than that at issue in *Sabree*, like in *Sabree* there has been no showing that the administrative-remedy provision at issue here (§ 1396u-2(b)(4)) is the sort of comprehensive enforcement scheme that demonstrates that Congress intended to preclude suits under 42 U.S.C. § 1983.  "'[T]he burden to demonstrate that Congress has expressly withdrawn the remedy is on the defendant,' and [] a court should 'not lightly conclude that Congress intended to preclude reliance on § 1983 as a remedy' for deprivation of an unambiguously conferred right." *Sabree*, 367 F.3d at 193 (quoting *Golden State Transit Corp.*, 493 U.S. at 107).  And to repeat the observation by the Third Circuit in *Sabree,* "'[a] plaintiff's ability to invoke § 1983 cannot be defeated simply by

14

"the availability of administrative mechanisms to protect the plaintiff's interests."'" *Id.* (quoting *Blessing*, 520 U.S. at 347 (in turn quoting *Golden State Transit Corp.*, 493 U.S. at 106) and citing *Wilder,* 496 U.S. at 523 ("The availability of state administrative procedures ordinarily does not foreclose resort to § 1983.")).  Here, defendant Miller has not shown that the administrative-remedy provision at issue demonstrates that Congress intended to preclude suits under 42 U.S.C. § 1983.  In fact, the defendant has not even made such an argument.  Rather, she merely cites to *Solter*, which as discussed above is not apposite and did not even involve 42 U.S.C. § 1983 and which is at odds with the analysis set forth in *Sabree*.

That a 42 U.S.C. § 1983 claim can be maintained for an alleged violation of the "entitlement mandate" and the "reasonable promptness" mandate, and, thus, this court has subject-matter jurisdiction, is further reinforced by *S.R. by & through Rosenbauer v. Pennsylvania Dep't of Human Servs.*, 309 F. Supp. 3d 250, 258 (M.D. Pa. 2018), a case in which [now Chief] Judge Jones rejected the argument that a case decided after *Sabree* undermined the reasoning of and required reconsideration of *Sabree*'s holdings.  Specifically, Judge Jones analyzed *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 328-32, (2015), a case in which the Court concluded that Medicaid providers cannot sue to enforce 42 U.S.C. § 1396a(a)(30)(A) of the Medicaid Act.   He concluded that "[t]he

reasoning of *Armstrong* is not at odds with *Sabree* because of the distinguishing characteristics of the provisions involved." *S.R.*, 309 F. Supp. 3d at 259.  "The entitlement [§1396a(a)(10)] and reasonable promptness [1396a(a)(8)] mandates are far more individual-focused and do not present the 'judicially unadministrable nature' of Section 30(A)." *Id*. (quoting *Armstrong*, 575 U.S. at 328).  We agree with Judge Jones's reasoning, and as did Judge Jones, we conclude that "[w]e are bound to follow Third Circuit precedent, and *Sabree* has conclusively held that Sections 1396a(a)(10)(A) and 1396a(a)(8) confer privately enforceable rights upon individuals." *Id*.

Further, although defendant Miller contends that because Doxzon's written service plan does not include residential habilitation or housing services, she does not raise a federal claim, the defendant cites no case in support of that assertion other than *Solter*, which as set forth above is inapposite.[7]

In sum, Doxzon brings arguable claims arising under the ADA, the RA, and § 1983.  Thus, we have subject-matter jurisdiction.

---

[7] Defendant Miller also cites *Solter* in connection with her argument that the federal government waived the "entitlement" and "reasonable promptness" mandates in approving the CHC waiver at issue in this case. *See doc. 60* at 3.  We address that argument in connection with the discussion of whether Doxzon has a reasonable likelihood of success on the merits.

**A.  Doxzon has a reasonable likelihood of success on the merits as to at least some of her claims.[8]**

### 1.  42 U.S.C. § 1983.

Title XIX of the Medicaid Act requires, among other things, that "a state plan for medical assistance 'provide for making medical assistance available' to a long list of eligible categories of individuals." *S.R.*, 309 F. Supp. 3d at 256. (quoting 42 U.S.C. §1396a(a)(10)(A)).  It also "requires a state plan for medical assistance to 'provide that all individuals wishing to make application for medical assistance under the plan shall have the opportunity to do so, and that such assistance shall be furnished with reasonable promptness to all eligible individuals.'" *Id*. (quoting 42 U.S.C. 1396a(a)(8)).  As already discussed, these mandates are privately enforceable under 42 U.S.C. § 1983. *Id*. at 259.

Defendant Miller contends that the federal government has waived the requirements of 42 U.S.C. § 1396a as to the CHC waiver, and, therefore, the "entitlement" and "reasonable promptness" mandates of § 1396a(a)(10)(A) and § 1396a(a)(8) do not apply here.  Pennsylvania's Community HealthChoices is governed by both a managed care waiver and a home and community-based services ("HCBS") waiver:

---

[8]  Although Doxzon asks for compensatory damages as well as injunctive relief in her amended complaint, damages are not at issue in connection with the motion for a preliminary injunction.

> The Commonwealth operates this §1915(c) waiver application
> concurrently with a §1915(b) waiver application to implement
> Community HealthChoices (CHC). . . . CHC is Pennsylvania's
> managed long-term services and supports initiative. The
> 1915(b)/1915(c) concurrent waivers allow the Commonwealth
> to require Medicaid beneficiaries to receive nursing facility,
> hospice, home and community-based services (HCBS),
> behavioral health, and physical health services through
> managed care organizations (MCOs) selected by the state
> through a competitive procurement process.

*Plaintiff's Exhibit 11* at 4.  42 U.S.C.A. § 1396n(c)(3), which covers the HCBS

waiver services at issue in this case, provides that a waiver granted under

§ 1396n(c)(1) "may include a waiver of the requirements of section 1396a(a)(1) of

this title (relating to statewideness), section 1396a(a)(10)(B) of this title (relating to

comparability), and section 1396a(a)(10)(C)(i)(III) of this title (relating to income

and resource rules applicable in the community)."  But the "entitlement" and

"reasonable promptness" mandates are not among those requirements listed that

can be waived.  Further, the HCBS waiver does not indicate that the "entitlement"

and "reasonable promptness" mandates were waived. *See Plaintiff's Exhibit 11* at 6

(listing provisions waived but not including the "entitlement" and "reasonable

promptness" mandates among those listed).  Moreover, neither does the managed

care waiver cited by defendant Miller show that the "entitlement" and "reasonable

promptness" mandates were requested to be waived or were waived. *See Doc. 60-1*

(titled "Section 1915(b) Waiver Proposal For MCO, PIHP Programs And FFS

Selective Contracting Programs.").  Thus, we reject defendant Miller's argument

18

that the "entitlement" and "reasonable promptness" mandates of § 1396a(a)(10)(A) and § 1396a(a)(8) do not apply here.

Defendant Miller also contends that under the CHC waiver, the managed care organizations ("MCOs") are accountable for the services provided under the waiver and are responsible for complying with applicable "rules, regulations, and Bulletins . . . ." *Doc. 60* at 4 (citing *doc. 60-2* ("2020 COMMUNITY HEALTHCHOICES AGREEMENT") at 32).  She also asserts that Doxzon's MCO "has certified that it will comply with the entitlement and reasonable promptness mandates." *Id.*  To the extent defendant Miller is suggesting that because the MCO is responsible for providing services to Doxzon, DHS is relieved of its responsibility to Doxzon, we disagree.

As Doxzon points out, federal regulations require a state to "ensure that all services covered under the State plan are available and accessible to enrollees of MCOs," and  to "ensure, through its contracts, that each MCO . . . consistent with the scope of its contracted services, . . . [m]aintains and monitors a network of appropriate providers that is supported by written agreements and is sufficient to provide adequate access to all services covered under the contract for all enrollees, including those with limited English proficiency or physical or mental disabilities." 42 C.F.R. § 438.206(a) and § 438.206(b)(1).  Mr. Nolen affirmed in his testimony that DHS is so required.

Further, Doxzon has pointed to cases that reject the suggestion that a state escapes responsibility by entering into an MCO contract. *See e.g. Katie A., ex rel. Ludin v. Los Angeles Cty.*, 481 F.3d 1150, 1159 (9th Cir. 2007) ("Even if a state delegates the responsibility to provide treatment to other entities such as local agencies or managed care organizations, the ultimate responsibility to ensure treatment remains with the state."); *A. H. R. v. Washington State Health Care Auth.*, No. C15-5701JLR, 2016 WL 98513, at *7 (W.D. Wash. Jan. 7, 2016) (observing that it is the state "not the MCOs, that bears the responsibility to ensure that the State Plan complies with federal law and that Plaintiffs received the required treatment"); *John B. v. Menke*, 176 F. Supp. 2d 786, 801–02 (M.D. Tenn. 2001) ("[T]he failure of State contractors to follow the federal requirements does not relieve the State Defendants of their responsibilities."). In sum, just because an MCO is responsible for providing services and complying with the "entitlement" and "reasonable promptness" mandates, does not mean that DHS is not also responsible. Thus, we reject defendant Miller's argument that DHS is not responsible for ensuring that services are provided in accordance with the "entitlement" and "reasonable promptness" mandates.

We also reject defendant Miller's contention that Doxzon does not have a reasonable likelihood of success on the merits of the 42 U.S.C. § 1983 claims against her because she was not personally involved in any decision regarding

20

Doxzon's CHC waiver services.  Personal involvement is not, however, required as

to claims for prospective injunctive relief for ongoing violations of federal law.

*Parkell v. Danberg*, 833 F.3d 313, 332 (3d Cir. 2016) ("Our conclusion that the

State Defendants lacked personal involvement in past constitutional violations does

not preclude Parkell from obtaining prospective injunctive relief for ongoing

violations.").  Rather, a plaintiff seeking prospective injunctive relief "is required

to name an official or officials 'who can appropriately respond to injunctive

relief.'" *Id*. (quoting *Hartmann v. California Dep't of Corr. & Rehab.*, 707 F.3d

1114, 1127 (9th Cir. 2013)).  Here, because we are addressing a motion seeking

prospective injunctive relief, personal involvement is not a requirement.  And there

is no basis to think that defendant Miller, the Secretary of DHS, cannot

appropriately implement any injunctive relief ordered by the court.

Defendant Miller correctly contends that room and board is not covered by

the CHC waiver.  42 U.S.C. § 1396n(c)(1), under which the waiver was, at least in

part, implemented provides, in pertinent part:

> The Secretary may by waiver provide that a State plan
> approved under this subchapter may include as "medical
> assistance" under such plan payment for part or all of the cost
> of home or community-based services (other than room and
> board) approved by the Secretary which are provided pursuant
> to a written plan of care to individuals with respect to whom
> there has been a determination that but for the provision of such
> services the individuals would require the level of care provided
> in a hospital or a nursing facility or intermediate care facility

for the mentally retarded the cost of which could be reimbursed
under the State plan.

42 U.S.C.A. § 1396n(c)(1).  And the waiver itself also explicitly excludes payment

for room and board. *See Plaintiff's Exhibit 11* at 93.  Further, Doxzon "does not

contend that the federal Medicaid Act requires Defendants to provide her with

"housing"—only residential habilitation and other services available in the

Waiver." *Doc. 61* at 24 n.12.

We note that we issued the TRO requiring the defendants to provide services

to Doxzon "in a safe, wheelchair accessible, community-based location" because

Doxzon was facing imminent homelessness or institutionalization because

although she had a home to live in (her friend's basement), she could no longer

live there because the failure to provide Doxzon with services and modifications in

a timely manner under the waiver made that living situation untenable and her

friend would no longer allow her stay there.

Defendant Miller also asserts that Doxzon is not entitled to residential

habilitation because it is not listed in her Person-Centered Service Plan ("PCSP").

Further, Miller asserts that Doxzon could, and should, have filed a grievance and

administrative appeal if she was not satisfied with the services listed in her PCSP.

The court understands Miller's point.  But here the most recent PCSP that is in the

record is the one completed in March 2020. *See Plaintiff's Exhibit 3*.  That service

plan indicates that its effective date is March 2, 2020, and that its end date is June

2, 2020. *Id*. at 1 (Bates No. KFCHC000039).  Further, that PCSP was completed when Doxzon was living in her friend's basement. *See id*. at 7 (Bates No. KFCHC000039).  In effect, there is no current PCSP for Doxzon that reflects her current situation.

In sum, Doxzon contends that she has not been provided with services and supports that she is eligible for under the CHC waiver program.  And based on the testimony provided and the exhibits submitted at the preliminary injunction hearing, we conclude that she has a reasonable likelihood of success on the merits of her 42 U.S.C. § 1983 claim for prospective injunctive relief.

## 2.  The ADA and RA.

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.  Similarly, Section 504 of the RA provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).  "With limited exceptions, the same legal principles govern ADA and RA claims."

*C.G. v. Pennsylvania Dep't of Educ.*, 734 F.3d 229, 235 (3d Cir. 2013) (footnote omitted).  Thus, we analyze the ADA and RA claims together under the rubric of the ADA.

To establish "a claim under Title II of the ADA, a person 'must demonstrate: (1) he is a qualified individual; (2) with a disability; (3) [who] was excluded from participation in or denied the benefits of the services, programs, or activities of a public entity, or was subjected to discrimination by any such entity; (4) by reason of his disability.'" *Haberle v. Troxell*, 885 F.3d 170, 178–79 (3d Cir. 2018) (quoting *Bowers v. Nat'l Collegiate Athletic Ass'n*, 475 F.3d 524, 553 n.32 (3d Cir. 2007)).  Here, there is no dispute that Doxzon satisfies the first two elements. *See doc. 62* (Joint Submission) at ¶ 1.  The defendants, however, contend that Doxzon has no evidence that they discriminated against her.  Thus, they are challenging the third and fourth elements.

Both the ADA and the RA prohibit "*discrimination* on the basis of disability without requiring exclusion *per se.*" *Chisolm v. McManimon,* 275 F.3d 315, 330 (3d Cir. 2001) (italics in original).  Further, the ADA and the RA are not limited to deliberate discrimination. *Helen L. v. DiDario,* 46 F.3d 325, 335 (3d Cir. 1995) ("[W]e will not eviscerate the ADA by conditioning its protections upon a finding of intentional or overt "discrimination.").  Rather, both the ADA and the RA require reasonable accommodations for the disabled. *Muhammad v. Court of*

24

*Common Pleas of Allegheny Cnty.,* 483 F. App'x 759, 763 (3d Cir. 2012) (stating that "a plaintiff can assert a failure to accommodate as an independent basis for liability under the ADA and RA").

In addition, the ADA and RA contain an integration mandate that requires that "[a] public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d); *see also* 28 C.F.R. 41.51(d) ("Recipients shall administer programs and activities in the most integrated setting appropriate to the needs of qualified handicapped persons."). "In short, where appropriate for the patient, both the ADA and the RA favor integrated, community-based treatment over institutionalization." *Frederick L. v. Dep't of Pub. Welfare of Com. of Pennsylvania*, 364 F.3d 487, 491–92 (3d Cir. 2004).

In *Helen L.*, the Third Circuit held that "the ADA and its attendant regulations clearly define unnecessary segregation as a form of illegal discrimination against the disabled." 46 F.3d at 333. And in *Olmstead v. L.C.*, the Supreme Court also so held. 527 U.S. 581, 597 (1999) ("Unjustified isolation, we hold, is properly regarded as discrimination based on disability."). The Supreme Court also recognized, however, that "[t]he State's responsibility, once it provides community-based treatment to qualified persons with disabilities is not boundless." *Id*. at 603. Rather, although "[a] public entity shall make reasonable modifications

in policies, practices, or procedures when the modifications are necessary to avoid

discrimination on the basis of disability," the public entity need not do so if it "can

demonstrate that making the modifications would fundamentally alter the nature of

the service, program, or activity." 28 C.F.R. § 35.130(b)(7)(i).  Given this

qualification, "unnecessary institutionalization only violates the ADA when the

following conditions are met:"[9]

> [1] the State's treatment professionals have determined that
> community placement is appropriate, [2] the transfer from
> institutional care to a less restrictive setting is not opposed by
> the affected individual, and [3] the placement can be reasonably
> accommodated, taking into account [a] the resources available
> to the State and [b] the needs of others with . . . disabilities.

*Frederick L.*, 364 F.3d at 492 (3d Cir. 2004) (quoting *Olmstead*, 527 U.S. at 587).

As to the first *Olmstead* requirement, the Supreme Court has observed that

"the State generally may rely on the reasonable assessments of its own

professionals in determining whether an individual 'meets the essential eligibility

requirements' for habilitation in a community-based program." *Olmstead*, 527 U.S.

at 602.  In so observing, the Court cited *Sch. Bd. of Nassau Cty., Fla. v. Arline*, 480

U.S. 273, 288 (1987), for the proposition that "[c]ourts normally should defer to

the reasonable medical judgments of public health officials." *Id.* (footnote

omitted).  And it noted that contrary to the dissent's assertion, it was not holding

---

[9]  We refer to these conditions as the *Olmstead* requirements.

"that the ADA imposes on the States a 'standard of care' for whatever medical services they render, or that the ADA requires States to 'provide a certain level of benefits to individuals with disabilities.'" *Id*. at 603 n. 14 (quoting *Id*. at 623–24 (Thomas, J., dissenting)).  The Supreme Court did "hold, however, that States must adhere to the ADA's nondiscrimination requirement with regard to the services they in fact provide." *Id*.

Here, the defendants contend that Doxzon's claims are "standard of care" and "level of benefits" type claims that the Supreme Court in *Olmstead* held were not cognizable.  *See doc. 54* at 16.  But the defendants misconstrue Doxzon's claims.  Doxzon is not claiming that the defendants violated a standard of care as to medical services that were provided to her.  Nor is she claiming that the defendants should provide benefits in addition to those that it already provides under the Medicaid Act and the CHC waiver.  Rather, she contends that she is eligible for numerous services that the defendants do provide but have not provided to her.  Having provided these services to some, the defendants "must provide them in accordance with the ADA's anti-discrimination mandate." *Haddad v. Arnold*, 784 F. Supp. 2d 1284, 1302 (M.D. Fla. 2010).  And here, given that Doxzon is eligible for and enrolled in the CHC waiver, absent a showing by the defendants that providing those services in the community, rather than a nursing

home, would result in a fundamental alteration of CHC waiver (which they have
not shown) that means providing those services in the community.

The defendants do not explicitly argue that Doxzon cannot meet the first
*Olmstead* requirement.  They suggest, however, that she cannot prevail because her
PCSP does not contain certain services.  But that Doxzon is appropriate for
community placement is reflected in the very fact that the she was found eligible
for and enrolled in the CHC waiver program.  Further, she previously lived in the
community with supports.  And, as set forth above, there is no current PCSP in the
record that reflects Doxzon's current situation and current needs.

As to the second *Olmstead* requirement, there is no question that Doxzon
wants to live in the community

That leaves that third *Olmstead* requirement, which is known as the
fundamental alteration defense. *Pennsylvania Prot. & Advocacy, Inc. v.
Pennsylvania Dep't of Pub. Welfare*, 402 F.3d 374, 379–80 (3d Cir. 2005) (stating
that the "third prong of this *Olmstead* test embodies the fundamental alteration
defense").  "[T]he state's available resources and responsibility to other
institutionalized mental health patients [are] primary considerations in evaluating a
fundamental-alteration defense." *Frederick L.*, 364 F.3d at 493.  "In assessing
these primary considerations, [the Third Circuit] noted:

> [F]actors that are relevant to the fundamental-alteration defense
> . . . includ[e] but [are] not limited to the state's ability to

> continue meeting the needs of other institutionalized . . .
> patients for whom community placement is not appropriate,
> whether the state has a waiting list for community placements,
> and whether the state has developed a comprehensive plan to
> move eligible patients into community care settings.

*Pennsylvania Prot. & Advocacy, Inc.*, 402 F.3d at 380 (quoting *Frederick L.*, 364

F.3d at 495). "Though clearly relevant, budgetary constraints alone are insufficient

to establish a fundamental alteration defense." *Id.*  And because "[*a*]*ny* program

that runs afoul of the integration mandate would be fundamentally altered if

brought into compliance," "[a] state cannot meet an allegation of noncompliance

simply by replying that compliance would be too costly or would otherwise

fundamentally alter its noncomplying programs." *Id*. at 381 (italics in original).

Otherwise, "the fundamental alteration defense would swallow the integration

mandate whole." *Id.*  "Instead, the only sensible reading of the integration mandate

consistent with the Court's *Olmstead* opinion allows for a fundamental alteration

defense only if the accused agency has developed and implemented a plan to come

into compliance with the ADA and RA." *Id.*

Here, to the extent the defendants are raising a fundamental alteration

defense, they have not established such a defense.  Mr. Nolen testified that more

than 450,000 people receive services under the CHC waiver program, and the

program would be unmanageable if everyone brought suit such as Doxzon had.

Such testimony is too general to establish a fundamental alteration defense.

29

In sum, because (prior to the TRO) Doxzon was not receiving the services to which she is entitled in a community setting, we conclude that she is likely to succeed on the merits of at least some of her claims under the ADA and RA.

### B. Doxzon would likely suffer irreparable injury if the court does not grant a preliminary injunction.

Without the services and supports to which she is eligible under the CHC waiver, Doxzon cannot live in the community.  And the defendants are not providing her with those services and supports.  Thus, she faces imminent institutionalization.  And unwarranted institutionalization represents irreparable injury.  Further, the last time that Doxzon was in a nursing home, she because depressed and suicidal.  This reinforces the fact that she faces irreparable injury if she is institutionalized. *See Haddad v. Arnold*, 784 F. Supp. 2d 1284, 1307 (M.D. Fla. 2010) ("Plaintiff clearly established that she is at risk of irreparable injury if required to enter a nursing home.").  The risk of irreparable injury is further exacerbated considering the dangers of COVID-19 in nursing homes.

In sum, Doxzon is likely to suffer irreparable harm if this court does not issue a preliminary injunction.

**C.  The balance of the equities and the public interest weigh in favor of a preliminary injunction.**

Further, we conclude that any harm the defendants would suffer if the court issues a preliminary injunction would not outweigh the harm if Doxzon were not provided with the services and supports to which she is entitled under CMC waiver, the ADA, and the RA.  It is in the public interest that Doxzon not be unnecessarily institutionalized when she is eligible and enrolled in the CHC waiver, which purpose is to provide services in the community.

**D.  Security is waived.**

Federal Rule of Civil Procedure 65(c) provides that "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  But "[a] district court may waive the bond requirement under Federal Rule of Civil Procedure 65(c) under certain circumstances." *Drenth v. Boockvar*, No. 1:20-CV-00829, 2020 WL 2745729, at *7 (M.D. Pa. May 27, 2020).  "When considering whether to waive the bond requirement, a court should consider (1) 'the possible loss to the enjoined party together with the hardship that a bond requirement would impose on the applicant'; and (2) 'the impact that a bond requirement would have

on enforcement' of an important federal right." *Id*. (quoting *Temple Univ. v. White*, 941 F.2d 201, 220 (3d Cir. 1991)).

Here, the preliminary injunction will impose requirements on the defendants that will cost money. But those costs are outweighed by the hardship a bond requirement would impose on Doxzon, a Medicaid recipient who cannot post a meaningful bond. Further, this case implicates important federal civil rights under 42 U.S.C. § 1983, the ADA, and the RA.

## V.  Conclusion.

Based on Doxzon's motion for a preliminary injunction, the briefs and arguments of the parties, and the evidence presented at the hearing, **IT IS ORDERED** that Doxzon's motion for a preliminary injunction is **GRANTED**.  A preliminary injunction shall issue as follows:

1.  As soon as practicable, but not later than July 22, 2020, the defendants shall ensure that Keystone First conducts a new, comprehensive assessment of Ms. Doxzon and establishes a new, comprehensive Person-Center Service Plan for her that includes all the services and supports under the CHC waiver which she wants and to which she is entitled.  Ms. Doxzon's counsel shall be present at that

assessment.  Counsel for the defendants and for Keystone First may also be present for that assessment, if they want.

2.   On or before July 30, 2020, the parties shall inform the court whether this process has resulted in a Person-Center Service Plan and an appropriate placement for Ms. Doxzon.

3.   Unless and until the above process is complete and the court lifts the preliminary injunction, the defendants shall continue to ensure that Doxzon is provided with round-the-clock aide services in a safe, wheelchair accessible, community-based location acceptable to Ms. Doxzon in the Philadelphia area. Under no circumstances shall Ms. Doxzon be sent to a congregate care setting, including a nursing facility, shelter or other facility or institution that has multiple people in a single bedroom.  In addition to the aides, the defendants shall ensure that Ms. Doxzon is provided with all necessary medical equipment (including, but not limited to, her wheelchair, appropriate hospital bed, and lift), adequate food, medications, supplies (including, but not limited to, diapers, wipes, and chux pads), and all reasonably requested transportation during her temporary placement.

.

*S/Susan E. Schwab*
Susan E. Schwab
Chief United States Magistrate Judge